## 18 Pa.C.S.A. § 5107

### CRIMES AND OFFENSES

### § 5107. Aiding consummation of crime

#### Official Comment—1972

This section is derived from Section 242.4 of the Model Penal Code. There is no similar provision in existing law.

#### Research References

**ALR Library**

113 ALR 1179. What Amounts to Conviction or Satisfied Requirement as to Showing of Conviction, Within Statute Making Conviction a Ground for Refusing to Grant or for Canceling License or Special Privilege.

**Encyclopedias**

Summary Pa. Jur. 2d Criminal Law § 6:2, Aiders and Abettors.

Summary Pa. Jur. 2d Criminal Law § 18:54, Aiding Consummation of Crime.

**Treatises and Practice Aids**

2 Substantive Criminal Law § 13:6, Post-Crime Aid: Accessory After the Fact, Misprision and Compounding.

14 West's Pennsylvania Practice A460, Aiding Consummation of Crime.

### § 5108. Compounding

#### Official Comment—1972

This section is derived from Section 242.5 of the Model Penal Code.

Under existing statutory law the crime of compounding is limited to certain specified crimes such as treason, felony, murder, larceny, etc. The Penal Code of 1939, § 907 (18 P.S. § 4907). Rule 315 of the Pennsylvania Rules of Criminal Procedure authorizes the court to approve settlement of offenses not alleged to have been committed by force or violence or threat thereof, if the aggrieved party has a civil remedy and it appears that the public interest will not be materially affected.

This section also extends existing law to cover any offense, not just the more serious offenses.

**Penalty:** Reduced from 3 to 2 years.

#### Research References

**Encyclopedias**

Summary Pa. Jur. 2d Criminal Law § 18:55, Compounding.

**Treatises and Practice Aids**

2 Substantive Criminal Law § 13:6, Post-Crime Aid: Accessory After the Fact, Misprision and Compounding.

14 West's Pennsylvania Practice C760, Compounding.

### § 5109. Barratry

#### Official Comment—1972

This section retains existing law as contained in Section 306 of The Penal Code of 1939 (18 P.S. § 4306) without substantial change.

**Penalty:** Unchanged.

#### Research References

**Encyclopedias**

Summary Pa. Jur. 2d Criminal Law § 18:56, Barratry.

**Treatises and Practice Aids**

14 West's Pennsylvania Practice B90, Barratry.

### § 5110. Contempt of General Assembly

#### Official Comment—1972

This section is derived from Article II, Section 11 of the Pennsylvania Constitution, which authorizes each House to punish "persons for contempt or disorderly behavior in its presence..."

### CRIMES AND OFFENSES

### 18 Pa.C.S.A. § 5111

#### Research References

**Encyclopedias**

Summary Pa. Jur. 2d Criminal Law § 18:57, Contempt of General Assembly.

**Treatises and Practice Aids**

14 West's Pennsylvania Practice C1020, Contempt of General Assembly.

### § 5111. Dealing in proceeds of unlawful activities

(a) **Offense defined.**—A person commits a felony of the first degree if the person conducts a financial transaction under any of the following circumstances:

(1) With knowledge that the property involved represents the proceeds of unlawful activity, the person acts with the intent to promote the carrying on of the unlawful activity.

(2) With knowledge that the property involved represents the proceeds of unlawful activity and that the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of unlawful activity.

(3) To avoid a transaction reporting requirement under State or Federal law.

(b) **Penalty.**—Upon conviction of a violation under subsection (a), a person shall be sentenced to a fine of the greater of $100,000 or twice the value of the property involved in the transaction or to imprisonment for not more than 20 years, or both.

(c) **Civil penalty.**—A person who conducts or attempts to conduct a transaction described in subsection (a) is liable to the Commonwealth for a civil penalty of the greater of:

(1) the value of the property, funds or monetary instruments involved in the transaction; or

(2) $10,000.

(d) **Cumulative remedies.**—Any proceedings under this section shall be in addition to any other criminal penalties or forfeitures authorized under the State law.

(e) **Enforcement.**—

(1) The Attorney General shall have the power and duty to institute proceedings to recover the civil penalty provided under subsection (c) against any person liable to the Commonwealth for such a penalty.

(2) The district attorneys of the several counties shall have authority to investigate and to institute criminal proceedings for any violation of subsection (a).

(3) In addition to the authority conferred upon the Attorney General by the act of October 15, 1980 (P.L. 950, No. 164), known as the Commonwealth Attorneys Act, the Attorney General shall have the authority to investigate and to institute criminal proceedings for any violation of subsection (a) or any series of related violations involving more than one county of the Commonwealth or involving any county of the Commonwealth and another state. No person charged with a violation of subsection (a) by the Attorney General shall have standing to challenge the authority of the Attorney General to investigate or prosecute the case, and, if any such challenge is made, the challenge shall be dismissed and no relief shall be available in the courts of the Commonwealth to the person making the challenge.

(4) Nothing contained in this subsection shall be construed to limit the regulatory or investigative authority of any department or agency of the Commonwealth whose functions might relate to persons, enterprises or matters falling within the scope of this section.

(e.1) **Venue.**—An offense under subsection (a) may be deemed to have been committed where any element of unlawful activity or, of the offense under subsection (a) occurs.

(f) **Definitions.**—As used in this section, the following words and phrases shall have the meanings given to them in this subsection:

"Conducts." Includes initiating, concluding or participating in initiating or concluding a transaction.

"Financial institution." Any of the following:

(1) An insured bank as defined in section 3(h) of the Federal Deposit Insurance Act. (64 Stat. 873, 12 U.S.C. § 1813(h)).

## 18 Pa.C.S.A. § 5111 — CRIMES AND OFFENSES

(2) A commercial bank or trust company.

(3) A private banker.

(4) An agency or bank of a foreign bank in this Commonwealth.

(5) An insured institution as defined in section 401(a) of the National Housing Act (48 Stat. 1246, 12 U.S.C. § 1724(a)).

(6) A thrift institution.

(7) A broker or dealer registered with the Securities and Exchange Commission under the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.).

(8) A broker or dealer in securities or commodities.

(9) An investment banker or investment company.

(10) A currency exchange.

(11) An insurer, redeemer or cashier of travelers' checks, checks, money orders or similar instruments.

(12) An operator of a credit card system.

(13) An insurance company.

(14) A dealer in precious metals, stones or jewels.

(15) A pawnbroker.

(16) A loan or finance company.

(17) A travel agency.

(18) A licensed sender of money.

(19) A telegraph company.

(20) An agency of the Federal Government or of a state or local government carrying out a duty or power of a business described in this paragraph.

(21) Another business or agency carrying out a similar, related or substitute duty or power which the United States Secretary of the Treasury prescribes.

"Financial transaction." A transaction involving the movement of funds by wire or other means or involving one or more monetary instruments.

"Knowing that the property involved in a financial transaction represents the proceeds of unlawful activity." Knowing that the property involved in the transaction represents proceeds from some form, though not necessarily which form, of unlawful activity, regardless of whether or not the activity is specified in this section.

"Monetary instrument." Coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, money orders, investment securities in bearer form or otherwise in such form that title thereto passes upon delivery and negotiable instruments in bearer form or otherwise in such form that title thereto passes upon delivery.

"Transaction." Includes a purchase, sale, loan, pledge, gift, transfer, delivery or other disposition. With respect to a financial institution, the term includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit or other monetary instrument and any other payment, transfer or delivery by, through, or to a financial institution, by whatever means effected.

"Unlawful activity." Any activity graded a misdemeanor of the first degree or higher under Federal or State law. Amended 2002, June 28, P.L. 481, 1989, Dec. 22, P.L. 770, No. 108, § 1, imd. effective. No. 82, § 4, effective in 60 days.

1 71 P.S. § 732-101 et seq.

### Historical and Statutory Notes

**Act 2002-82 legislation**

Act 2002-82, § 4, rewrote subsec. (a), which prior thereto read:

"(a) Offense defined.—A person commits a felony of the first degree if the person, knowing that the property involved in a financial transaction represents the proceeds of unlawful activity, conducts a financial transaction which involves the proceeds of unlawful activity under any of the following circumstances:

"(1) With the intent to promote the carrying on of the unlawful activity.

"(2) Knowing that the transaction is designed in whole or in part:

"(i) to conceal or disguise nature, location, source, ownership or control of the proceeds of unlawful activity; or

## CRIMES AND OFFENSES — 18 Pa.C.S.A. § 511.

"(ii) to avoid a transaction reporting requirement under State or Federal law."; and added subsec. (e).

### Research References

**Encyclopedias**

Summary Pa. Jur. 2d Criminal Law § 18:58, Dealing in Proceeds of Unlawful Activities.

**Treatises and Practice Aids**

14 West's Pennsylvania Practice D130, Dealing in Proceeds of Unlawful Activities.

### Notes of Decisions

Drug dealing 2
Expert witnesses 3
Unlawful activity 1

**1. Unlawful activity**

Defendant who was convicted of, among other things, felony theft, committed offense which amounted to "unlawful activity" within meaning of statute prohibiting dealing in proceeds of unlawful activities. Com. v. Barnhart, 722 A.2d 1093, 1093. Super.1998, appeal denied 739 A.2d 539, 559 Pa. 672. Receiving Stolen Goods ⊜ 1

**2. Drug dealing**

Transacting in proceeds of illegal drug dealing is not required element of statute prohibiting dealing in proceeds of unlawful activities; statute presents explicit language which clearly defines unlawful activity as any felony of first-degree misdemeanor, and targets the dealing in proceeds derived from any of those various illegal activities. Com. v. Barnhart, 722 A.2d 1093, Super.1998, appeal denied 739 A.2d 539, 559 Pa. 672. United States ⊜ 34

**3. Expert witnesses**

Trial court did not abuse its discretion in excluding expert opinion testimony, by certified public accountant, that defendant could not have understood how to commit alleged crime under statute prohibiting dealing in proceeds of unlawful activity, where testimony would have resulted in confusing mix of fact and opinion on ultimate issue for which jury did not require expert's clarification. Com. v. Barnhart, 722 A.2d 1093, Super.1998, appeal denied 739 A.2d 539, 559 Pa. 672. Criminal Law ⊜ 470(2)

### § 5112. Obstructing emergency services

(a) Offense defined.—A person commits a misdemeanor of the third degree if he knowingly impedes, obstructs or interferes with emergency services personnel providing emergency medical services to an injured victim or performing rescue or firefighting activities.

(b) Definitions.—As used in this section, the following words and phrases shall have the meanings given to them in this subsection:

"Emergency medical services." The services utilized in responding to the needs of an individual for immediate medical care in order to prevent loss of life or the aggravation of physiological or psychological illness or injury.

"Emergency services personnel." A person, including a trained volunteer or a member of the armed forces of the United States or the National Guard, whose official or assigned responsibilities include performing or directly supporting the performance of emergency medical or rescue services or firefighting.

"Rescue." The act of extricating persons from entrapment or dangerous situations which pose the imminent threat of death or serious bodily injury.

1998, Dec. 21, P.L. 1240, No. 157, § 1, effective in 60 days.

### Research References

**Encyclopedias**

Summary Pa. Jur. 2d Criminal Law § 18:59, Obstructing Emergency Services.

# HEINONLINE

Citation: 2002 vol. I 486 2002



Content downloaded/printed from
HeinOnline (http://heinonline.org)
Wed Oct  2 10:36:29 2013

-- Your use of this HeinOnline PDF indicates your acceptance
   of HeinOnline's Terms and Conditions of the license
   agreement available at http://heinonline.org/HOL/License

-- The search text of this PDF is generated from
   uncorrected OCR text.

This material may be protected by copyright law (Title 17 U.S. code)

486  Act 2002-82    LAWS OF PENNSYLVANIA

(a) Falsely incriminating another.—[A] *Except as provided in subsection (c), a* person who knowingly gives false information to any law enforcement officer with intent to implicate another commits a misdemeanor of the second degree.

(b) Fictitious reports.—[A] *Except as provided in subsection (c), a* person commits a misdemeanor of the third degree if he:

  (1) reports to law enforcement authorities an offense or other incident within their concern knowing that it did not occur; or

  (2) pretends to furnish such authorities with information relating to an offense or incident when he knows he has no information relating to such offense or incident.

*(c) Grading.—If the violation of subsection (a) or (b) occurs during a declared state of emergency and the false report causes the resources of the law enforcement authority to be diverted from dealing with the declared state of emergency, the offense shall be graded one step greater than that set forth in the applicable subsection.*

Section 4. Section 5111(a) of Title 18 is amended and the section is amended by adding a subsection to read:

§ 5111. Dealing in proceeds of unlawful activities.

(a) Offense defined.—A person commits a felony of the first degree if the person[, **knowing that the property involved in a financial transaction** represents the proceeds of unlawful activity,] conducts a financial transaction [which involves the proceeds of unlawful activity] under any of the following circumstances:

  (1) With *knowledge that the property involved represents the proceeds of unlawful activity, the person acts with* the intent to promote the carrying on of the unlawful activity.

  (2) [Knowing] *With knowledge that the property involved represents the proceeds of unlawful activity and* that the transaction is designed in whole or in part[:

   (i)] to conceal or disguise *the* nature, location, source, ownership or control of the proceeds of unlawful activity[; or

   (ii) to avoid].

  *(3) To avoid* a transaction reporting requirement under State or Federal law.

  * * *

*(e.1) Venue.—An offense under subsection (a) may be deemed to have been committed where any element of unlawful activity or of the offense under subsection (a) occurs.*

  * * *

Section 5. Sections 5516, 5708(1) and 6105(b) of Title 18 are amended to read:

§ 5516. Facsimile [bombs] *weapons of mass destruction.*

(a) Offense defined.—A person commits an offense if the person *intentionally,* knowingly *or recklessly* manufactures, sells, purchases,

1
            COMMONWEALTH OF PENNSYLVANIA
              COUNTY OF LANCASTER

2
                 CRIMINAL

DEFENSE ATTORNEY

COPY

3

4

5
_____

                         :

6
COMMONWEALTH OF PENNSYLVANIA   :

                         :

7
         vs.            :   No. 5995-2006

                         :

8
LEVI L. STOLTZFOOS         :

_____:

9

10
                  JURY TRIAL

               VOLUME 1 OF 4

11

12
        Before:  Honorable Howard F. Knisely, Judge

13
        Date  :  Monday, May 5, 2008

14
        Place :  Courtroom No. 3

                 50 North Duke Street

15
                 Lancaster, Pennsylvania 17602

16

17

18
APPEARANCES:

19
    STEVAN K. PORTMAN, ESQUIRE

    ASSISTANT ATTORNEY GENERAL

20
       For - The Commonwealth

21
    JEFFREY A. CONRAD, ESQUIRE

    CLYMER & MUSSER

22
    408 West Chestnut Street

    Lancaster, Pennsylvania 17603

23
       For - The Defendant

24

25
ORDERED 5-16-08  LODGED _____  FILED _____

```
 1                          I N D E X

 2   Suppression Hearing

 3   WITNESS:           DIRECT    CROSS    REDIRECT    RECROSS

 4   Daniel Licklider     3         7        --          --

 5   Jonathan Heisse     14        18        20          --

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                       P R O C E E D I N G S

                         (10:00 a.m.)

              THE COURT:  This is the time and date for the

     trial of Levi L. Stoltzfoos, Number 5995-2006.  As I have

     met with counsel in chambers prior to opening court,

     we're going to proceed first with defense's motion to

     suppress.

              Mr. Portman, are you ready to proceed?

              MR. PORTMAN:  Yes, we are, Your Honor.

              THE COURT:  Please.

              MR. PORTMAN:  Call Detective Dan Licklider to

     the stand, Your Honor.

                        DANIEL O. LICKLIDER,
     called as a witness, having been duly sworn or affirmed,
              was examined and testified as follows:

              MR. CONRAD:  Your Honor, I would ask to

     sequester witnesses, obviously, sir.

                      DIRECT EXAMINATION

     BY MR. PORTMAN:

         Q.    Would you please state your name for the

     record?

         A.    Daniel O. Licklider.

         Q.    And by whom are you employed?

         A.    Commonwealth of Pennsylvania, Office of the

     Attorney General.

         Q.    In what capacity?
```

 1          A.    Narcotic Agent 3.

 2          Q.    And with respect to the case before us,

 3    Commonwealth versus Levi Stoltzfoos, are you the lead

 4    investigator on the case?

 5          A.    Yes, sir, I am.

 6          Q.    I'd like to direct your attention back to

 7    March of 2007.  Did you have an occasion to meet with

 8    Levi Stoltzfoos at the New Holland Borough Police

 9    Department?

10          A.    Yes, I did.  In 2006.

11          Q.    Two thousand six.  I'm sorry.

12                And is Levi Stoltzfoos in the courtroom

13    today?

14          A.    Yes, sir, he is.

15          Q.    Please identify him.

16          A.    He's to the left of defense counsel in the

17    long-sleeve blue shirt.

18                MR. PORTMAN:  Note for the record the

19    defendant's been identified.

20                THE COURT:  It shall be noted.

21    BY MR. PORTMAN:

22          Q.    With respect to your meeting with

23    Mr. Stoltzfoos in March of 2006, who initiated that

24    meeting?

25          A.    Mr. Stoltzfoos.

```
 1              Q.   And how did that contact take place?

 2              A.   The contact started on or about

 3    February 23rd.  Mr. Stoltzfoos would call the office on

 4    numerous occasions and that's how it was initiated.

 5              Q.   Do you recall about what time the meeting

 6    took place?

 7              A.   Yes.  The meeting took place on or about

 8    March 17th, 2006 at New Holland Police Department,

 9    borough office.

10              Q.   And was that in the morning, afternoon or

11    evening?

12              A.   I don't remember.  I don't recall.

13              Q.   Now, can you please describe the room in

14    which the meeting took place?

15              A.   Yeah.  The room was the -- it was the Council

16    Chambers room.

17              Q.   Okay.  And who was present for the meeting?

18              A.   Detective Jonathan Heisse from New Holland

19    Borough Police Department, myself and the prosecutor,

20    Stevan Kip Portman.

21              Q.   And did Mr. Stoltzfoos appear?

22              A.   Mr. Stoltzfoos appeared.  He come in through

23    the side door.

24              Q.   And to the best of your knowledge, where did

25    that side door lead to?
```

```
 1              A.   To the parking lot on the left.  As you face
 2    the building, it was on the left side.
 3              Q.   Now, were you present for the entire meeting?
 4              A.   Yes, sir.
 5              Q.   And at any time was the defendant in custody?
 6              A.   No, sir.
 7              Q.   Were there any uniform police officers in the
 8    meeting room?
 9              A.   No, sir.
10              Q.   Where did he -- was there a discussion
11    between the parties?
12              A.   Yes, sir.
13              Q.   Where did that take place?
14              A.   In the conference room.
15              Q.   All right.  Was there a single table,
16    multiple tables?
17              A.   There was -- we sat at a large table.
18    Mr. Stoltzfoos sat on the one side of the table.  Myself,
19    Prosecutor Mr. Portman and Detective Heisse sat on the
20    opposite side.
21              Q.   Did you at any time tell Mr. Stoltzfoos that
22    he was not free to leave?
23              A.   No, sir.
24              Q.   Now, were you present for the arrest of
25    Mr. Stoltzfoos?
```

```
 1          A.    Yes, sir.

 2          Q.    And where did that take place, if you recall?

 3          A.    Yes.  He turned himself in to the New Holland

 4    Borough Police Department.

 5          Q.    And you were present when he turned himself

 6    in?

 7          A.    Yes, sir.

 8          Q.    Did you take any statements from him at that

 9    time?

10          A.    No, not that I recall.  None that I recall.

11          MR. PORTMAN:  No further questions.

12          THE COURT:  Mr. Conrad.

13          MR. CONRAD:  Thank you, Your Honor.

14                     CROSS-EXAMINATION

15    BY MR. CONRAD:

16          Q.    Sir -- good morning, by the way.

17          Your last name is Licklider?

18          A.    That's correct.

19          Q.    Very well.  Is it Agent Licklider, Detective?

20          A.    Agent.

21          Q.    Okay.  Agent Licklider, with regard to the

22    March incident, do you recall what day that was,

23    March 2006?

24          A.    What day of the week?

25          Q.    What day of the month it was.
```

```
 1              A.    No, sir.

 2              Q.    All right.  If I told you it was March 28th,

 3    would that make sense?

 4              A.    Best of my recollection, it was on or about

 5    March 17th.

 6              Q.    March 17th?

 7              A.    That's correct.

 8              Q.    Okay.  On that particular date when you

 9    had -- you said there were three officers in the room and

10    Mr. Stoltzfoos?

11              A.    No, sir.  No.  There was Prosecutor

12    Mr. Portman, myself and Detective Heisse.

13              Q.    Okay.  Prosecutor and then you two fellows.

14              Okay.  You had indicated that Mr. Stoltzfoos

15    had initiated the contact?

16              A.    Yes, sir.

17              Q.    So out of the blue, Levi Stoltzfoos called

18    you and said, hey, I want to come talk to you?

19              A.    Absolutely.  What happened was when we did

20    our search warrants on February 23rd, that night back at

21    the office, Mr. Stoltzfoos called the office and he

22    called every day.  Every day he's talking to me.  He

23    tried to talk to Mr. Portman.  He was talking to our

24    secretary and eventually it led to having the meeting

25    down there at New Holland.
```

1          Q.   Okay.  So actually what started this was a

2    search warrant that you guys did is what actually started

3    all this, correct?

4          A.   I didn't reach out to talk to him.  He called

5    us.  I could care less if he -- and he kept calling us

6    and kept calling us.

7          Q.   If he wanted to speak with you?

8          A.   That's correct.

9          Q.   All right.  When he came in for this

10   interview, what statements did he make to you?

11         A.   He produced --

12         MR. PORTMAN:  Objection.

13         THE COURT:  And your objection, sir?

14         MR. PORTMAN:  Your Honor, the issue is not

15   what statements were made.  It's whether or not it was

16   constitutional.  Exact statements are not at issue.

17         THE COURT:  Counsel.

18         MR. CONRAD:  Your Honor, we're certainly

19   entitled to know what the Commonwealth expects to

20   present.  I'd like to know what, if any, statements were

21   made to determine how they came about getting those

22   particular statements.  So I'm just simply asking what,

23   if any, statements are they attempting to introduce.

24         MR. PORTMAN:  This is not an evidentiary

25   hearing.  This is a motion to suppress statements, which

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1 goes to how the statements were obtained, not the

2 contents of those statements.

3          THE COURT:  Have the statements themselves

4 been given in discovery, Mr. Portman?

5          MR. PORTMAN:  They have, Your Honor.

6          THE COURT:  Then I would sustain the

7 objection.

8 BY MR. CONRAD:

9          Q.   Sir, is it my understanding that at that

10 time, he handed you some kind of paper?

11         A.   No, sir.

12         Q.   How did you -- did you ever receive a

13 statement from him?

14         A.   No, sir.

15         Q.   Ever receive a written statement from him?

16         A.   No, sir.

17         Q.   Is it your testimony he made no statements to

18 you when he came in for this meeting, though?

19         A.   No, sir.

20         Q.   So he did make statements, you just don't

21 want to share them at this point?

22         A.   He read a prepared statement that he brought

23 in his wallet.  It was a yellow piece of paper --

24 handwritten statement and he read it.

25         Q.   Did you then question him about the

1    statement?

2         A.    I attempted to.

3         Q.    What happened when you attempted to?

4         A.    He reiterated some of these statements that

5    he had and then he didn't want to talk.  He said his

6    purpose there was to read the statement and he wouldn't

7    answer any questions.

8         Q.    Did you eventually obtain a copy of that

9    statement?

10        A.    Yes, sir.

11        Q.    Where did you receive a copy of that

12   statement?

13        A.    When I executed the search warrant on his

14   residence, it was in his room.

15        Q.    How can you be sure the statement you

16   recovered is the same one from that day?

17        A.    It was the yellow one that he read from and

18   it was the yellow one that he had in the room.  And he

19   was -- as we would give him answers to his questions, he

20   would write on them.  And, also, our phone numbers are

21   affixed on the yellow piece of paper.  He took our phone

22   numbers where to contact us.

23        Q.    So he actually interviewed you?

24        A.    Yeah.  We wanted to hear what he had to say.

25   I could have cared less if he wanted to come in.

```
 1        Q.   He wanted to come in and talk?

 2        A.   He wanted to talk to us and, you know -- so

 3  who knows what he's going to say.  Didn't matter to me

 4  whether he come in or not.

 5        Q.   You never indicated to him whether or not he

 6  had a right to an attorney?

 7        A.   Not at that time.

 8        Q.   At any point during the discussion did he ask

 9  for an opportunity to leave?

10        A.   No.

11        Q.   Never asked to leave?

12        A.   No.

13        Q.   If he wanted to leave, could he have left?

14        A.   Absolutely.

15        Q.   How long did the meeting take?

16        A.   Approximately a half hour.

17        Q.   Did you ever determine his educational

18  background?

19        MR. PORTMAN:  Your Honor, if we could get

20  clarification as to the time frame when that question is

21  posed, whether it was before or after this meeting took

22  place.

23        THE COURT:  I believe that's appropriate.

24  BY MR. CONRAD:

25        Q.   Before you began talking with him about that
```

1  particular matter, talking with Levi Stoltzfoos that

2  morning, did you find out what his educational background

3  was, how far he'd gone in school?

4      A.   Well, I found out from paperwork, but I mean

5  it wasn't a priority, no.

6      Q.   You didn't know if he was an educated man or

7  uneducated man?

8      A.   I saw what he did.  He was an intelligent

9  man.

10      Q.   Okay.  Did you determine whether or not he

11  was under the influence of any drugs or alcohol at the

12  time?

13      A.   I didn't ask him.  He didn't appear to be.  I

14  said he didn't appear to be at the time and I didn't ask

15  him that.  I mean for what he did and was doing and I was

16  investigating him for, he wasn't an illiterate for what

17  he did.

18      MR. CONRAD:  Court's indulgence for one

19  moment.

20  BY MR. CONRAD:

21      Q.   On the day of the arrest, you were there to

22  take him into custody?

23      A.   Yes, I was there.

24      Q.   And is it your testimony that he did make

25  statements at the time of his arrest?

SUSAN A. MILTON, OFFICIAL COURT REPORTER

```
 1            A.    He could have.  I mean it's nothing much I,

 2    best of my recollection, that I took notes of.

 3            MR. CONRAD:  Your Honor, sir, I know I was

 4    objected to earlier on this, but whether or not

 5    statements were made at that time the defense is unclear

 6    if they were.  If they were made, it would be important

 7    to know if the Commonwealth intends to introduce anything

 8    from the time of arrest and then for me to explore

 9    whether he was in custody at that point when he made the

10    statement or not in custody.  I need to know whether they

11    intend to introduce any statements from the time of the

12    arrest.

13            THE COURT:  What would you like to say?

14            MR. PORTMAN:  We'll not be introducing any

15    statements from the day of arrest.

16            THE COURT:  Thank you, Mr. Portman.

17            MR. CONRAD:  No further questions.

18            THE COURT:  Next witness.

19            I'm sorry.  Do you have any --

20            MR. PORTMAN:  Nothing on redirect, Your

21    Honor.

22                    JONATHAN HEISSE,
      called as a witness, having been duly sworn or affirmed,
23            was examined and testified as follows:

24                   DIRECT EXAMINATION

25    BY MR. PORTMAN:
```

1          Q.    Would you please state your name for the

2    record?

3          A.    Jonathan Heisse.

4          Q.    And by whom are you employed?

5          A.    New Holland Police.

6          Q.    In what capacity?

7          A.    Detective.

8          Q.    And for how long have you been so employed?

9          A.    Eighteen years.

10          Q.    Are you familiar with a gentleman by the name

11    of Levi Stoltzfoos?

12          A.    Yes, I am.

13          Q.    Is he in the courtroom today?

14          A.    Yes.  He's seated next to counsel at the

15    table.

16          Q.    And when did you first become acquainted with

17    Mr. Stoltzfoos?

18          A.    I became acquainted with him several years

19    ago.  I don't know an exact time, but at least five, six

20    years ago.

21          Q.    I'd like to direct your attention back to

22    March of 2006.  Did you have an occasion to be in a

23    meeting with Mr. Stoltzfoos, Mr. Licklider and myself and

24    you?

25          A.    Yes, I did.

1          Q.   And did that take place at the New Holland
2    Borough facility?

3          A.   Yes, it did.

4          Q.   And do you remember where that meeting took
5    place?

6          A.   Took place in our Borough Council Chambers.

7          Q.   And do you recall how that meeting came to
8    being?

9          A.   My understanding was Mr. Licklider had set up
10   the meeting with Mr. Stoltzfoos.  Mr. Stoltzfoos arrived
11   on his own and we all went into the council room.

12         Q.   And do you recall -- strike that.

13              How did Mr. Stoltzfoos enter the room, if you
14   know?

15         A.   Came in the front door of the office
16   building, which is opened to the public.  We went through
17   the double doors, down the hallway and into the council
18   room.

19         Q.   And is the council room open to the public at
20   all times?

21         A.   Well, no, I would say it's not.  It's a
22   public facility.  It's on the borough side.  The police
23   department is on the one side and the borough side is on
24   the other.  That's where they hold their public meetings,
25   audits, water/sewer meetings, that kind of stuff.

          Q.   In addition to yourself, Mr. Licklider

and myself and Mr. Stoltzfoos, was there anyone else

present while you were in the room?

          A.   No.

          Q.   Were there any uniformed officers in there?

          A.   No.

          Q.   And can you describe the layout of the

borough room for us?

          A.   Yes.  The room has three doors; one door to

the hallway that I described, one door goes into the

borough office where the secretaries and borough manager

are, and the third door is an exterior door that opens

into the parking lot.

          Q.   At any time while you were present -- strike

that.

          Were you present for the entire meeting?

          A.   Yes.

          Q.   And while you were present, was

Mr. Stoltzfoos in any way restrained?

          A.   No, he was not.

          Q.   At any time during the meeting, did you or

Mr. Licklider or myself tell the defendant that he was

not privy to leave?

          A.   No.

          Q.   Did he ask at any time if he was able to

1    leave or free to leave?

2              A.   I don't recall that.

3                   MR. PORTMAN:  No further questions.

4                   THE COURT:  Cross.

5                        CROSS-EXAMINATION

6    BY MR. CONRAD:

7              Q.   Good morning, Detective.

8              A.   Good morning, Mr. Conrad.

9              Q.   Was Mr. Stoltzfoos ever read his Miranda

10   rights?

11             A.   No, he was not.

12             Q.   Why is that?

13             A.   He had come in voluntarily.  He was free to

14   leave at any time he wanted to.

15             Q.   You had indicated that Detective -- I'm

16   sorry -- Agent Licklider had set up the meeting?

17             A.   That's correct.

18             Q.   Is that your recollection?

19             A.   That's my recollection, yes.

20             Q.   So it wasn't set up by Mr. Stoltzfoos?

21             A.   I was only assisting, so I knew there was a

22   meeting.  They asked to use our facility and I

23   accommodated.

24                  The communication they had prior to that I

25   really don't know.  I assume he set it up.  If they were

1    talking back and forth and if it was mutual, I really

2    don't know.

3            Q.    Once inside the meeting, did my client appear

4    to be under the influence of alcohol or drugs?

5            A.    No.

6            Q.    Did he seem oriented to time and place?

7            A.    Yes.

8            Q.    The questions -- who posed the first

9    question?

10           A.    I believe Mr. Licklider discussed with him

11   why he was there and began.  Mr. Stoltzfoos immediately

12   had a list -- he had prepared a list of questions on his

13   own, almost like a statement, and he began into that

14   briefly into the meeting.

15           Q.    Okay.  Why was he there?  You said there was

16   a discussion about that.  What was said about why he was

17   there?

18           A.    About the money that was taken from the bank

19   that he claimed was his money and why it was taken.

20           Q.    Money that was taken from the bank or money

21   he was putting into the bank?

22           A.    Money ended up being taken from the bank that

23   he had deposited.

24           Q.    That the government had seized?

25           A.    Yes.

1          Q.    And then you say he went right into reading a

2    statement?

3          A.    He had a list of questions he had posed.  And

4    the meeting at the beginning was, you know, basically why

5    you're here, I want to talk to you about that.  And

6    within a short time, he announced he had a list and he

7    had questions on his own and he began reading them.

8          Q.    Okay.  And did you fellows then respond to

9    his questions?

10         A.    Yes.

11         Q.    At the conclusion of his questions, what

12   happened then?

13         A.    He was released.  He was, you know -- the

14   meeting ended and he was free to go.

15         Q.    You didn't take a written statement from him

16   then?

17         A.    It wasn't up to me to take it.  It was Agent

18   Licklider's case.  I was simply present.  I took nothing

19   written.

20         Q.    Did you prepare a report from that?

21         A.    No, I did not.

22               MR. CONRAD:  Thank you, sir.

23                     REDIRECT EXAMINATION

24   BY MR. PORTMAN:

25         Q.    Just to clarify, Detective.  You said

1    released.  When did the meeting end?

2          A.   I don't recall the time.  The meeting ended

3    basically when everybody was done talking and it was

4    obvious that he wasn't going to really give a full

5    statement or anything.

6          Q.   And then did the parties just leave?

7          A.   Yes.

8          Q.   And do you recall how Mr. Stoltzfoos left the

9    room?

10         A.   Either went out the side door that's open to

11   the public or back out through the hallway.  I don't

12   recall exactly which.

13              MR. PORTMAN:  Nothing further.

14              THE COURT:  Any recross?

15              MR. CONRAD:  No, Your Honor.

16              THE COURT:  You may be excused.

17              MR. PORTMAN:  You may step down.

18              Your Honor, with respect to the motion to

19   suppress, the Commonwealth would rest.

20              THE COURT:  Any testimony on behalf of

21   defense?

22              MR. CONRAD:  Your Honor, if I could ask the

23   Court's indulgence again for just a moment, sir?

24              THE COURT:  Okay.

25              MR. CONRAD:  Your Honor, we have no testimony

1    regarding the suppression issue.  However, with regard to

2    some of the other motions that we're obviously going to

3    argue this morning, there may be a need for me to present

4    testimony based on what the Commonwealth's intentions

5    are.  So I guess at this point, I simply reserve the

6    right, as we go into the motions hearing, whether or not

7    to call or present testimony at that time.

8             THE COURT:  But relative to the motion to

9    suppress itself, there is no testimony at this point?

10            MR. CONRAD:  That is correct, Your Honor.

11            THE COURT:  If I may move on then.

12   Mr. Portman, motion to quash Count 59?

13            MR. PORTMAN:  Your Honor, the Commonwealth

14   would move to nol pros Count 59 in the Information, I

15   think, which makes the motion to sever and the motion to

16   quash that count moot.

17            THE COURT:  Agreed, Counsel?

18            MR. CONRAD:  Your Honor, yes.  If we're going

19   to nol pros Count 59, then, yes, as to the motion

20   number 3, the motion to quash becomes moot as would the

21   motion to sever, yes, sir.

22            THE COURT:  Very well.  The motion relative

23   to the return of property is not going to be addressed at

24   this point in time.  That matter can be addressed

25   certainly after the proceedings have been complete.

```
 1                As to the motion in limine, for the record,
 2    the Commonwealth has indicated that they will not be
 3    putting the matters in the motion in limine relative to
 4    what we'll call briefly the credit card bust-out, those
 5    type of matters, in its case in chief.  If issues are
 6    raised by the defense, certainly the Commonwealth has
 7    reserved its right to bring those matters back to the
 8    Court's attention and we would face that motion at the
 9    appropriate time.
10                MR. PORTMAN:  Correct, Your Honor.
11                MR. CONRAD:  Your Honor, just so I
12    understand, if I could, sir, just to clarify the record.
13    So the Commonwealth then is precluded from discussing
14    anything to do with the credit card bust-out or any other
15    positive schemes?  In terms of buying and selling
16    merchandise, they're precluded from discussing those kind
17    of issues?
18                THE COURT:  In its case in chief until the
19    matter has been raised, if at all, by defense.
20                Is that your understanding also,
21    Mr. Portman?
22                MR. PORTMAN:  Yes, it is, Your Honor.
23                MR. CONRAD:  Very well, Your Honor.  Selling
24    merchandise, they're absolutely precluded.
25                THE COURT:  Anything else, Mr. Conrad?  Those
```

```
1     are all the issues I think we spoke of in chambers.

2               MR. CONRAD:  Your Honor, to argue the motion

3     to quash Counts 1 through 58, that would need to be

4     argued this morning as well.

5               THE COURT:  Mr. Conrad.

6               MR. CONRAD:  Your Honor, if I could have the

7     Court's indulgence for just a moment here.

8               Your Honor, we have a number of issues to

9     make with regard to the motion to quash.  The statute

10    itself that my client has been charged with is Title 18,

11    5111, dealing in proceeds of unlawful activities.  And,

12    Your Honor, we would move to quash that for a number of

13    reasons, first off being that there is no mens rea

14    requirement that's actually indicated in the statute.

15              And, Your Honor, the -- in Pennsylvania, this

16    being a relatively new statute, there's been nothing

17    really in terms of research that I can come up with in

18    any way, shape or form to discuss this matter.  The only

19    thing I could find on point was actually a federal case

20    in the Third Circuit here in Pennsylvania.  United States

21    versus Hill, 167 F.3d -- Third -- 1055, a 1999 case.

22              A very similar statute that the federal

23    government utilizes is structuring.  It's essentially the

24    same statute.  And in that, the Court has said that to

25    prove structuring, the government must show the defendant
```

1   knew of relative reporting requirements and that he

2   structured his transaction for the purpose of evading

3   those reporting requirements, and that he acted with

4   knowledge that such conduct was unlawful.

5          Essentially what we have here is all but a

6   strict liability statute.  And, Your Honor, we would

7   argue that it's actually unconstitutional in the sense

8   that there's no mens rea requirement here in the statute

9   and therein is an unconstitutional statute.

10          The federal government in their statute,

11  they've at least laid out a mens rea.  And they indicated

12  one has to have knowledge of this, then try to subvert

13  the statute.  Here in this particular instance, there's

14  no mens rea.  So that would be the first argument.  The

15  second argument, Your Honor, would be as to the fact that

16  -- and I think what's noted in the motion is that it's

17  void for vagueness and it would be unconstitutional

18  because it's void for vagueness.

19          Citing a case called Commonwealth versus

20  Barud, B-a-r-u-d, it's at 545 Pennsylvania 296, a 1996

21  case, Court said:  As generally stated, the void for

22  vagueness doctrine requires that a penal statute define

23  the criminal offense with sufficient definiteness that

24  ordinary people can understand what conduct is prohibited

25  and in a manner that does not encourage arbitrary and

1    discriminatory enforcement.

2           Your Honor, this particular statute, the way

3    it's laid out is -- we would argue is, in fact, void for

4    vagueness in that hypothetically, if I were to go to the

5    bank today, tomorrow, the next day and deposit one

6    dollar, but my intent was to avoid having to file a form,

7    one of the forms that is required here, then I would then

8    have violated the statute.  It seems highly improbable or

9    unlikely that one could intend that result.  But given

10   the fact the way the statute is written, that is what

11   could occur.  It's void.

12          How does one -- is there a threshold?  How

13   many days does one have to put in -- how many times does

14   one have to go in to put their money in the bank?  If an

15   individual were to cash their paycheck and then simply

16   try to deposit their paycheck, but their intention in

17   doing so was that they didn't save up too much at the

18   house, get up to $10,000, then have to bring it in,

19   that -- Your Honor, that individual could be guilty under

20   this offense.  And if that's the case, we'd be arresting

21   most of, if not all of, Lancaster County.

22          Additionally, I go on to note the statute we

23   would argue also should be found void and quashed in that

24   the statute is over broad.  And, again citing the same

25   case, Commonwealth versus Barud, B-a-r-u-d, 545

1   Pennsylvania 297, a statute is over broad if by its reach

2   it punishes constitutionally protected behavior as well

3   as illegal activity.

4           The language of the statute in question

5   literally encompasses a variety of protected lawful

6   conduct.  Again, how do we not prosecute everybody in

7   Lancaster County that's putting their money in the bank?

8   If every single person out there is simply saying to

9   themselves, well, I don't want to get to having $10,000

10  here at the house, at which point I have to put it in and

11  file a form, then this statute reaches out to everyone.

12          If it's truly about unlawful activities, then

13  if one were out there doing unlawful activities and

14  trying to place the money in, that would be a crime, but

15  here, this statute affects every Mary and Joe Citizen if

16  they're simply putting their money in the bank if they

17  ever even have the thought that they could one day have

18  to fill out a form.

19          A governmental purpose to control or prevent

20  activities constitutionally subject to state regulation

21  may not be achieved by means unnecessarily broad and

22  thereby invade the area of protected freedoms.

23          Your Honor, it would be our argument, put

24  your money in the bank any way you want to and that this

25  statute does overreach and get to folks that it ought

```
 1    not.  So accordingly, Your Honor, we would argue that for

 2    those reasons, that the Counts 1 through 58 should be

 3    quashed.

 4              THE COURT:  Thank you, Counsel.

 5              MR. CONRAD:  Thank you, Your Honor.

 6              THE COURT:  Mr. Portman, would you like to

 7    respond?

 8              MR. PORTMAN:  Yes, Your Honor.  And I find

 9    myself agreeing with Counsel on one issue.  It's a strict

10    liability crime; and, second, that there is a dirt of

11    case law on points raised by the defense.  However, being

12    a strict liability crime, they have been held

13    constitutional.  They are not unconstitutional just

14    because they are a strict liability.

15              The criminal conduct is not the depositing

16    cash in a bank.  The criminal conduct arises from doing

17    so in a manner so that a bank does not have to -- or a

18    financial institution does not file a form required by

19    other state or federal law.

20              It's not merely putting the cash in the bank

21    that counts, it's how you do it.  That's why it's

22    referred to as structuring.  Structuring is a criminal

23    conduct, not depositing the cash.  And it would not be a

24    check and if somebody attempted to deposit $500 in such a

25    fashion as to avoid a bank filling out a CTR, that would
```

```
 1   be criminal conduct.

 2              The legislature, in amending the Statute

 3   5111, removed any requirement as to the source of the

 4   funds and chose not to put any type of limit on the

 5   amount of money involved.  So those issues are not

 6   relevant for this discussion.

 7              And as far as all of Lancaster County, we

 8   could include the entire state.  Anyone who structures

 9   their cash transactions in a manner to make a bank avoid

10   a CTR form would, in fact, be guilty of criminal conduct.

11              I submit, Your Honor, that the statute is

12   constitutional on its face and ask the Court to so find.

13              THE COURT:  It's my understanding that having

14   once again reviewed the pretrial motion, we have

15   addressed each of the motions outlined in the pretrial

16   motion that was filed by prior counsel at this point; is

17   that correct?

18              MR. CONRAD:  That is correct, Your Honor.

19              MR. PORTMAN:  Yes, Your Honor.

20              MR. CONRAD:  Your Honor, if I could argue in

21   the alternative, sir, in response?

22              THE COURT:  I will allow that.

23              MR. CONRAD:  Arguing in the alternative, Your

24   Honor, if I could, it would be our position that because

25   there is no mens rea requirement at all, that the statute
```

1    in and of itself is unconstitutional.  However, if the

2    Court were to uphold the validity of the statute itself,

3    then, Your Honor, the defense would argue in the

4    alternative this:  If that is the case, then there is a

5    catchall mens rea that is applied under the Criminal Code

6    under Title 18-302.  The catchall mens rea requirement

7    would be that of recklessness.

8         So, Your Honor, in the event that the Court

9    were to uphold the constitutionality of this particular

10   statute, then I would argue in the alternative only,

11   Your Honor, that the mens rea requirement that the

12   Commonwealth would need to meet would not then be a

13   strict liability but rather recklessly, as found

14   in 18-302.

15        I'm sorry.  I can give the Court the citation

16   if the Court would so desire.  Well, Your Honor, as to

17   recklessness, it would be 302(b)(3), which acknowledges

18   recklessness.  And, Your Honor, if the Court would need

19   case law as to the fact that is the default standard, I

20   can certainly provide that if necessary.

21        MR. PORTMAN:  Your Honor, if I may.  I

22   disagree with Counsel's representation that recklessness

23   is the only level of culpability.  302(c), culpability

24   required unless otherwise provided provides a culpability

25   may be established by intentional knowing or reckless

1  behavior.  I submit that in this case, intention and

2  knowing are present and it's not strictly recklessness.

3          THE COURT:  Thank you, Counsel.

4          As to the motion to suppress evidence, which

5  would be the first of the omnibus pretrial motions, I

6  find that at all times during the occasion in March

7  of 2006, the defendant was not in custody, was informed

8  he was free to leave and chose not to leave.  The

9  defendant was not entitled to any Miranda warning.  The

10  defendant was not coerced into making any statement, and

11  any statement made by him, especially those items for

12  which he read from his yellow sheet of paper and wrote

13  down answers, was freely and knowingly and voluntarily

14  given, and at no time was he in the custody of either the

15  New Holland Borough Police or the Attorney General's

16  Office of Pennsylvania.  Therefore, the motion is denied.

17          As to the motion to quash, which would be

18  motion number three relative to Count 59, I accept the

19  nol pros of the Attorney General's Office.  That issue,

20  therefore, becomes moot.

21          As to the motion to sever in that Count 59

22  has been withdrawn by the Attorney General's Office, the

23  motion to sever is, therefore, also moot.  I have already

24  ruled relative to the motion of return of property.

25          And, also, relative to the motion in limine

1    relative to motion number two, which is the motion to

2    quash Counts 1 through 58, I deny defense's motion

3    relative to quashing those counts.

4              Are there any other pretrial matters for the

5    Court's attention in the courtroom?

6              MR. PORTMAN:  No, Your Honor.

7              MR. CONRAD:  Your Honor, defense would only

8    ask if the Court were to rule as to what the level of

9    culpability will be so we can address that as part of our

10   case in chief.  And, also, I would need that for

11   openings.

12             THE COURT:  Court will take a 30-minute

13   recess at this point in time and I will come back with

14   that particular --

15             MR. CONRAD:  Thank you, Your Honor.

16             MR. PORTMAN:  Thank you, Your Honor.

17             (A recess was held.)

18             THE COURT:  The last matter before the Court

19   in the pretrial motions is the motion to quash relative

20   to Counts 1 through 58.  As I indicated, that motion is

21   denied.  Statute 302 of Title 18 is clear under Paragraph

22   (c) that culpability unless otherwise provided.  When the

23   culpability is sufficient to establish a material element

24   of an offense is not prescribed by law, such element is

25   established if a person acts intentionally, knowingly or

1    recklessly with respect thereto.

2              That is the ruling of the Court.

3              Specifically regarding issues raised by

4    Counsel, I concur with the Commonwealth and not with the

5    defense that the depositing of one dollar by any Tom,

6    Dick or Harry -- or I believe it was Mary or Joe -- does

7    not violate the statute.  Taking a paycheck to the bank

8    does not violate the statute.  And, in fact, it is what

9    I'll refer to as the structuring which is what is

10   prohibited by this particular statute.  And that's what

11   we will proceed on.

12             At this point in time, prior to the selection

13   of the jury in this matter, I'm going to ask my bailiff

14   to retrieve from the appropriate panel the questionnaires

15   of counsel to have some time to review those prior to

16   bringing the panel in.  So I'd appreciate if counsel

17   would remain here.  Mr. Battisti will get the

18   questionnaires, bring them to you, give you some time to

19   review those and then I will have Mr. Battisti bring the

20   actual panel members to the courtroom promptly at 1:30.

21             So you may take whatever time you would like

22   with the questionnaires once they are here.  The

23   courtroom will be open for your use.  I will not be on

24   the bench during your review of those questionnaires.

25             So if you could call for the panel for 1:30

1    and get the questionnaires, I would appreciate that.

2              THE BAILIFF:  How many would you like?

3              THE COURT:  What's that?

4              THE BAILIFF:  36, 35?

5              THE COURT:  Why don't we go with 35.  That

6    gives us sufficient room.  We'll have jurors seated both

7    in the two rows behind you as well as in the jury box for

8    the purpose of voir dire.

9              MR. CONRAD:  Your Honor, if I could, just as

10   a matter that would have come up as a result of this

11   morning.  First of all, not to be -- in all deference to

12   the Detective, Detective Heisse had indicated that he

13   knew my client from the past.  As a motion in limine here

14   this morning, I only ask that the Detective not be able

15   to indicate that only because that would bring into

16   suspect as to why he would have known him from the past.

17   So I would ask that as a motion in limine here this

18   morning.

19             MR. PORTMAN:  No problem with that, Your

20   Honor.

21             THE COURT:  Detective, I would direct that

22   subject to your being asked that question by defense

23   counsel and it's an appropriate answer, that you not talk

24   about how you would have known or how long you would have

25   known him prior to the date of that first meeting set up

Case 5:13-cv-02684-WLD-PT Document 2-1 Filed 11/19/13 Page 39 of 93

1   at Council Chambers.

2              DETECTIVE HEISSE:  That's fine, Your Honor.

3              MR. CONRAD:  One last matter.  And, again,

4   just so we have an understanding how we're proceeding

5   through trial, and I would rather do it now, if we could.

6   With regard to the statement that the Commonwealth

7   addressed, obviously they did not put the statement into

8   evidence at this point, just that the Court has ruled

9   that it could come into evidence.

10             The question would be this:  The statement

11  was a written statement made by my client.  There are

12  portions that, obviously, the Commonwealth would like to

13  have, there are probably other portions they would not

14  like to have.  But I would like to have a ruling up front

15  if they intend to introduce it, we would have the right

16  to have the entire document introduced.

17             Again, Your Honor, that goes to opening the

18  door.  Certainly as we noted and the Court has ruled, the

19  motion in limine prohibits any testimony as to the

20  underlying or where these funds came from, but what is

21  relevant to the case is that gentleman claims that he

22  pulled at least some of these monies out of his bank

23  account prior to the new millennium, and that is

24  addressed in this statement that the Commonwealth has

25  fought to keep in.  Additionally, some of the workers at

1    -- the bank workers would have knowledge of hearing

2    similar statements as they dealt with my client.

3              So I don't want to open up the door.  I don't

4    want to cause any alarm, but certainly if we're going to

5    go there, I should at least be able to question about the

6    statement itself and ask the bank personnel about the

7    statement or things that would confirm that.

8              THE COURT:  Is there any objection to either

9    counsel having me see the statement in advance?

10             MR. PORTMAN:  Not from the Commonwealth, Your

11   Honor.

12             MR. CONRAD:  No objection, Your Honor.

13             THE COURT:  If there's a copy that would be

14   available to the Court or if you would like a copy made,

15   Mr. Portman or Mr. Conrad, Mr. Battisti will be more than

16   glad --

17             MR. CONRAD:  I think I have an extra copy

18   here.  If you would like this.

19             THE COURT:  Are the scribbles in the document

20   as it was seized at the time of the search warrant?

21             MR. PORTMAN:  If I could just briefly, Your

22   Honor, just --

23             MR. CONRAD:  I did not scribble on it.

24             THE COURT:  Appears to be the same pen,

25   but --

1    MR. PORTMAN:  Yes, Your Honor, they should be

2  on the original, which we have just confirmed with

3  Counsel.

4    THE COURT:  Did you want to respond at all,

5  Mr. Portman, to Counsel's request?

6    MR. PORTMAN:  I have no objection, Your

7  Honor, to his request to get into the entire document.

8    THE COURT:  Very well.

9    MR. CONRAD:  Thank you, Your Honor.  Thank

10  you.

11    THE COURT:  Again, if you would just remain

12  until you get the materials from Mr. Battisti, then we'll

13  reconvene at 1:30 for the selection of the jury.

14    MR. PORTMAN:  Thank you very much, Your

15  Honor.

16    MR. CONRAD:  Thank you, Your Honor.

17    MR. PORTMAN:  Your Honor, if I may, will the

18  courtroom be locked during the lunch recess?

19    THE COURT:  Yes, it will be.  As soon as you

20  gentlemen are finished with the questionnaires,

21  Mr. Battisti will see that everything is locked up.

22    MR. PORTMAN:  Thank you, Your Honor.

23    MR. CONRAD:  Thank you, Your Honor.

24    (The luncheon recess was held.)

25

```
 1              A F T E R N O O N   S E S S I O N

 2                      (1:40 p.m.)

 3              THE COURT:  Good afternoon.  My name is Judge

 4   Knisely and this is Courtroom 3.

 5              You've been summoned to this courtroom to

 6   participate in a case in which Levi L. Stoltzfoos has

 7   been charged with 58 counts of dealing in proceeds of

 8   unlawful activity arising out of incidents alleged to

 9   have taken place between January 6th and February 11th

10   of 2006 at various locations in Lancaster County in which

11   the complainant is Daniel Licklider of the Office of the

12   Attorney General.

13              The Deputy Attorney General trying this case

14   today is Stevan Portman and defense counsel is Jeffrey

15   Conrad, who represents Levi Stoltzfoos.

16              MR. CONRAD:  Good afternoon, folks.  Good

17   afternoon.

18              THE COURT:  And will be assisted by

19   Leonard --

20              MR. BROWN:  Brown.  Good afternoon.

21              THE COURT:  This matter is of gravest

22   importance to both the defendant and the Commonwealth of

23   Pennsylvania.

24              I'm going to discuss with you certain basic

25   principles that apply to a criminal trial and I ask that
```

1    you listen very carefully to what I have to say.  Later

2    you will be questioned about these principles by myself

3    and perhaps by counsel.

4                At the beginning, I must tell you that if you

5    are selected to be a member of the trial jury, it will be

6    your duty to apply the law as I explain it to you.  That

7    will be part of your oath as a juror in this matter.

8                It would be highly improper to permit each

9    juror to decide himself or herself what law to apply in

10   the trial of a criminal case.  The law which applies in

11   the trial of a criminal case must be in accordance with

12   the Constitution of the United States, Constitution of

13   the Commonwealth of Pennsylvania, the Rules of Criminal

14   Procedure as established by the Supreme Court of

15   Pennsylvania.

16               It is the responsibility of the Judge to tell

17   the jury what the law is, and it will be your duty to

18   apply the law as I give it to you if you are selected as

19   a member of the trial jury.  If you cannot or will not do

20   this, you should not be a juror in this case.

21               The defendant is charged in this case with

22   certain crimes.  The charges are not evidence.

23               Just because a person has been arrested, held

24   for court by a judge, had an Information issued by the

25   Attorney General's Office and was brought here for trial

1   is not evidence of guilt.  Charges are only charges.

2   This is because all persons who come before the Court for

3   trial are presumed innocent.  And this presumption of

4   innocence remains with them until such time as the

5   Commonwealth of Pennsylvania, through the Deputy Attorney

6   General, presents evidence in open court which proves the

7   defendant's guilt beyond a reasonable doubt.  What a

8   reasonable doubt is will be explained to you if you are

9   selected to be a member of the trial jury.

10              At this time, I will just mention that

11  reasonable doubt does not mean beyond any doubt.  It

12  means beyond a reasonable doubt.  The burden of proof is

13  on the Commonwealth throughout the trial and relates to

14  all of the elements of the crimes charged against the

15  defendant.

16              In determining the guilt or innocence of the

17  defendant, the only evidence that may be considered is

18  evidence that comes from the witness stand here in open

19  court.  The charges themselves are not evidence of guilt.

20              It is unlikely, but some of you may have read

21  about this case or you may have heard about this case.

22  If so, you must put that out of your minds, especially

23  anything that came out of the newspapers or any kind of

24  publication, because if you are selected to be a juror

25  for this trial, it will be your duty to decide this case

1  solely and entirely on the basis of the evidence offered

2  from the witness stand.

3         The law says that a defendant is presumed

4  innocent until such time as the Commonwealth proves

5  beyond a reasonable doubt his guilt, and that cloak of

6  innocence remains with the defendant throughout the

7  entire trial and right into the jury room where the jury

8  begins to deliberate on its verdict.  That is the

9  principle which each of you must accept or you should not

10  serve as a juror in a criminal case.

11         There is another important point of

12  constitutional law that I want to explain to you.  The

13  defendant does not have to produce any evidence in his

14  defense; neither does the defendant have to take the

15  witness stand.  This must clearly be understood and

16  accepted by you.

17         Every criminal defendant has a constitutional

18  right to say to the Attorney General, you made the

19  charges, you have the burden of proving them, go ahead

20  and try and do that.  You must understand that a

21  defendant does not have to testify or produce evidence,

22  and that during the trial the jury may not draw any

23  inference adverse to the defendant if that turns out to

24  be the situation in this case.  Jurors must keep a

25  completely open mind during the trial with respect to

1    guilt or innocence of the defendant until all of the

2    evidence has been presented, until the lawyers have made

3    their closing speeches and until I've instructed the

4    jurors in the law which they will apply to the facts as

5    they find them.  Until then, members of the jury will not

6    be sufficiently informed about this case to deliberate on

7    their verdict.

8              Some of you may say to yourselves, well,

9    before I could make up my mind, I would have to hear both

10   sides.  That is not proper in a criminal case because as

11   I have explained to you, the defendant does not have to

12   present any evidence.  He does not have to take the

13   witness stand himself.  He does not have to present his

14   side and the jury cannot hold that against him.  The

15   burden is on the Commonwealth to prove guilt beyond a

16   reasonable doubt by its own evidence.

17             If the Commonwealth's evidence does not

18   convince the jury that the defendant is guilty beyond a

19   reasonable doubt, the verdict of the jury must be not

20   guilty even though the defendant did not take the stand

21   and did not present any evidence.  Of course, if the

22   defendant chooses to take the stand or if the defendant

23   does present evidence, the jury may also consider that

24   evidence in determining whether or not the Commonwealth

25   has proved the defendant guilty beyond a reasonable

1    doubt.

2              Some of you may be concerned about the nature

3    of the charges against the defendant which are entitled

4    dealing in proceeds of unlawful activity.  I must tell

5    you that if you are selected as a member of the trial

6    jury, it will be no part of your duty to consider the

7    nature of the charges.  By that I mean if a different

8    charge could have been made in this case, the only

9    function of the jury will be to determine fairly and

10   impartially from the evidence presented in this case

11   whether any of the crimes charged have been committed

12   and, if so, whether or not the defendant committed any of

13   those crimes.

14             Jurors have the duty of determining what the

15   facts are in a case.  To do so they have to pass upon the

16   credibility; that is, the believability of the witnesses

17   in the case.  What were their opportunities to see, hear

18   and to understand?

19             No one comes before a jury with a ticket

20   entitling him or her to be believed.  The jury is the

21   final and only authority to determine who is to be

22   believed and to what extent.

23             The trial jury may not consider the

24   credibility -- that is, the believability -- of any

25   particular witness by any different standard than it

1    determines the credibility of any other witness in a

2    case. When a witness is called by the Attorney General's

3    Office or by the defendant, the witness' credibility as

4    to truthfulness and accuracy is to be evaluated by the

5    same standards.

6              For example, the jury should not believe the

7    testimony of a law enforcement official just because that

8    person is a law enforcement official, nor should the jury

9    disbelieve the testimony of a law enforcement official

10   just because that person is a law enforcement official.

11   The jury should evaluate the credibility and the

12   testimony of a law enforcement officer in the same way

13   and to the same extent as the testimony of a civilian.

14             We'll soon begin the actual selection of the

15   jury for this trial, but before we do I would like to

16   caution you concerning one matter. Starting now and

17   regardless of whether or not you are selected as a juror

18   for the trial of this case, you are not to discuss this

19   case with any of the people involved in it, with anyone,

20   not even among yourselves, until you retire to deliberate

21   upon your verdict. Just do not speculate or talk about

22   it.

23             Certainly do not permit anyone to speak with

24   you about this case. If someone does try and engage you

25   in a discussion about this case, do not answer, but

1    report that to me immediately so that I may be aware of

2    it and take whatever steps are necessary to ensure a fair

3    and impartial trial.

4              You must also carefully avoid reading,

5    watching or listening to any news accounts of the case or

6    the trial.  The case must be decided solely upon what you

7    see and hear in this courtroom during the course of this

8    trial.

9              From this panel or any additional panels, if

10   necessary, 14 jurors will be selected by the Commonwealth

11   and the defendant.  Of these 14 jurors, the first 12 will

12   constitute the jury for the trial.  The other two will be

13   alternate jurors who will serve only if one of the

14   original jurors is unable to serve until the end of the

15   trial.  If the original 12 are intact at the time the

16   jury is about to retire to deliberate upon the verdict in

17   this case, those 12 will decide the matter of guilt or

18   innocence of the defendant and the alternate jurors will

19   be excused.

20             If you are going to go -- I'm sorry.  We are

21   going to go through the selection procedure here, which

22   is routine in the sense that this is what occurs in the

23   preparation of all jury trials in criminal cases.  The

24   objective is to be able to obtain a fair and impartial

25   and unprejudiced jury.  It's for that reason that you

1    will be questioned about your background, your

2    activities, your knowledge and so forth.  No one should

3    deliberately attempt to avoid serving on this jury nor to

4    make a special effort to get on this jury.

5         You'll be asked a series of questions that

6    are designed to disclose if you're qualified to serve as

7    a juror in this case and whether or not you should be

8    excused for cause.  Please bear in mind that these

9    questions are not intended to be an invasion of your

10   privacy or an improper inquiry into personal affairs.

11   This is an important procedure that is simply a necessary

12   part of the preparation for the trial of this case.  You

13   should answer the questions that are put to you with

14   complete candor and honesty.

15        In addition to being excused by the Court for

16   cause, the Attorney General and the attorney for the

17   defendant each shall have a right to a limited number of

18   what are called peremptory challenges.  That is the right

19   counsel may use to exercise to excuse jurors without

20   disclosing any reason for doing so.

21        Your answer to the questions I'm about to

22   address to you will indicate how you should be further

23   questioned by them as to your qualifications to be

24   members of the trial jury when you are later questioned

25   individually.

1    I will now direct the clerk to collectively

2    swear or affirm the entire panel of prospective jurors

3    for voir dire.

4             (The jury panel was sworn.)

5             THE CLERK:  You may be seated.

6             THE COURT:  Thank you.  Members of the panel,

7    if any of the questions which I'm about to ask applies to

8    you in any way, you should rise and when asked, to

9    provide your juror number.  Remain standing until you are

10   given leave to resume your seat.  If no member of the

11   panel rises, I will conclusively assume that the question

12   does not apply to any member of the panel.

13            It is most important that if any of these

14   questions do apply to you, that you rise and identify

15   yourself to the Court.  If you are not certain as to

16   whether these questions do or do not apply to you, you

17   should rise and respond to a particular question so that

18   it can be explored later.

19            Please remember that you are under oath to

20   rise if any of the questions apply to you in any way.  If

21   you fail to rise when you should, it may constitute

22   contempt of court or perjury.

23            As I said, I will ask you questions as a

24   group.  We'll not ask for individual responses initially.

25   If a question applies to you, you will rise, give your

1    juror number when asked, and I will discuss with you

2    individually how the question applies with you.  Counsel

3    for both sides may also pursue the answers you have given

4    to my questions and may ask some other questions.

5              Again, I want to emphasize that no one's

6    attempting to embarrass you, and I am certain that the

7    great majority of the questions and answers will not be

8    embarrassing to anyone.  However, if there is any

9    particular question that you are asked that you would

10   rather not answer in open court but at sidebar, all you

11   have to do is indicate that you would rather answer at

12   sidebar.

13             Now, again, as I ask these questions, if they

14   apply to you, just simply rise.  We'll give you an

15   opportunity and I will point to you and we'll just ask

16   you for your number, and then all of us will have the

17   opportunity to jot that number down.  Okay.

18             Is any member of the panel under the age of

19   18, or is any member of the panel not a citizen of the

20   United States or not a resident of Lancaster County?

21             Has any member of the panel been convicted of

22   a crime punishable by imprisonment of more than one year

23   and has not been granted a pardon or amnesty for that

24   offense?  If any of those things apply to you, please

25   rise.

1      A JUROR:  Ninety-six.

2      THE COURT:  Ninety-six.  Thank you.

3      Next question, is any member of the panel

4  unable to understand the English language or do any of

5  you have any difficulty in understanding the English

6  language?  If so, please rise.  I see no response.

7      Do any of you have any physical, mental or

8  emotional disability which would make it difficult for

9  you to hear and concentrate upon the testimony of the

10  witnesses in this case?  If so, please rise.

11      A JUROR:  I have a hearing problem.

12      THE COURT:  Just your number, sir.

13      A JUROR:  One twenty-six.

14      THE COURT:  Thank you very much.

15      The defendant in this case is Levi L.

16  Stoltzfoos.  Mr. Stoltzfoos, would you rise so that they

17  can see you from both directions please.

18      Counsel for Mr. Stoltzfoos is Jeffrey Conrad.

19  I had introduced him earlier.

20      The name of the Deputy Attorney General who

21  will represent the Commonwealth in this case is Stevan

22  Portman.

23      Are any of you related by blood or marriage

24  or do any of you have a close association with the

25  defendant, the defense counsel or the Deputy Attorney

```
 1    General?  If so, please rise.  I see no response.

 2               I will now ask the Deputy Attorney General to

 3    tell you the names of the witnesses that he may call,

 4    persons whose names may be mentioned in the trial of this

 5    case.  If any of you are related by blood or marriage or

 6    have a close association with any of those potential

 7    witnesses, I'm going to ask you to rise once he has given

 8    that list of witnesses to you.

 9               (Reporting of the voir dire is waived by

10    counsel.)

11               THE COURT:  Thank you.

12               At this point in time, I'm going to have the

13    clerk swear in the jury.  You will listen to his remarks,

14    respond appropriately and then we're going to have

15    Mr. Battisti take you back to the jury room for about a

16    15-minute break before we begin.

17               THE CLERK:  Would you please rise.

18               (The jury was sworn.)

19               THE COURT:  Thank you.  Counsel, at this

20    point in time, we'll take a 15-minute recess, give

21    everybody an opportunity to go back.

22               Mr. Battisti, if they need a little bit

23    longer, please let me know.

24               (A recess was taken.)

25               THE COURT:  Members of the jury, you are
```

SUSAN A. MILTON, OFFICIAL COURT REPORTER

```
 1    about to perform one of the most serious duties of

 2    citizenship.  You're going to decide whether a fellow

 3    citizen is guilty of a criminal charge brought by the

 4    Commonwealth of Pennsylvania.

 5              The way you jurors do your job is as

 6    important to the administration of justice as the way I

 7    do mine as Judge and the way the lawyers do.  Pay close

 8    attention to everything that is said and done in this

 9    courtroom so that you can perform those duties well.

10              The Commonwealth has charged the defendant

11    with 59 -- I'm sorry, 58 counts of what is entitled

12    dealing in proceeds of unlawful activities.  This charge

13    is made through a formal document called an Information.

14              An Information is only an accusation.  It is

15    not any proof that the defendant is guilty.  Under our

16    constitution, the defendant is presumed innocent unless

17    and until he's proven guilty.  I'm sorry.  The Deputy

18    Attorney General, as counsel for the Commonwealth, has

19    the burden of proving him guilty beyond a reasonable

20    doubt.

21              The defendant has the right to remain silent

22    and to present no evidence.  You must not hold it against

23    the defendant if he happens to choose not to testify at

24    trial.

25              I shall describe to you in a general way what
```

1   will take place.  First, the Deputy Attorney General may

2   make an opening statement in which he will outline the

3   Commonwealth's case against the defendant.  The

4   defendant's attorney may make an opening statement

5   outlining the defense's case either immediately following

6   the Deputy Attorney General's opening statement or at a

7   later time in the trial.

8           Next, the Deputy Attorney General will

9   present his evidence.  He may call witnesses to testify

10   and he may offer such exhibits or documents or physical

11   evidence as he chooses.  The defense counsel has the

12   right to cross-examine witnesses called by the Deputy

13   Attorney General in order to test the truthfulness and

14   accuracy of their testimony.

15           After the Commonwealth has presented the

16   Commonwealth's case, defense counsel may present evidence

17   for the defendant.  The defendant has no obligation to

18   offer any evidence or to testify himself.  The

19   Commonwealth may, of course, cross-examine any witnesses

20   that may be called by the defense.

21           After all the evidence has been presented,

22   counsel for both sides will have the opportunity to make

23   their closing arguments to you.  At that point, I shall

24   give my final charge, which will include the instructions

25   on the rules of law that apply to this case and whatever

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1    additional guidance I think you will need for your

2    deliberations.  You will then retire to the jury room to

3    deliberate and decide what your verdict will be.

4         It is my responsibility to decide all

5    questions of law.  You must follow my rulings and

6    instructions on the matters of law whether or not you

7    agree with them.  I may give you other instructions

8    during the trial in addition to these preliminary

9    instructions in my final charge.

10        You should consider all of my instructions as

11   a connected series.  They constitute the law which you

12   must follow.

13        I am not, however, the judge of the facts.

14   It is not for me to decide what are the true facts about

15   the charge against this defendant.  You, the jurors, are

16   the sole judge of the facts.

17        It will be your responsibility at the end of

18   trial when you deliberate to evaluate the evidence and

19   from the evidence find what the facts are.  You will

20   apply the rules of law, which I give to you, to the facts

21   as you find them to decide whether this defendant has

22   been proven guilty or whether he will be not guilty.

23        While you are deciding the facts of this

24   case, you will have to judge the credibility and weight

25   of the testimony and other evidence.  By credibility I

1    mean truthfulness and accuracy.  When you judge the

2    credibility and weight of a witness' testimony, you are

3    deciding whether you believe all, part or none of his or

4    her testimony and how important that testimony is.

5              Use your understanding of human nature and

6    your common sense.  Observe each witness as he or she

7    testifies.  Be alert for anything in his or her own

8    testimony or behavior or for anything in the other

9    evidence that might help you judge the truthfulness,

10   accuracy and weight of that evidence.

11             Each of you must keep an open mind throughout

12   the trial.  You should avoid forming opinions about the

13   guilt or innocence of the defendant or about any other

14   disputed question until the trial has ended and you begin

15   your deliberations.

16             Do not talk with each other about the

17   evidence or any other matter relating to whether the

18   defendant has been proven guilty until I send you to the

19   jury room to deliberate on your verdict.  Only then will

20   you know enough about the case, the evidence and the law

21   to discuss it intelligently and fairly.  When you

22   deliberate on your verdict, the law allows you to

23   consider only the evidence, arguments and instructions

24   that were presented to you properly.

25             You must avoid anything that might result or

Case 3:13-cv-02684-WQH-PTD Document 2-1 Filed 11/01/13 Page 59 of 93

1   appear to result in your being exposed to outside

2   information or influences.  More specifically, do not

3   talk with anyone else about this case or listen to others

4   talk about this case until the trial is completely over

5   and I discharge you as jurors.  Do not even discuss the

6   case with members of your family, close friends or court

7   personnel.

8           There are some people with whom you should

9   not have any conversation at all, even casual

10   conversation.  These people are the defendant, counsel

11   for both sides and the witnesses.

12           Do not read, listen or watch anything about

13   this case in the newspapers, magazines or on radio or

14   television.  Do not try to get information relative to

15   this case on your own.  Do not make any investigation, do

16   any research, visit the scene of any of the offenses that

17   are alleged or conduct any experiment.  Your only

18   information about this case should come to you while

19   you're all together here acting as a jury in the presence

20   of myself, the attorneys and the defendant.

21           As I told you earlier, you are the sole

22   judges of the facts and of the credibility and weight of

23   the evidence.  You must rely on your own recollection and

24   evaluation of the evidence during your deliberations and

25   not mine or counsel's.  You are not bound by any opinion

1    that counsel or I might express about the guilt or

2    innocence, credibility or weight of the evidence, facts

3    proven by the evidence or inferences to be drawn from

4    those facts.

5            An inference is a deduction.  For example, if

6    everything is wet outdoors, you might infer it had been

7    raining.  You should consider the statements and

8    arguments of counsel carefully even though they are not

9    binding on you as they are not evidence.  You may be

10   guided by them if the statements and arguments are

11   supported by the evidence and appeal to your reason and

12   judgment.

13           The questions that counsel put to witnesses

14   are not evidence.  The same is true of any questions that

15   I might ask.  You should not guess that a fact is true

16   because one of the attorneys or I ask a question about

17   it.  It is the witnesses' answers that provide the

18   evidence.

19           Part of my job is to rule on any objections

20   to evidence made by counsel.  If I decide the evidence is

21   admissible, I will overrule the objection.  This simply

22   means that you are entitled to hear and consider the

23   evidence.  On the other hand, if I decide the evidence is

24   inadmissible, I will sustain the objection.  This means

25   that you are not entitled to hear the evidence.

1       Sometimes I may order evidence stricken from

2   the record after you have heard it.  Whenever I sustain

3   an objection or order evidence stricken from the record,

4   you must completely disregard that evidence when deciding

5   the case.

6       Counsel and I may have to deal with matters

7   that you are not supposed to know about.  When one of

8   these matters comes up, counsel and I may discuss it at

9   sidebar, or in front here, or in my chambers or in the

10  courtroom after I have asked you to leave.  Please do not

11  try and guess what we are talking about.  While we are

12  discussing matters at the bench, feel free to stand or

13  converse quietly among yourselves on any matter unrelated

14  to this case.

15      Do not concern yourself with what the penalty

16  might be should you find the defendant guilty.  The

17  question of guilt and punishment are totally separate

18  questions.  If you do find the defendant guilty, it will

19  become my responsibility as Judge to fix the penalty.

20      Whatever your verdict, it will have to be

21  unanimous to be valid.  All of you will have to agree on

22  it or there will be no verdict.

23      In the jury room, you will discuss the case

24  among yourselves, but ultimately each of you will have to

25  make up his or her own mind; therefore, each of you has

1    the responsibility which you cannot avoid.  You must do

2    your best throughout the trial to fulfill that great

3    responsibility.

4              As I indicated to you, there will be

5    permitted in this particular case the taking of notes.

6    Once counsel has finished their opening argument, should

7    both counsel decide to make them today, I will go over

8    with you first thing in the morning relative to the rules

9    and regulations regarding note taking.

10             Mr. Portman, would you like to address the

11   jury?

12             MR. PORTMAN:  Thank you.

13             Good afternoon, ladies and gentlemen.  As I

14   indicated earlier, my name is Stevan Kip Portman.  I'm a

15   Deputy Attorney General.  I represent the Commonwealth in

16   this case.

17             I'd like to first free your minds of anything

18   you've seen on television regarding criminal trials.

19   That is not reality.  That is make-believe.  Cases are

20   settled within an hour and the good guy always wins.

21   This is a real, live case.

22             This involves an allegation by the

23   Commonwealth that beginning on or about January 6th

24   of 2007 -- excuse me, 2006, the defendant, Levi

25   Stoltzfoos, started on a pattern of structuring cash

deposits in banks.  That is he took $540,200 and over a six-week period made 58 separate deposits ranging anywhere from $5200 to $10,000 on 58 separate occasions involving ten banks located within Lancaster County, Pennsylvania.  And that he did so for one purpose and one purpose only.  That was to prevent the government from knowing that he had that money.

If he had made deposits of $10,000 -- in excess of $10,000, each bank would have had to fill out a form called a Cash Transaction Report, which is required by the federal government.  That puts the government on notice that this money has been deposited and it's cash.

That is the entire case merely in a nutshell.  Fifty-eight transactions to avoid having banks do what they're required to do under the law, which is fill out a Cash Transaction Report.

To prove to you that occurred, you're going to hear testimony from Special Agent Licklider from the witness stand regarding how he started the investigation when he received information from the bank -- excuse me, Susquehanna Bancshares from one of their employees that called him and notified him of some activity going on by Mr. Stoltzfoos in the banks in Lancaster County.  And that through his investigation, Mr. Licklider obtained, from each of those ten banks, copies of cash-in tickets

        1    and the deposit slips filled out by Mr. Stoltzfoos for

        2    each one of those 58 separate transactions.  He will

        3    identify the documents received.

        4              Then you will hear from bank representatives

        5    from each of those ten banks who will testify as to the

        6    authenticity of those documents and, in fact, they were

        7    presented at their bank, and that Mr. Stoltzfoos

        8    presented cash coinciding with those deposit tickets,

        9    proof through the cash-in tickets.

       10              Although the statute, as the Judge read,

       11    indicates that it's dealing in proceeds of unlawful

       12    activities, that's just the name of the statute.  What

       13    we're alleging in this case is that Mr. Stoltzfoos'

       14    transactions, what he did was to avoid the banks filling

       15    out a Cash Transaction Report, a report required under

       16    federal or state law.

       17              And after you've heard all that testimony, I

       18    submit that you will agree with me that Mr. Stoltzfoos'

       19    only reason for making those 58 transactions was to

       20    prevent the government from knowing about his cash.

       21    Thank you.

       22              THE COURT:  Mr. Conrad, would you like to

       23    open at this time?

       24              MR. CONRAD:  Yes.  Thank you, Your Honor.

       25              May it please.  Mr. Portman.  Ladies and

1    gentlemen of the jury, it is a pleasure to finally get a

2    chance to get in front of you on this case.  Since I was

3    brought on board here to help out Levi Stoltzfoos, I've

4    been waiting for this opportunity to get in front of you

5    folks because you've never heard a case like you're about

6    to hear.

7              Folks, this young man over here, my client,

8    this is Levi Stoltzfoos.  This young man grew up right

9    here in Lancaster County.  He grew up in an Amish family.

10   And what you're going to hear is this young man is

11   terrifying the government.

12             He has worked for 22 years.  He lives with

13   his mom and dad who are, in fact, Amish and he's afraid

14   of the federal government.  He's afraid they'll take his

15   money.  And guess what?  They did.  I'm sorry, not the

16   federal government.  The government.  He's afraid they'll

17   take his money and they did.

18             Why did they take his money?  Well, Levi

19   Stoltzfoos wanted to put his money in the bank, cash

20   money in the bank so he could get some interest and buy a

21   truck.  So he knows about a form.  There's a form as the

22   government pointed out, a banking form.  And the banking

23   form has to be filled out for transactions over 10,000

24   bucks.

25             Well, here's Levi Stoltzfoos.  And you'll

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1    hear about an eighth grade education that he has.  And,

2    let's see, going to put money in the bank, don't like the

3    federal government, I'll just put it in nine grand at a

4    time or $9,000, as the government pointed out, $5,000 or

5    whatever, but he's going to put it in under the limit.

6    Why?  He's afraid of the federal government.

7              So what's he do?  Well, he starts putting his

8    money in the bank.  And he went to, here in Lancaster

9    County, numerous banks.  And I'm sure, as counsel pointed

10   out, you're going to hear from each one of those banks,

11   banks here in Lancaster County that want to do business

12   with folks.  Why?  Because they want to collect their

13   money.  Sign out a form, I want a banking account, I want

14   a savings account, I want a checking account.  That's

15   what I want to do.

16             Now, you come in, the people you trust,

17   deliver your money.  And as you'll hear, he's doing

18   something that apparently is illegal.  Apparently if you,

19   in fact, do this and structure your money to put it in

20   this way, it's a crime.

21             So what you're going to hear is the ten

22   different banks that he deals with and the folks that

23   work at those banks as they see -- and you'll hear the

24   testimony they see this man bringing in the money under

25   the 10,000-dollar limit.  Not once does anybody walk up

1    to this simple man and simply say, sir, if you put your

2    money in that way, it's a crime.  You could be

3    incarcerated and they'll take every penny that you own.

4    Every penny.  Not once does anybody do that.  So he can

5    put his money in like that until one day the police come

6    and arrest the man.

7              Before today, I'm an attorney.  Been an

8    attorney for years.  Forty-one years of age.  Did you

9    know that was a crime?  Dealing in proceeds of unlawful

10   activities.  A person commits the offense of dealing in

11   proceeds of unlawful activities if the person conducts a

12   financial transaction under any of the following

13   circumstances:  To avoid the reporting under state or

14   federal law.

15             Man, put my money in under ten grand a couple

16   of times.  And guess what?  They're going to take it all.

17             Well, I submit to you folks in this

18   particular case, this man is afraid of the federal

19   government and this man wants to put his money in the

20   bank.  And this man does exactly what the Commonwealth

21   said.  He put numerous amounts of money in.

22             Pictures taken everywhere he goes.  He's

23   smiling as he comes into the bank.  He's going about his

24   business.  Doesn't hide anything.  Good morning.  Here's

25   my money.  Good morning.  Over here, here's my money.

1    Conduct that is criminal, conduct that needs prosecuted,

2    conduct for which this man needs to have all his money

3    taken, it's not in this case.

4            The Commonwealth has to show that he's

5    reckless.  That's the standard you guys are going to hear

6    about.  And the Judge is going to talk to you about that.

7    Anything that has to do with the law the Judge will have.

8    Anything that has to do with the facts, you folks will be

9    the final -- you'll have the final say on that.  And

10   you're going to get a chance to hear all the facts in

11   this case.

12           I submit to you that when we get all done

13   with this case, you're going to find out that this young

14   man did, in fact, put his cash money in, he put it in

15   under $10,000 and that he did so innocently.  No crime.

16   And we'll come back at the end and argue exactly that,

17   that the conduct that Levi Stoltzfoos, one of our people

18   here in Lancaster County, grew up Amish, the conduct that

19   he did, did not rise to the level of the offense that the

20   government has charged him with in this case.  And we'll

21   ask you to keep your eyes and ears open and listen to all

22   of it, as I'm sure you will, and we'll come back and

23   argue at the end that he is not guilty of this charge.

24           Thanks, folks.  Thank you, Your Honor.

25           THE COURT:  Members of the jury, at this

```
1    time, there will be quite a number of witnesses; many of
2    them, of course, like yourselves, coming from what I'll
3    call professional banking institutions.  The reason that
4    I bring that to your attention is solely because we've
5    now heard the opening comments by each side and at this
6    point we're going to break for the day.  We will begin
7    testimony promptly at 9:00 tomorrow morning.
8    Mr. Battisti will direct you exactly where to be, when to
9    be, and also to wear those juror buttons.
10             I'm going to excuse you until tomorrow
11   morning.  As I said, trial will resume with taking of
12   testimony at nine a.m.
13             I ask that you report back to the jury room
14   no later than -- Mr. Battisti, what would you like?
15             THE BAILIFF:  8:45.
16             THE COURT:  -- no later than 8:45.  You're
17   certainly welcome to come earlier than that.  8:30 is
18   fine.
19             Please remember you have now heard just a bit
20   about this case from both counsel.  You are not to
21   discuss this case among yourselves or with anyone else.
22   You are not to conduct any experiment, visit any scenes
23   or make any other individual investigation of any of the
24   facts of this case.  You are not to read, listen or watch
25   any media accounts of this case.  Please wear your jury
```

```
1    buttons in a conspicuous place at all times when you are

2    around the courthouse environs.

3              I thank you for your service so far and we'll

4    see you bright and early tomorrow morning.  Thank you

5    very much.

6              (The jury left the courtroom.)

7              THE COURT:  Counsel, do you expect any

8    preliminary matters before we begin tomorrow morning?

9              MR. PORTMAN:  No -- just one.  I would ask

10   the Court to address the jury on Mr. Conrad's

11   misstatement of the law when he said that the burden is

12   reckless when the Court in the pretrials ruled that it

13   wasn't strictly reckless.  You said it was intentional,

14   knowingly, reckless under 302(c).  I'd ask for a

15   cautionary instruction, Your Honor, tomorrow morning with

16   the jury.

17             THE COURT:  Thank you, sir.  Any expectation

18   you'll need to see me before we begin testimony in the

19   morning?

20             MR. PORTMAN:  No, Your Honor.

21             MR. CONRAD:  No, Your Honor.  Only my

22   response to that's the lowest standard -- there are

23   three, as the Court will instruct certainly at the end,

24   and that's just simply the lowest.  In other words --

25   only argue there's no need for a cautionary instruction,
```

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1   Your Honor.  It's simply the Court will address that

2   clearly throughout the trial or at the end of the trial.

3           THE COURT:  Very well.  Then I would ask

4   everybody to be seated at approximately 8:45 tomorrow

5   morning so we can begin promptly at 9:00 with the calling

6   of witnesses.  Thank you all very much.

7           MR. CONRAD:  Thank you, Your Honor.

8           (The proceedings recessed at 3:55 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

I HEREBY CERTIFY that I was present upon the hearing of the above-entitled matter and there reported stenographically the proceedings had and the testimony produced, and I further certify that the foregoing is a true and correct copy of my said stenographic notes.

In testimony whereof, I have hereunto subscribed my hand this 17th day of June, 2008.

_Susan A. Milton_

Susan A. Milton
Official Court Reporter

AND, NOW, _____, _____,

this transcript is approved and ordered to be filed.

_____

Howard F. Knisely, Judge

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF LANCASTER
CRIMINAL

DEFENSE ATTORNEY

COPY

1

2

3

4

5   _____
    COMMONWEALTH OF PENNSYLVANIA        :
6                                       :
               vs.                      :   Number 5995-2006
7                                       :
    LEVI L. STOLTZFOOS                  :
8   _____:

9

10                    JURY TRIAL
                    VOLUME 2 OF 4

11

12          Before:  Honorable Howard F. Knisely, Judge

13          Date  :  Tuesday, May 6, 2008

14          Place :  Courtroom No. 3
                     50 North Duke Street
15                   Lancaster, Pennsylvania 17602

16

17

18  APPEARANCES:

19      STEVAN K. PORTMAN, ESQUIRE
        ASSISTANT ATTORNEY GENERAL
20          For - The Commonwealth

21      JEFFREY A. CONRAD, ESQUIRE
        CLYMER & MUSSER
22      408 West Chestnut Street
        Lancaster, Pennsylvania 17603
23          For - The Defendant

24

25  ORDERED 5-16-08  LODGED _____    FILED _____

SUSAN A. MILTON, OFFICIAL COURT REPORTER

```
1                      INDEX TO WITNESSES

2        VOLUME 2 OF 4

3        WITNESSES:        DIRECT    CROSS    REDIRECT    RECROSS

4        Daniel Licklider  76        131       148         152
         Tarah Forsythe    155       159       162         ---
5        Annie Frackman    164       167       ---         ---
         Nadine McGarrity  171       174       ---         ---
6        Elaine Shope      176       179       ---         ---
         Lana L. Neff      181       184       ---         ---
7        Linda Lane        185       188       ---         ---
         Jennie McComsey   190       192       ---         ---

8

9        COMMONWEALTH'S EXHIBITS                     IDENTIFIED

10       No. 1 - Application for Search Warrant       81
         No. 2 - Application for Search Warrant       82
11       No. 3 - Application for Search Warrant       83
         No. 4 - Application for Search Warrant       84
12       No. 5 - Application for Search Warrant       84
         No. 6 - Application for Search Warrant       85
13       No. 7 - Application for Search Warrant       86
         No. 8 - Application for Search Warrant       86
14       No. 9 - Application for Search Warrant       87
         No. 10 - Application for Search Warrant      87
15       No. 11 - Application for Search Warrant      89
         No. 20 - Yellow paper                        90
16       No. 31 - Deposit ticket                      94
         No. 31A - Cash in ticket                     95
17       No. 32 - Teller ticket                       95
         No. 32A - Teller ticket                      96
18       No. 33 - Deposit ticket                      96
         No. 33A - Teller ticket                      96
19       No. 34 - Deposit ticket                      96
         No. 34A - Teller ticket                      96
20       No. 35 - Deposit ticket                      96
         No. 35A - Teller ticket                      97
21       No. 36 - Teller ticket                       97
         No. 36A - Teller ticket                      97
22       No. 37 - Deposit ticket                      97
         No. 37A - Teller ticket                      97
23       No. 40 - Signature card                      99
         No. 41 - Deposit ticket                      99
24       No. 42 - Deposit ticket                      100
         No. 43 - Deposit ticket                      100
25
```

1        <u>INDEX TO EXHIBITS</u> (continued)

2    COMMONWEALTH'S EXHIBITS                    IDENTIFIED

3    No. 44 - Deposit ticket                       100
     No. 45 - Deposit ticket                       100
4    No. 50 - Signature card                       101
     No. 51 - Deposit ticket                       101
5    No. 52 - Deposit ticket                       101
     No. 53 - Deposit ticket                       102
6    No. 54 - Deposit ticket                       102
     No. 55 - Deposit ticket                       103
7    No. 60 - Signature card                       103
     No. 61 - Deposit ticket                       104
8    No. 61A - Teller ticket                       104
     No. 62 - Deposit ticket                       104
9    No. 62A - Teller ticket                       105
     No. 63 - Cash-in ticket                       105
10   No. 63A - Cash-in ticket                      105
     No. 64 - Deposit ticket                       105
11   No. 64A - Teller ticket                       105
     No. 65 - Deposit ticket                       106
12   No. 65A - Teller ticket                       106
     No. 66 - Deposit ticket                       106
13   No. 66A - Teller ticket                       106
     No. 70 - Signature card                       107
14   No. 71 - Deposit ticket                       107
     No. 71A - Teller ticket                       107
15   No. 72 - Deposit ticket                       108
     No. 72A - Teller ticket                       108
16   No. 73 - Deposit ticket                       108
     No. 73A - Teller ticket                       109
17   No. 74 - Deposit ticket                       109
     No. 74A - Teller ticket                       109
18   No. 75 - Deposit ticket                       109
     No. 75A - Teller ticket                       109
19   No. 80 - Signature card                       111
     No. 81 - Deposit tickets                      111
20   No. 82 - Deposit ticket                       112
     No. 83 - Deposit ticket                       113
21   No. 90 - Signature card                       114
     No. 91 - Deposit ticket                       114
22   No. 91A - Teller ticket                       114
     No. 92 - Deposit ticket                       114
23   No. 92A - Deposit ticket                      114
     No. 93 - Deposit ticket                       115
24   No. 93A - Teller ticket                       115
     No. 94 - Deposit ticket                       115

25

COMMONWEALTH'S EXHIBITS (continued)

| | |
|---|---|
| No. 95 - Deposit ticket | 115 |
| No. 95A - Deposit ticket | 115 |
| No. 96 - Deposit ticket | 115 |
| No. 96A - Teller ticket | 116 |
| No. 97 - Deposit ticket | 116 |
| No. 97A - Deposit ticket | 116 |
| No. 100 - Signature card | 117 |
| No. 101 - Deposit ticket | 117 |
| No. 102 - Deposit ticket | 117 |
| No. 103 - Deposit ticket | 118 |
| No. 104 - Deposit ticket | 118 |
| No. 105 - Deposit card | 118 |
| No. 106 - Deposit ticket | 119 |
| No. 110 - Signature card, Sovereign Bank | 120 |
| No. 111 - Deposit ticket | 120 |
| No. 112 - Deposit ticket | 120 |
| No. 113 - Deposit ticket | 120 |
| No. 114 - Deposit ticket | 121 |
| No. 115 - Deposit ticket | 121 |
| No. 116 - Deposit ticket | 121 |
| No. 120 - Account agreement | 122 |
| No. 121 - Money market deposit ticket | 122 |
| No. 121A - Teller ticket | 122 |
| No. 122 - Money market deposit ticket | 123 |
| No. 122A - Cash-in ticket | 123 |
| No. 123 - Cash-in ticket | 123 |
| No. 123A - Cash-in ticket | 123 |
| No. 124 - Money market deposit ticket | 123 |
| No. 124A - Cash-in ticket | 123 |
| No. 125 - Cash-in ticket | 123 |
| No. 125A - Cash-in ticket | 123 |


DEFENDANT'S EXHIBITS                        IDENTIFIED

Nos. 1 through 18 - Photographs                 134

```
 1                  P R O C E E D I N G S
 2                     (9:02 a.m.)
 3            THE COURT:  As you can tell, it's not always
 4    the easiest thing driving to the City of Lancaster.  I
 5    encourage you -- and I know that the radio is not always
 6    accurate as to where accidents are and so forth, but
 7    please be mindful of that for tomorrow.
 8            The Court has two items that I need to bring
 9    to your attention before the first witness is called.
10    First of all, defense counsel, in his opening comments,
11    indicated the culpability in this case is the standard of
12    recklessness.  Although that is a correct statement, it
13    is not actually a complete statement.  And so I'm going
14    to just read to you very briefly the applicable law.
15            When the culpability is sufficient to
16    establish a material element of the offense as prescribed
17    by law, such element is established if a person acts
18    intentionally, knowingly or recklessly with respect to
19    that.
20            We'll come back to that in my final
21    instructions, but I just wanted you to have three
22    possible ways of culpability.
23            Second, you now have packets on your seats or
24    on your laps and that is regarding note taking.  I'm
25    required to give you instructions relative to note
```

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1    taking, and so I would like you to listen to these

2    instructions and at the end I will direct you as to what

3    you may do with your packets.

4              You will be distributed notepads and pens in

5    the event you wish to take notes during the trial.

6    You're under no obligation to take notes and it is

7    entirely up to you whether you wish to take notes to help

8    you remember what witnesses said and to use them during

9    your deliberations.

10             If you do take notes, remember that one of

11    your responsibilities as a juror is to observe the

12    demeanor of witnesses to help you assess their

13    credibility.  Do not become so involved with note taking

14    that it interferes with your ability to observe the

15    witnesses or it distracts you from hearing the questions

16    being asked the witnesses and the answers given by the

17    witnesses.

18             Again, the witnesses will all be testifying

19    from the witness stand right here.  Your notes may help

20    you refresh your recollection of the testimony and should

21    be treated as a supplement to rather than a substitute

22    for your memory.  Your notes are only to be used by you

23    as memory aids and should not take precedence over your

24    independent recollection of the facts.

25             Those of you who do not wish to take notes

should not be overly influenced by the notes of other jurors. It is just as easy to write down something incorrectly as it is to remember it incorrectly and your fellow jurors' notes are entitled to no greater weight than each juror's independent memory.

Although you may refer to your notes during deliberations, give no more or less weight to the view of other fellow jurors just because that juror did or did not take notes. Although you are permitted to use your notes for your deliberations, the only notes you may use are the notes you write down in the courtroom during the proceedings on the materials distributed by court staff.

Each time that we adjourn, your notes will be collected and secured by the court staff. Your notes are completely confidential and neither I nor any member of the court staff will read your notes now or at any time in the future. After you have reached a verdict in this case, your notes will be destroyed immediately by court personnel.

You will only be permitted to take notes during the portion of the trial when evidence was presented. For example, you did not have the notepads for opening statements. You will not have the notepads for closing arguments nor for the instructions of the Court, only for the purpose of taking notes when someone

1   is testifying from the witness stand.

2                  For those of you who wish to take notes, you

3   may now remove the pen and pad from your folders as we

4   are about to have the first witness.  And, yes, they do

5   make noise.

6                  Okay.  Is the Commonwealth ready to proceed?

7                  MR. PORTMAN:  Yes, we are, Your Honor.

8                  THE COURT:  Would you call your first

9   witness.

10                 MR. PORTMAN:  Dan Licklider to the stand

11  please.

12                      DANIEL O. LICKLIDER,
    called as a witness, having been duly sworn or affirmed,
13              was examined and testified as follows:

14                      DIRECT EXAMINATION

15  BY MR. PORTMAN:

16       Q.   Good morning.  Please state your name for the

17  record and spell your first and last names.

18       A.   Daniel O. Licklider.  It's D-a-n-i-e-l;

19  Licklider, L-i-c-k-l-i-d-e-r.

20       Q.   And Mr. Licklider, by whom are you employed?

21       A.   Commonwealth of Pennsylvania, Office of the

22  Attorney General.

23       Q.   And in what capacity?

24       A.   The title is Field Investigator Supervisor,

25  Field Investigator, and also Narcotic Agent 3.

1    Q.    And how long have you been employed by the

2    Office of the Attorney General?

3    A.    Thirty-four years.  Over 34 years.

4    Q.    Prior to that did you have any law

5    enforcement experience?

6    A.    No.  I had college prior to that and

7    military.

8    Q.    And what, if any, special training have you

9    had as a narcotics officer or a Field Investigator?

10   A.    I started work in 1973, went to Gannick

11   (phonetic) College -- that's where the training academy

12   was -- and I performed undercover work from '73 to '86.

13   In 1987 we formed a financial investigation unit and I

14   was assigned to that unit.  Subsequently in 1991, I was

15   the -- became the field supervisor for that unit.

16        The name of the unit changed from the

17   Financial Investigative Unit to the Money Laundering Unit

18   subsequently.

19   Q.    And did you have any special training with

20   respect to financial investigations slash money

21   laundering investigations?

22   A.    Yes, sir.  I attended -- one's the FBI had an

23   academy I went to down in Quantico, Virginia.  I went to

24   IRS schools, additional FBI, DEA schools, McLaughlin,

25   numerous -- numerous schools through the years.

```
1          Q.    And during your 34 years, did you participate
2   in any financial investigations prior to 2006?
3          A.    Yes, sir.
4          Q.    Approximately how many?
5          A.    Separate from being the supervisor aspect?
6          Q.    Start there.
7          A.    Personally, approximately -- do you want from
8   1987 up to -- I mean from the start of the financial
9   investigations?
10         Q.    That's fine.
11         A.    At least a hundred, and that is a supervisor
12  being more than that because I had people that worked
13  under me, also.
14         Q.    Okay.  Starting in 2006 were you so involved
15  in the Money Laundering Investigation Unit?
16         A.    Yes, sir.
17         Q.    And in 2006 did you become involved in an
18  investigation of Levi Lapp Stoltzfoos?
19         A.    Yes, sir, I did.
20         Q.    And can you please tell us how you became
21  involved in that investigation?
22         A.    On or about February 13th, I received a phone
23  call from Lisa Krick, who is a BSA Compliance Officer --
24  some banks called them compliance officers, some of them
25  call it security, they have various titles, but I
```

```
 1    received a phone call from her.
 2            Q.   Do you recall which bank she worked for?
 3            A.   Yes.  Susquehanna Bancshares.
 4            Q.   As a result of that telephone call what, if
 5    any, action did you take?
 6            A.   I initiated an investigation against
 7    Mr. Stoltzfoos.  He's seated to the left of the defense
 8    counsel.
 9            Q.   And what steps did you initially take for
10    that investigation?
11            A.   From the information I received from Lisa
12    Krick, we found that Mr. Stoltzfoos was making what
13    appeared to be structured deposits throughout Lancaster
14    County in a short time frame, and as a result of that I
15    went around and conducted interviews and took the
16    information, to put it in in preparation for a search
17    warrant affidavit for each one of these financial
18    institutions.
19                 And the first wave of search warrants were
20    executed about February 23rd, about ten days later.  They
21    were sealed search warrants.  I had -- they were signed
22    here by a Common Pleas Judge and they were executed on
23    February 23rd.
24                 Subsequently, there was a search warrant
25    which I did.  Again, it was a sealed search warrant we
```

1   executed at the residence of Levi Stoltzfoos.  That was

2   on or about March 30th of 2006.  And then there was

3   approximately two more search warrants done subsequent to

4   the search warrant execution at the residence, and that

5   was done -- I think one of the last banks that we did was

6   Graystone Bank, New Holland.  And then I did one at Blue

7   Ball National Bank that was for just documents only.

8          Q.   Okay.  With respect to the search warrant

9   executed at the banks, how many banks did you identify as

10  being involved with or flowing from the information you

11  initially received from Miss Krick?

12         A.   Initially, information was approximately six

13  banks.

14         Q.   And how many banks in total did you end up

15  receiving information from with respect to

16  Mr. Stoltzfoos' activities?

17         A.   Ten.

18              MR. PORTMAN:  May I approach the witness,

19  Your Honor?

20              THE COURT:  You may.

21  BY MR. PORTMAN:

22         Q.   Mr. Licklider, I handed you what have been

23  previously marked as Commonwealth Exhibits 1 through 10.

24  Would you please look through those, see if you recognize

25  those.

1          A.    It's 11 Commonwealth Exhibits.

2          Q.    Sorry.  One through 11.

3                With respect to Exhibit Number 1, can you

4    please tell us what that is?

5          A.    Yeah.  This is the application for search

6    warrant authorization.  It's Lancaster County and it's

7    for the Bank of Lancaster County.  It has my signature on

8    it and it has the issue of authority with the Judge's

9    signature, Judge Allison.  And it has the date that I

10   served the search warrant -- that was February 23rd --

11   and the date that the -- I signed before the Judge swore

12   to it was on the 22nd.

13         Q.    Now, with respect to Commonwealth Exhibit 1,

14   did you personally present that to the Bank of Lancaster

15   County?

16         A.    Yes, sir, I did.

17         Q.    And as a result of presenting that, did you

18   receive any documents or other material from the bank?

19         A.    Yes, sir, I did.

20         Q.    What did you receive?

21         A.    I received a cashier's check number 230408 in

22   the amount of $78,612.11.  And that was made out to the

23   Commonwealth of Pennsylvania or the Attorney General's

24   Office.

25         Q.    And any other documents?

```
 1              A.    Twenty-six monthly statements for Mr. Levi

 2    Stoltzfoos' account; and it has the account number on

 3    there, his signature card for when he took out the

 4    account, and cash-in transactions and deposit tickets and

 5    photographs of Mr. Stoltzfoos when he is inside of the

 6    bank.

 7              Q.    Did the information you obtained indicate the

 8    account number?

 9              A.    Yes, sir, it did.

10              Q.    And can you please tell us what that number

11    was?

12              A.    Sure.  9020010147.

13              Q.    Next, if you would please refer to

14    Commonwealth's Exhibit 2 for Coatesville Savings Bank.

15              A.    Yes, sir.

16              Q.    Could you please tell us when that was

17    signed, executed and what, if anything, was received back

18    from the bank?

19              A.    This one was for -- it's a sealed search

20    warrant signed before Judge Michael J. -- I apologize if

21    I --

22              THE COURT:  Perezous.

23              THE WITNESS:  -- Perezous that was signed on

24    March 3rd, 2006.  And it was executed the same day by

25    myself, on March 3rd, '06, and it was for Coatesville
```

1    Savings Bank.  And it was, again, one of Mr. Levi

2    Stoltzfoos' accounts.

3         Q.    Did you receive anything from this bank as a

4    result of executing that search warrant?

5         A.    Yes, sir.  I received a Coatesville Savings

6    Bank official check number 012408 in the amount of

7    $35,758.91.  The account number which this money came out

8    of was 3026001651.

9              The signature cards, I received monthly

10   statements, the deposit slips, withdrawal slips and I

11   received some photocopies of the monies that were

12   deposited by Mr. Stoltzfoos, the hundred-dollar bills.

13   There was some $14,000 worth of photographs of the money,

14   and there was a photograph -- an additional photograph of

15   Mr. Stoltzfoos.

16        Q.    Next I'd like to direct your attention to

17   what's been previously marked as Commonwealth's Exhibit 3

18   for Ephrata National Bank.  Do you see that?

19        A.    Yes, sir.

20        Q.    Could you please tell us when that was

21   signed, executed, and whether or not you personally

22   executed that search warrant?

23        A.    Yes, sir.  It was -- again, it was another

24   sealed search warrant signed by Judge Allison.  I swore

25   to it, signed it on February 22nd.  It was executed the

1    next day, on February 23rd, at Ephrata National Bank,

2    Hinkletown Office in New Holland.

3              The account number was 882011.  I received a

4    cashier's check number 3923 in the amount of $48,251.85.

5    I received monthly statements, signature cards, copy of

6    deposit slips, videotapes this time of the deposits,

7    transactions.

8         Q.    Next I'd like to direct your attention to

9    what was previously marked as Commonwealth's Exhibit 4

10   for Fulton Bank.  You recognize that?

11        A.    Yes, sir, I do.  It's another -- it's another

12   sealed search warrant which I swore to it and signed

13   before Judge Allison here in the County on February 22nd.

14   It was Fulton Bank, 696 East Main Street, New Holland.

15   It's one of Mr. Stoltzfoos' accounts.

16             I received a Fulton Bank check number 0988601

17   in the amount of $54,212.79.  I received signature cards,

18   monthly statements, deposit items, withdrawal tickets, a

19   retail account agreement, and this time there was digital

20   surveillance photographs of Mr. Stoltzfoos making the

21   deposits.  This account number was 362268587.

22        Q.    Next directing your attention to what was

23   previously marked as Commonwealth's Exhibit 5 for

24   Graystone Bank.  Again, do you recognize that document?

25        A.    Yes, sir, I do.  It's another one which I

```
1   signed on this date, April 3rd.  The Honorable Judge
2   Joseph C. Madenspacher.  Apologize, Your Honor.  I'm not
3   familiar with the judges' names around here.
4            Okay.  This is -- it was on account number
5   for Mr. Stoltzfoos 210002077.  Mr. Stoltzfoos.  I
6   executed it on the same day, April 3rd, '06.  I received
7   a check, Graystone Bank check number 1453 in the amount
8   of $48,115.29.
9            I received monthly statements for account
10  number 210002077, signature cards and account number
11  and -- a signature card with the same account number on
12  it, miscellaneous documents and deposit tickets.  Again,
13  that was a sealed search warrant as well as the other
14  ones.
15       Q.   Right.  Directing your attention then to
16  Commonwealth's Exhibit 6, M&T Bank.  Do you recognize
17  that document?
18       A.   Yes, sir.
19       Q.   Can you please tell us what that is?
20       A.   Again, it's a sealed search warrant and it
21  was -- I signed it and swore to it before Judge Allison
22  on February 22nd, '06.  I executed it at M&T Bank, 210
23  East Main Street, New Holland on February 23rd.
24            I received M&T Bank official bank check
25  number 288625251, and it was in the amount of $66,138.61.
```

1   I received a transaction statement.  I received

2   photocopies of $9,000 from one of Mr. Stoltzfoos'

3   deposits.  It was photocopied.

4          Q.   Anything else that you received from the

5   bank?

6          A.   And it says pending surveillance photographs

7   of cash deposits by Mr. Stoltzfoos.

8          Q.   And with respect to Commonwealth's Exhibit 7,

9   do you recognize that document?

10         A.   Yes, sir.  That's another sealed search

11  warrant.  I swore to it on February 22nd before

12  Judge Allison and I executed it the following day,

13  February 23rd, at National Penn Bank, 301 West Main

14  Street in New Holland.  Again, it was on Mr. Stoltzfoos'

15  accounts.  The account number was 215641620.

16              I received the official bank check

17  number 1009 in the amount of $66,700, and I received

18  approximately 46 documents; monthly statements and

19  various deposit tickets.

20         Q.   Referring you now to what was previously

21  marked as Commonwealth's Exhibit 8, please take a look at

22  that.  And do you recognize that?

23         A.   Yes, sir.  Again, that's a sealed search

24  warrant on one of Mr. Stoltzfoos' accounts at Northwest

25  Savings Bank.  The account number was 1711015709.  I

1    swore to it on February 22nd, '06 before Judge Allison

2    and I executed it the following day, on February 23rd.

3              I received an official bank check number

4    250642254 in the amount of $57,271.60.  I also received

5    deposit slips, currency statements, signature card and

6    six surveillance photographs.  And, again, I'm not sure

7    if I said this account number, but it was 1711.

8         Q.   Referring your attention now to what was

9    previously marked as Commonwealth's Exhibit 9 for

10   Sovereign Bank.  Do you recognize that?

11        A.   Yes, sir.

12        Q.   Could you please tell us about that document?

13        A.   Yes.  Again, it's a sealed search warrant

14   which I swore to and signed before Judge Allison.  This

15   happened on February 22nd, '06 for the Sovereign

16   Bank, 689 West Main Street, New Holland.  And the account

17   number was 0022019944.  Again, it's one of the Levi

18   Stoltzfoos' accounts.  I executed it the next day.

19             I received eight surveillance photographs,

20   four monthly statements, I received deposit slips and

21   various opening documents.  And I received an official

22   bank check 6058858 in the amount of $56,724.55.

23        Q.   Now, referring your attention to what was

24   previously marked as Commonwealth's Exhibit 10, do you

25   recognize that?

```
 1              A.    Yes, sir.

 2              Q.    Can you please tell us about that?

 3              A.    Yes, sir.  It's, again, a sealed search

 4   warrant which I signed and swore before Judge Allison

 5   here in the -- at -- on February 22nd, '06, Susquehanna

 6   Bancshares, 3433 Old Philadelphia Pike, Intercourse,

 7   Pennsylvania.  The account number was 10001385466.  It's

 8   for Levi Stoltzfoos and the next day I executed it.  I

 9   received an official check, 14 photographs, a signature

10   card, monthly statements and an account agreement and

11   deposit slips and deposit inquiries.

12              Q.    Can you please tell us the amount on the

13   check that was received?

14              MR. CONRAD:  Your Honor, I'm going to object.

15   If I could just for a moment.

16              I'll withdraw the objection, Your Honor.

17              THE COURT:  Thank you, Mr. Conrad.

18              THE WITNESS:  For some reason the amount's

19   not written on -- the check number is written on it, but

20   not the amount.

21   BY MR. PORTMAN:

22              Q.    Okay.  Now, with each of the ten checks that

23   you testified to receiving, with the exception of not

24   having the amount for the Susquehanna Bancshares' check,

25   what, if anything, did you do with each of those checks?
```

```
 1          A.   We had called an Asset Forfeiture
 2   Administrator and I turned them over to her.
 3          Q.   And what would be the procedure for the asset
 4   administrator to do with those checks, if you know?
 5          A.   Yes, I know.  That money is -- the Office of
 6   the Attorney General has an account which they put that
 7   money in to get interest on it.
 8          Q.   So in short, the Office of the Attorney
 9   General deposited that money into a bank account?
10          A.   That's correct.
11          Q.   Next I'd like to direct your attention to
12   what was previously marked as Commonwealth's Exhibit 11.
13   Do you have that?
14          A.   Yes, sir.
15          Q.   And can you please identify that for us?
16          A.   Yes, sir.  This is a sealed search warrant
17   which I swore to here in the County on March 31st, 2006
18   -- no, it's not.  March 29th, 2006.  Pardon me.  That's
19   March 29th, 2006; and I executed it the next day, on
20   March 30th, 2006.
21          Q.   And where was that executed at?
22          A.   That was executed at Mr. Stoltzfoos' parents'
23   house where he resided.
24          Q.   And what was the address that the search
25   warrant was executed at?
```