1          A.    There's two more pages that aren't attached

2    to this.  Says see attached exhibit.

3          Q.    All right.  Do you know the address that

4    Mr. Stoltzfoos resided at off the top of your head?

5          A.    I don't recall.

6          Q.    Would that be in your records --

7          A.    Yes.

8          Q.    -- reports?  I'll get back to that.

9                If I suggested to you that the address was

10   232 Groffdale Road, would that refresh your recollection?

11         A.    That's correct.

12         Q.    That's in Lancaster County?

13         A.    Yes, sir.

14         Q.    Thank you.

15               MR. PORTMAN:  May I approach the witness,

16   Your Honor?

17               THE COURT:  You may.

18   BY MR. PORTMAN:

19         Q.    I've handed you what was previously marked as

20   Commonwealth's Exhibit 20.  Do you recognize that?

21         A.    Yes, sir.

22         Q.    Could you please tell us, without going into

23   the contents of it, what it is and when you first saw

24   that?

25         A.    I first saw this yellow piece of paper, it

1    was all folded up little, small.  I saw it on or about

2    March 17th.  Mr. Stoltzfoos pulled it out of his wallet.

3              Q.    And can you tell us where you were in contact

4    with Mr. Stoltzfoos?  On or about March 17th you're

5    talking about, 2006?

6              A.    Yes, sir.  We were at New Holland Police

7    Department in the Council Chambers room, an interview

8    room.

9              Q.    And can you please tell us, again without

10   going into the contents of what's on Exhibit 20, what it

11   is to the best of your ability?

12             A.    Yeah.  It was -- Mr. Stoltzfoos read this

13   statement to us.

14             Q.    Is it typed, handwritten?

15             A.    Handwritten.  I was -- it was myself,

16   Detective Jonathan Heisse and yourself was in the room.

17             Q.    Okay.  Directing your attention to that

18   document, if you would please read to the jurors what is

19   contained on the first line.

20             A.    Yes, sir.  It says, I have worked for more

21   than 22 years.

22             Q.    And how about what's on the second line?

23             A.    I had money in my personal safe.

24             Q.    And the third line?

25             A.    I decided to put money in bank and have one

1    year CD's opened by 4/23/06.

2          Q.   And continuing please.

3          A.   I needed the money so I could buy new truck

4    this fall.

5          Q.   And please continue.

6          A.   I knew that when you withdrew $10,000 cash or

7    deposit $10,000 cash, a form has to be filled out.

8          Q.   And would you please read the next line.

9          A.   I found this out in fall of 1999 before the

10   new millennium.

11         Q.   And the next line please.

12         A.   I don't want no part of government

13   investigation or harassment.

14         Q.   Okay.  In addition to the information written

15   down on that form, was there any identification attached

16   to that that indicated personal information regarding

17   yourself, me or Detective Heisse?

18         A.   Yes, sir.  Mr. Stoltzfoos wanted some contact

19   numbers.  Stevan Kip Portman's phone numbers are on

20   there, my name and phone number is on there and Detective

21   Jon Heisse's name and phone number's on there.  And that

22   was affixed to that when I got my hands on this.

23         Q.   Following that meeting you just described,

24   did Mr. Stoltzfoos leave that meeting with that paper?

25         A.   Yes, sir, he did.

1    Q.   And when did you next see that document?

2    A.   When I executed search warrant number 11 at

3 where Levi was living with his parents.  At his -- in his

4 bedroom I found that same one.

5    Q.   Do you recall where it was when you found it?

6    A.   Right by his bed.  There was a desk by his

7 bed there and there was -- it was just laying out there.

8         MR. PORTMAN:  If I may have a second, Your

9 Honor.

10         May I approach the witness, Your Honor?

11         THE COURT:  You may.

12 BY MR. PORTMAN:

13    Q.   Mr. Licklider, I've handed you what's

14 previously been marked as Commonwealth Exhibits 30

15 and 31.  Would you please take a look at those?

16    A.   Yes, sir.

17    Q.   Do you recognize Exhibit 30?

18    A.   Yes, sir.

19    Q.   Would you please tell us what it is?

20    A.   This is an account -- opening account

21 statement form, signature card form for the account.  It

22 has Mr. Stoltzfoos' signature on there and it's -- and we

23 also have the deposit tickets for Mr. Stoltzfoos on that

24 account.

25    Q.   All right.  Going back to Exhibit 30, is

1    there a particular bank that references?

2          A.    Yes, sir.  It's Bank of Lancaster County.

3          Q.    Okay.  And is there a date indicated when

4    it's opened?  I believe if you look, it would be at the

5    top of the form.

6          A.    March 10th, 2004.

7          Q.    And is there an address listed for the

8    account holder?

9          A.    P.O. Box 84, Smoketown, PA.

10         Q.    And is there an indication of the account

11   number for this particular account?  I believe -- you can

12   check the form -- it would be on the right-hand side.

13         A.    Yes, sir.  It's 9020010147.

14         Q.    And when did you first see that form?

15         A.    When I received the documents pursuant to the

16   search warrant.

17         Q.    And what did you do with those documents when

18   you received them?

19         A.    I did an analysis of them and saw when the

20   deposits took place and the amount of the deposits.

21         Q.    Next directing your attention to the

22   Exhibit 30, please briefly describe -- excuse me,

23   Exhibit 31 -- what those consist of.

24         A.    It's a deposit ticket and the amount for the

25   Bank of Lancaster County.  It's dated January 6th, '06 at

1    the top.  And the amount of the deposit is $10,000.

2    Customer name, it has Levi L. Stoltzfoos, and it has the

3    account number 9020010147.

4         Q.   And are there more documents attached to

5    Exhibit 31?

6         A.   Yes, sir.

7         Q.   And what is the next document?

8         A.   Thirty-one A is a teller ticket.  Has his

9    name on it, $10,000, and it shows that it cleared on

10   January 9th, '06.

11        Q.   And the next document that's provided?

12        A.   It's a deposit ticket for Mr. Levi

13   Stoltzfoos, the same account number which I previously

14   testified to.  This amount, however, was $9,900 and it

15   was in Mr. Stoltzfoos' name.  And that account cleared --

16   pardon me.  That deposit cleared on 1/17/06.

17        Q.   And is that information contained on another

18   document?

19        A.   Yeah.  That's on the teller ticket.  I'm

20   sorry.  Yes, sir.

21        Q.   Does that have a separate exhibit number,

22   sir?

23        A.   Yes.  That's 32-A.

24        Q.   Next in your exhibit --

25             THE COURT:  I'm sorry.  Did you say 32-A?

```
 1              THE WITNESS:  That's correct, Your Honor.
 2   BY MR. PORTMAN:
 3         Q.  -- should be what was previously marked as
 4   Commonwealth Exhibit 33.  Can you please tell us about
 5   that?
 6         A.  Yes, sir.  That's a deposit ticket.  Again,
 7   it's Mr. Stoltzfoos' same account number which I
 8   previously testified to.  The amount is the same, $9,900.
 9   And that took place on January 19th, '06.
10         Q.  And how about 33-A?
11         A.  Thirty-three A is the teller ticket for that
12   deposit.  And that cleared on January 20th, 2006.
13   $9,900.
14         Q.  And Commonwealth's Exhibit 34, do you
15   recognize that?
16         A.  Yes, sir.  Again, it's a deposit ticket for
17   Levi Stoltzfoos, same account number, and this amount was
18   $9,500.
19         Q.  And 34-A, do you recognize that exhibit?
20         A.  Yes, sir.  That was the teller ticket for
21   that deposit.  And that cleared on January 23rd, 2006.
22         Q.  And Commonwealth's Exhibit 35, do you
23   recognize that?
24         A.  Yes, sir.  It was a deposit, as my -- all
25   these deposits were cash deposits.  It was January 27th,
```

1  2006 and the amount was $9,000.  Same account number of

2  Mr. Stoltzfoos' account.

3       Q.   How about for Exhibit 35-A?

4       A.   That was a teller ticket showing that had

5  cleared on January 30th, 2006.

6       Q.   And what was previously marked as

7  Commonwealth's Exhibit 36, do you recognize that?

8       A.   Yes, sir.  It's another cash deposit

9  for $9,000.  Same account number.  Mr. Stoltzfoos.

10       Q.   And how about the next document?

11       A.   And that cleared on February 6th, 2006.

12       Q.   And what is the exhibit number on that,

13  please?

14       A.   Thirty-six A.

15       Q.   Referring you to Exhibit 37, do you recognize

16  that?

17       A.   Yes, sir.  That's a deposit ticket; the same,

18  Levi Stoltzfoos' account.  Cash deposit was $9,000.  And

19  that took place on February 11th, '06.

20       Q.   And Commonwealth's Exhibit 37-A, do you

21  recognize that?

22       A.   Yes.  And that cleared -- the teller ticket

23  cleared on February 13th, for a 9,000-dollar cash

24  deposit.

25       Q.   Each of those items that you've just

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1    testified to, Commonwealth's Exhibits 30 through 37-A,

2    are those the documents you received when you executed

3    the search warrant to the Bank of Lancaster County?

4         A.    That's right.

5         Q.    And those are photocopies of the documents,

6    correct?

7         A.    Yes, sir.

8              MR. PORTMAN:   If I may approach.

9    BY MR. PORTMAN:

10        Q.    Mr. Licklider, I've handed you what have been

11   previously marked as Commonwealth's Exhibits 40

12   through 45.  Do you recognize those documents?

13        A.    Yes, sir, I do.

14        Q.    Directing your attention to Commonwealth's

15   Exhibit 40, can you please identify that for us?

16        A.    Yes, sir.  This is the signature card for the

17   account -- opening account of Mr. Levi Stoltzfoos.  And

18   it's -- the other ones are the deposit tickets for the

19   corresponding deposits.

20        Q.    With respect to Commonwealth's Exhibit 40,

21   could you please tell us the account number, if it's on

22   there, and the date that it was opened if that

23   information is on there.

24        A.    Sure.  The account number was 3026001651 and

25   the opening date was 1/19/2006.  It has Levi Stoltzfoos'

1    name typed on there, has his signature on there and his

2    Social Security number is underneath of it.

3        Q.   Now, with respect to the account opening

4    document in front of you, Commonwealth's Exhibit 40, does

5    it indicate the initial deposit and, if so, whether it

6    was by cash, check or other means?

7        A.   It was $9,900 in cash on January 19th, '06.

8        Q.   Next directing your attention to

9    Commonwealth's Exhibit 41, could you please identify that

10   for us?

11       A.   I'm sorry, what number did you say?

12       Q.   Forty-one.

13       A.   That was the cash deposit for $9,900.

14       Q.   And the date?

15       A.   January 19th, '06.

16       Q.   And that corresponds to the opening deposit?

17       A.   Yes, sir.

18       Q.   Next directing your attention to

19   Commonwealth's Exhibit 42, do you recognize that?

20       A.   Forty-two is a 9,500-dollar cash deposit.

21       Q.   And the date?

22       A.   The teller date is the same date, on

23   January 21st, '06.

24       Q.   And that's into the Coastal Savings Bank; is

25   that correct?

1          A.    That's correct.  The same account number.

2          Q.    And Commonwealth's Exhibit 42, please tell us

3     what that is.

4          A.    That's the one which I just testified to,

5     the $9,500.

6          Q.    Commonwealth's 43.

7          A.    Forty-three was a cash deposit of $9,000 in

8     the same Levi Stoltzfoos' Coatesville Savings account

9     number.

10         Q.    And the date?

11         A.    11/28/06.  And the teller cleared it on the

12    same date, 11/28/06.

13         Q.    And next directing your attention to

14    Commonwealth's 44, do you recognize that?

15         A.    Yes, sir.

16         Q.    Could you please tell us what that is?

17         A.    That's another cash deposit.  The amount

18    is $9,000 into the same account on February 4th, '06, and

19    the teller stamp shows February 4, 2006.

20         Q.    And the next document, Commonwealth

21    Exhibit 45, do you recognize that?

22         A.    Yes, sir.  It's a 5,200-dollar cash deposit

23    on February 11th, 2006; same account and the teller stamp

24    is the same date.

25         Q.    The exhibits you've just testified to,

1    Commonwealth's Exhibits 40 through 45, did you receive

2    those from Coatesville Savings Bank as a result of

3    executing the search warrant you previously testified to

4    at that bank?

5              A.    That's correct.

6                    MR. PORTMAN:  If I may approach, Your Honor?

7                    THE COURT:  You may.

8    BY MR. PORTMAN:

9              Q.    I've handed you what have been previously

10   marked as Commonwealth's Exhibits 50 through 55.  Do you

11   recognize those?

12             A.    Yes, sir, I do.

13             Q.    And can you please tell us what Exhibit 50

14   is?

15             A.    Exhibit 50 is the signature card when

16   Mr. Stoltzfoos opened up the account at Ephrata National

17   Bank.  The account number was 8882011 [sic].  And the

18   date it was opened was January 9th, 2006 in the name of

19   Levi Stoltzfoos.

20             Q.    Next directing your attention to what was

21   previously marked as Commonwealth's Exhibit 51, can you

22   identify that for us please?

23             A.    Yes, sir.

24             Q.    What is that?

25             A.    It's a deposit ticket for $9,900 into the

Case 5:13-cv-02084-WLO-PT Document 2-2 Filed 11/19/13 Page 13 of 99

 1    account which I just said.  The amount was $9,900 and the

 2    date was January 17th, 2006.

 3            Q.    Would you please double-check that date,

 4    please?

 5            A.    I'm sorry.  January 7th, [sic] 2006.

 6            Q.    Next I'd like to direct your attention to

 7    what was previously marked as Commonwealth's Exhibit 52.

 8    Do you recognize that?

 9            A.    Yes, sir.  It's a cash deposit into

10    Mr. Stoltzfoos' account.  The amount was $9,900.

11            Q.    And the date of the deposit?

12            A.    January 14th, 2006.

13            Q.    And is this again into the Ephrata National

14    Bank?

15            A.    That's correct.

16            Q.    Next directing your attention to

17    Commonwealth's Exhibit 53.  Can you identify that for us?

18            A.    Yes, sir.  It's another cash deposit into the

19    Levi Stoltzfoos account.  The amount was $9,900 and the

20    date was January 19th, 2006.

21            Q.    Commonwealth's Exhibit 54, can you identify

22    that for us?

23            A.    That's another cash deposit ticket in the

24    amount of $9,500 into the Levi Stoltzfoos account, and

25    the date of the deposit was January 21st, 2006.

1    Q.   And Commonwealth's Exhibit 55, can you

2    identify that for us please?

3    A.   Yes, sir.  It's another cash-in deposit

4    ticket for $9,000 into the Levi Stoltzfoos account, and

5    the deposit date was January 28th.

6    Q.   And with respect to Commonwealth's Exhibits

7    50 through 55 which you've just testified to, are those

8    documents that you received from the Ephrata National

9    Bank with respect to executing your search warrant there?

10    A.   That's correct.

11    MR. PORTMAN:  If I may approach, Your Honor?

12    THE COURT:  You may.

13    BY MR. PORTMAN:

14    Q.   I've just handed you what have previously

15    been marked as Commonwealth's Exhibits 60 through 66-A.

16    Would you please look through those?

17    A.   Yes, sir.

18    Q.   Do you recognize those documents?

19    A.   I do.

20    Q.   Directing your attention to Commonwealth's

21    Exhibit 60, can you please tell us what that is?

22    A.   That's an opening account signature card for

23    Levi Stoltzfoos, the account at Fulton Bank.  And the

24    account number is 3622-68587.

25    Q.   And the date that it was opened?

1          A.    March 18th, 2004.

2          Q.    This an account for Levi Stoltzfoos; is that

3    correct?

4          A.    That's correct.

5          Q.    Next directing your attention to

6    Commonwealth's Exhibit 61, would you please identify that

7    for us?

8          A.    Yes, sir.  That's a deposit cash ticket for

9    that account which I testified to earlier for Fulton

10   Bank.  It's a cash deposit of $9,900, and the date

11   is 1 -- January 14th, 2006.

12         Q.    Commonwealth's Exhibit 61-A, would you please

13   identify that for us?

14         A.    That's a cash-in ticket, the teller ticket in

15   the amount of $9,900.  And it cleared on January 17th,

16   2006.

17         Q.    And Commonwealth's Exhibit 62, would you

18   identify that for us please?

19         A.    Yes, sir.  It's a cash deposit ticket in the

20   amount of $9,900 into the Levi Stoltzfoos account, and

21   that was dated January 20th, 2006.

22         Q.    Would it be fair to say with respect to that

23   document, there is no actual handwritten date on there?

24         A.    That's correct.

25         Q.    And the date you just testified to, does that

1    appear as printed on the checking deposit ticket?

2           A.    That's correct.

3           Q.    Next referring you to Exhibit 62-A, would you

4    identify that for us please?

5           A.    Yes.    That's the teller cash-in ticket for

6    that transaction of $9,900, and the posted date is

7    1/20/2006.

8           Q.    Next, if you would please go to Exhibit 63.

9    Can you tell us what that is please?

10          A.    Yes, sir.    It's a cash-in ticket for the date

11   of January 21st, 2006 for the Levi Stoltzfoos account in

12   the amount of $9,000.

13          Q.    And the date indicated on that check?

14          A.    January 21st, 2006.

15          Q.    And Exhibit 63-A?

16          A.    That is the teller ticket for the

17   aforementioned deposit, and the posted date for that is

18   January 23rd, 2006.

19          Q.    Next if you would please go to Exhibit 64 and

20   tell us what that is.

21          A.    Yes, sir.    It's a cash deposit ticket in the

22   amount of $9,000 on January 28th, 2006 to the Levi

23   Stoltzfoos account.

24          Q.    And 64-A?

25          A.    That is the teller ticket for the

1    aforementioned account, and it was posted on January

2    30th, 2006 in the amount of $9,000.

3          Q.   And Exhibit 65 please.

4          A.   It's a cash deposit ticket in the amount

5    of $6,600.  The date is February 4th, 2006.

6          Q.   And 65-A, if you could identify that for us

7    please.

8          A.   Yes, sir.  That is the teller ticket for that

9    6,600-dollar deposit, and it was posted on February 6th,

10   2006.

11         Q.   And Commonwealth's 66, if you would identify

12   that for us please.

13         A.   It's a cash deposit ticket dated February

14   11th, 2006 for the Levi Stoltzfoos account in the amount

15   of $9,000.

16         Q.   And Exhibit 66-A, if you would identify that

17   for us please.

18         A.   Yes, sir.  That is the teller ticket for that

19   aforementioned account, and that was posted on

20   February 13th, 2006.

21         Q.   And with respect to Commonwealth's Exhibits

22   60 through 66-A that you just identified, did you receive

23   those from Fulton Bank as a result of executing a search

24   warrant at that bank?

25         A.   Yes, sir.

1              MR. PORTMAN:  Again, Your Honor, if I may

2    approach?

3              THE COURT:  You may.

4    BY MR. PORTMAN:

5         Q.   I've just handed you what have been

6    previously marked as Commonwealth's Exhibits 70

7    through 75-A.  Would you please look through those?

8         A.   Yes, sir.

9         Q.   Do you recognize those?

10        A.   I do.

11        Q.   With respect to Exhibit 70, would you please

12   identify that for us?

13        A.   Yes.  That's an opening account signature

14   card for Levi Stoltzfoos at the Graystone Bank.  The

15   account number was 210002077, and the date was January

16   14th, 2006.

17        Q.   Next directing your attention to Exhibit 71.

18   Do you recognize that?

19        A.   Yes, sir, I do.  It's a deposit ticket for a

20   cash transaction into the Levi Stoltzfoos account in the

21   amount of $9,900.

22        Q.   And the date of that?

23        A.   January 14th, 2006.

24        Q.   And 71-A, do you recognize that?

25        A.   Yes, sir.  That's a teller ticket, one that

1     cleared.  And it cleared on -- I'm not -- I can't quite

2     make it out.  It appears to be January 17th.

3          Q.   If I were to suggest to you it was

4     January 14th of '06, would that help your deciphering

5     that?

6          A.   You're correct.  That's correct.

7          Q.   Next directing your attention to Exhibit 72.

8     Can you identify that for us?

9          A.   Yes, sir.  It's another cash deposit ticket

10    to the Levi Stoltzfoos account in the amount of $9,900.

11         Q.   And the date of that?

12         A.   January 19th, 2006.

13         Q.   And 72-A, can you identify that for us

14    please?

15         A.   Yes, sir.  That's a teller ticket when it

16    cleared, and it appears to be January 20th, 2006.

17         Q.   And if you could please go to Exhibit 73, do

18    you recognize that?

19         A.   Yes, sir.  It's another deposit -- cash

20    deposit ticket dated January 21st, 2006 into the Levi

21    Stoltzfoos account.

22         Q.   And for how much was that?

23         A.   Nine thousand dollars.

24         Q.   And 73-A, would you identify that for us

25    please?

```
 1          A.   Yes, sir.  That's a teller ticket when it

 2   cleared, and it cleared on January 23rd, 2006.

 3          Q.   And Exhibit 74, can you identify that for us

 4   please?

 5          A.   Yes, sir.  It's another cash deposit ticket

 6   dated January 30th, 2006 into the Levi Stoltzfoos account

 7   in the amount of $9,000.

 8          Q.   And Exhibit 74-A, if you can identify that

 9   for us please.

10          A.   Yes, sir.  That's another teller ticket when

11   the deposit cleared, and it appears to be January 30th,

12   2006.

13          Q.   And Commonwealth's Exhibit 75, can you

14   identify that for us please?

15          A.   Yes, sir.  It's a cash deposit ticket in the

16   amount of $10,000 dated February 11th, 2006 into the Levi

17   Stoltzfoos account.

18          Q.   And 75-A, would you identify that for us

19   please?

20          A.   Yes, sir.  It's a teller ticket showing that

21   the cash deposit cleared on February 13th, 2006.

22          Q.   With respect to Commonwealth's Exhibits 70

23   through 75-A, which you just testified to from the

24   Graystone Bank, did you receive those documents as a

25   result of executing the previously-testified-to search
```

```
1    warrant at that bank?

2             A.   I did.

3             THE COURT:  At this point, Counsel, I'm going

4    to give the jurors a 15-minute break.

5             Mr. Battisti will take you back to the jury

6    room and hopefully there will be some drinks for you at

7    that point.  We'll resume at 20 minutes to 11.

8             (A recess was taken.)

9             THE COURT:  Mr. Portman, you may continue.

10            MR. PORTMAN:  Thank you, Your Honor.

11   BY MR. PORTMAN:

12            Q.   During the break, Mr. Licklider, you had an

13   opportunity to review one of your reports relative to the

14   Susquehanna Bancshares search warrant?

15            A.   Yes, sir, I did.

16            Q.   And were you able to determine from reviewing

17   your report and recollection the amount of the check that

18   you received from Susquehanna Bancshares?

19            A.   Yes.  I reviewed my report and the amount

20   which I received in the bank check from Susquehanna

21   Bancshares was $45,807.57.  And I also had affixed to it

22   was a photocopy of the front of the check.

23            Q.   Would you please repeat the number for the

24   amount of the check?

25            A.   $45,807.57.
```

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1     Q.    Thank you.

2           Also, during the break I put in front of you

3     what has been previously marked as Commonwealth

4     Exhibits 80 through 83.  Do you recognize those?

5     A.    Yes, sir, I do.

6     Q.    And would you please identify Exhibit 80 for

7     us?

8     A.    Yes, sir.  It's a signature card for opening

9     an account for M&T Bank.  The account, it was for

10    Mr. Levi L. Stoltzfoos.  The account number was

11    15004213706938 and the opening date is January 9th, 2006.

12    Q.    Next I'd like to direct your attention to

13    what's previously marked as Commonwealth's Exhibit 81.

14    Would you please identify that for us please?

15    A.    Yes, sir.  It's a cash deposit ticket into

16    the Levi Stoltzfoos account.  The first one is dated

17    January 9th, 2006 in the amount of $9,900.

18    Q.    All right.  There appear to be four deposit

19    tickets on that one exhibit; is that correct?

20    A.    That's correct.

21    Q.    All right.  And the first one you indicated

22    has a date of January 9th of '06?

23    A.    Yes, sir.

24    Q.    How about the next document that appears on

25    there?

1    A.    The -- I'm sorry.  The first one was

2    January -- written actually on the ticket was January

3    7th, 2006.  That was for $9,900.

4    Q.    And the next item that appears on there?

5    A.    Is dated January 30th, 2006 in the amount

6    of $9,000.

7    Q.    And the next item?

8    A.    The next item is dated -- the cash date is --

9    deposit is January 19th, 2006 for $9,900.

10    Q.    And the last item on that sheet?

11    A.    Is a 9,000-dollar cash deposit on February

12    5th, 2006.

13    Q.    To the left of each of those deposit slips

14    are handwritten dates; is that correct?

15    A.    That's correct.

16    Q.    Are those your dates that you wrote?

17    A.    Yeah.  They are the clear dates.

18    Q.    And from whom did you receive that

19    information?

20    A.    From the M&T Bank when I executed my search

21    warrant.

22    Q.    Next directing your attention to what was

23    previously marked as Commonwealth's Exhibit 82.  Would

24    you identify that for us please?

25    A.    Yes, sir.  That's a cash deposit ticket dated

1    January 14th in the amount of $9,900.  The clear date is

2    January 17th, 2006.  And, again, it went into the Levi

3    Stoltzfoos account.

4         Q.   And Commonwealth's Exhibit 83, would you

5    please identify that for us?

6         A.   Yes, sir.  It's another cash deposit ticket,

7    went into the Levi Stoltzfoos account.  And the amount is

8    $9,000.  The date is January 23rd, 2006 and the clear

9    date is January 23rd, 2006.

10        Q.   With respect to Commonwealth's Exhibits 80

11   through 83 to which you just testified, did you receive

12   each of those documents as a result of executing your

13   search warrant at M&T Bank?

14        A.   That's correct.

15             MR. PORTMAN:  May I approach the witness,

16   Your Honor?

17             THE COURT:  You may.

18   BY MR. PORTMAN:

19        Q.   I've just handed you what have been

20   previously marked as Commonwealth's Exhibits 90

21   through 97-A.  Have you had an opportunity to review

22   those?

23        A.   Yes, sir, I did.

24        Q.   And do you recognize those?

25        A.   The first page of Exhibit 90 is the Hometowne

1    Heritage Bank.  It's a customer signature card for

2    opening up the new account, and the gentleman's name is

3    Levi Stoltzfoos.  And the account number is 215641620.

4         Q.    With respect to the Hometowne Heritage Bank,

5    refer to this bank by another name?

6         A.    It's a division of National Penn Bank.

7         Q.    Does it indicate when that account was

8    opened?

9         A.    Yes, sir.  March 18th, 2004.

10        Q.    I'd like to next direct your attention to

11   Exhibit 91.  Can you identify that for us please?

12        A.    Yes, sir.  It's a cash-in deposit ticket into

13   the Levi Stoltzfoos account, and the amount is $9,900.

14   The deposit date is January 9th, 2006.

15        Q.    And Exhibit 91-A?

16        A.    That is the teller ticket.  And that also

17   shows a clear date of January 9th, 2006.

18        Q.    And Exhibit 92, would you identify that for

19   us?

20        A.    Yes, sir.  It's another deposit ticket,

21   cash-in for $9,900 into the Levi Stoltzfoos account.  And

22   it's dated January 14th, 2006.

23        Q.    And 92-A?

24        A.    That is a teller ticket showing that it

25   cleared also on January 17th, 2006.

```
1           Q.   And Exhibit 93?

2           A.   Ninety-three is a cash-in ticket dated

3     January 19th, 2006, $9,900 into the Levi Stoltzfoos

4     account.

5           Q.   Ninety-three A?

6           A.   And that's a teller ticket showing that it

7     cleared on the same date, January 19th, 2006.

8           Q.   Ninety-four?

9           A.   It's a 9,000-dollar cash-in ticket.  And the

10    date was January 23rd, 2006, into the Levi Stoltzfoos

11    account.

12          Q.   And Exhibit 94-A?

13          A.   And it shows that it cleared on January 23rd.

14          Q.   And Commonwealth's Exhibit 95?

15          A.   Ninety-five is dated January 28th, 2006; a

16    cash-in ticket for $9,000 and it went into the Levi

17    Stoltzfoos account.

18          Q.   And the next exhibit, please?

19          A.   Ninety-five A, it cleared on January 30th,

20    2006.

21          Q.   And Commonwealth's Exhibit 96?

22          A.   Ninety-six, cash-in ticket to Levi

23    Stoltzfoos' account in the amount of $9,000.  The date

24    was February 6th, 2006.

25          Q.   And 96-A, if you would identify that for us
```

1    please.

2        A.   Yes.  It's a teller ticket showing that it

3    cleared on the same date, February 6th.

4        Q.   And Commonwealth's Exhibit 97?

5        A.   Ninety-seven is another cash-in ticket and

6    the amount is $9,000 cash.  The date is February 13, 2006

7    into the Levi Stoltzfoos account.

8        Q.   And 97-A?

9        A.   It was $9,000; cleared on the same date,

10   February 13th, 2006.

11       Q.   Now, with respect to Exhibits 90 through 97-A

12   to which you've just testified, did you receive each of

13   those as a result of executing your search warrant at

14   National Penn Bank?

15       A.   Yes, sir, I did.

16           MR. PORTMAN:  If I may approach the witness,

17   Your Honor?

18           THE COURT:  You may.

19   BY MR. PORTMAN:

20       Q.   You've just been handed what's been

21   previously marked as Commonwealth's Exhibits 100 through

22   106.  Do you recognize those?

23       A.   Yes, sir, I do.

24       Q.   And would you please tell us what Exhibit 100

25   is?

1          A.   That is a signature card for opening an

2   account at Northwest Savings Bank for Levi Stoltzfoos.

3   The account number is 1711015709.

4          Q.   And the date it was opened?

5          A.   January 9th, 2006.

6          Q.   Next directing your attention to what was

7   previously marked as Exhibit 101, would you please

8   identify that for us?

9          A.   Yes, sir.  That's a deposit in the amount

10   of $9,900 -- deposit ticket, $9,900 into the Levi

11   Stoltzfoos account.

12          Q.   Would you tell us the date please?

13          A.   January 9th, 2006.

14          Q.   And Commonwealth's Exhibit 102?

15          A.   It's another 9,900-dollar deposit into the

16   Levi Stoltzfoos account.  And the deposit date is January

17   17th, 2006.

18          Q.   Now, there were handwritten notes on that

19   exhibit; is that correct?

20          A.   That's correct.

21          Q.   Are those your handwritten notes?

22          A.   No, sir.

23          Q.   Were they supplied by the bank with that

24   exhibit?

25          A.   That's correct.

1    Q. Next if you would please go to Exhibit 102

2 and identify that for us.

3    A. 103?

4    Q. I'm sorry.  Yes.

5    A. That's a 9,900-dollar cash deposit ticket

6 into the Levi Stoltzfoos account, and the date was

7 January 19th, 2006.

8    Q. And Exhibit 104?

9    A. That's a 9,500-dollar cash deposit into the

10 Levi Stoltzfoos account.

11    Q. And the date on that?

12    A. It says deposit made through drive-thru on

13 Saturday, January 21st, 2006.  No pictures.

14    Q. And there's a handwritten note that appears

15 on that exhibit; is that correct?

16    A. That's correct.

17    Q. And, again, is that your handwriting?

18    A. No, it's not.

19    And then the clear date would be January

20 23rd, 2006.

21    Q. Next exhibit, 105, do you want to identify

22 that for us?

23    A. It's another cash deposit in the amount

24 of $9,000 into the Levi Stoltzfoos account.  The deposit

25 was made on a Saturday, January 28th, 2006, and then it

1    was cleared on Monday, January 30th.

2          Q.   And that information -- it appears there's

3    handwritten notes on that exhibit; is that correct?

4          A.   That's correct.

5          Q.   And Exhibit 106, would you identify that for

6    us please?

7          A.   Yes, sir.  It's a 9,000-dollar deposit into

8    the Levi Stoltzfoos account.  The deposit was made on

9    Saturday, February 4, 2006, and it was cleared on the --

10   on this date -- February 6th, 2006.

11         Q.   Now, with respect to Commonwealth's Exhibits

12   100 through 106 to which you've just testified regarding

13   Northwest Savings Bank, did you receive those documents

14   as a result of executing your search warrant at that

15   bank?

16         A.   That's correct.

17              MR. PORTMAN:  If I may approach, Your Honor?

18   BY MR. PORTMAN:

19         Q.   I've handed you what have been previously

20   marked as Commonwealth's Exhibits 110 through 116.  Do

21   you recognize those?

22         A.   Yes, sir, I do.

23         Q.   Starting with Exhibit 110, would you please

24   identify that for us?

25         A.   Yes, sir.  That's a signature card for

opening a new account at the Sovereign Bank for Levi

Stoltzfoos.  And the date the account was opened was

January 7th, 2006.

Q.   Does it indicate the account number?

A.   Yes.  The account number is 0022019944.

Q.   Next I'd like you to look at Exhibit 111.

Would you please identify that for us?

A.   Yes, sir.  That's -- it's a deposit ticket

cash in in the amount of $9,900, dated January 7th, 2006

into the Levi Stoltzfoos account.

Q.   And Exhibit 111 -- I'm sorry, 112, if you

would identify that for us please?

A.   It's a cash-in ticket in the amount of $9,900

into the Levi Stoltzfoos account.

Q.   And the date?

A.   Dated January 14th, 2006, with a clear date

of January 17th, 2006.

Q.   And Exhibit 113.

A.   It's a cash-in ticket into the Levi

Stoltzfoos account with a clear date of January 20th,

2006.  And the deposit date was January 19th, 2006.

Q.   And does it indicate the amount again?

A.   Nine thousand nine hundred dollars.

Q.   And Exhibit Number 114, would you please

identify that for us?

1          A.    Yes, sir.  It was a deposit which took place

2     on January 21st, 2006 in the amount of $9,000 into the

3     Levi Stoltzfoos account and with a clear date of

4     January 23rd, 2006.

5          Q.    And then Exhibit Number 115, would you

6     identify that for us?

7          A.    A cash-in deposit in the amount of $9,000

8     dated January 28th, 2006 in the amount of $9,000, with a

9     clear date of January 30th, again into the Levi

10    Stoltzfoos account.

11         Q.    And Exhibit Number 116, would you identify

12    that for us please?

13         A.    It's a 9,000-dollar cash deposit into the

14    Levi Stoltzfoos account dated February 4th, 2006 with a

15    clear date of February 6th, 2006.

16         Q.    Now, with respect to Commonwealth's Exhibits

17    110 through 116 that you've just testified to regarding

18    Sovereign Bank, did you receive copies of these -- or did

19    you receive these documents as a result of executing your

20    search warrant at that bank?

21         A.    I did.

22              MR. PORTMAN:  If I may?

23              THE COURT:  You may.

24              MR. PORTMAN:  Thank you.

25    BY MR. PORTMAN:

1     Q.   You've just been handed, for purposes for

2  identification, Commonwealth's Exhibits 120 through 125.

3  Would you please review those?

4     A.   Yes, sir.

5     Q.   Do you recognize those?

6     A.   I do.

7     Q.   With respect to Exhibit Number 120, please

8  identify that for us.

9     A.   This is a statement for opening a new account

10  for Levi Stoltzfoos at the Susquehanna Banc dated January

11  17th, 2006.  The account number is --

12     Q.   I believe you'll find that on page two of

13  that document.

14     A.   The account number is 10001385466.

15     Q.   And if you would please turn to Exhibit

16  Number 121 and identify that for us.

17     A.   Yes, sir.  That's a cash deposit ticket in

18  the amount of $8,700 dated January 14th, 2006 into the

19  Levi Stoltzfoos account.

20     Q.   And Exhibit 121-A, would you identify that

21  for us please?

22     A.   Yes, sir.  That's a -- clear date for that

23  teller ticket for the 8,700 deposit and the clear date is

24  January 17th, 2006.

25     Q.   And 122, if you could identify that for us

1    please.

2         A.    Yes, sir.  A cash-in ticket in the amount

3    of $9,900 dated January 20th, 2006 into the Levi

4    Stoltzfoos account.

5         Q.    And Number 122-A?

6         A.    The clear ticket showed that it cleared on

7    January 20th, 2006.

8         Q.    And Exhibit 123?

9         A.    Number 123 is a cash-in ticket in the amount

10   of $9,000.  The date was January 21st, 2006 into the

11   Stoltzfoos account.

12        Q.    And Exhibit 123-A?

13        A.    And 123-A, aforementioned deposit cleared on

14   January 23rd, 2006.

15        Q.    And Exhibit 124?

16        A.    Number 124 is a 9,000-dollar cash-in ticket

17   into the Stoltzfoos account.  And this took place on

18   January 30th, 2006.

19        Q.    And 124-A?

20        A.    The ticket for the teller cleared on January

21   30th, '06.

22        Q.    And 125?

23        A.    Number 125 is a 9,000-dollar cash-in ticket

24   dated February 11th, 2006 to the Stoltzfoos account.

25        Q.    And 125-A?

1          A.    Number 125-A is the date it cleared; February

2    13th, 2006.

3          Q.    Now, with respect to all previously marked

4    Commonwealth's Exhibits 120 through 125-A that you just

5    testified to, did you receive those as a result of

6    executing your search warrant at Susquehanna Banc?

7          A.    I did.

8          Q.    Mr. Licklider, as a result of your 34 years

9    in law enforcement and in working in financial

10    investigations since 1987, are you familiar with the

11    regulations pertaining to the withdrawal and deposit of

12    cash in financial institutions?

13          A.    Yes, sir.

14          Q.    Is there any significance with respect to

15    either a cash-in deposit or a cash withdrawal in a

16    financial institution such as a bank?

17          A.    Yes, sir.

18          Q.    And what, if any, significance is there with

19    respect to either a cash deposit or a cash withdrawal in

20    a financial institution such as a bank?

21          A.    Well, according to the Bank Secrecy Act, a

22    financial institution, which these banks are, they have

23    to fill out a form.  The customer doesn't fill them out,

24    the teller fills it out.  If it's a 10,000-dollar cash

25    deposit, not only a deposit in or if a cash in or a cash

1    out, but no checks, the financial institution has to --

2    financial institution fills them out, not the customer.

3         Q.   And the triggering amount is the 10,000 or

4    something in excess of 10,000?

5         A.   It's supposed to be over $10,000.

6         Q.   As a result of your training and experience,

7    are banks -- and I believe you may have testified to this

8    already -- required to fill out a particular form if a

9    customer either withdraws or deposits in excess

10   of $10,000 in cash?

11        A.   It's called a Currency Transaction Report,

12   and they just refer to them as CTRs.

13        Q.   Now, in the course of your 34 years in law

14   enforcement and since 1987 in financial investigations,

15   did you maintain contacts with bank employees throughout

16   Pennsylvania?

17        A.   Yes, sir.

18        Q.   And would you often have meetings with these

19   individuals regarding financial investigations?

20        A.   That's correct.

21        Q.   Would you have discussions with them

22   regarding financial investigations?

23        A.   That's correct.

24        Q.   Are you familiar with the banking laws at

25   least on the federal level and state level for reporting

1   these types of transactions?

2          A.    Yes, sir.

3          Q.    If a bank is required, as you testified to,

4   to report a transaction involving cash, either a deposit

5   or a withdrawal, in excess of 10,000, are they precluded

6   from doing so if the transaction is less than 10,000?  In

7   other words, does the bank have discretion to file a

8   report even if the sum does not trigger the cash

9   transaction report?

10         A.    It's up to the discretion of the bank.  They

11  have what they call know your customer policy.

12         Q.    And just briefly can you tell us what that

13  is?

14         A.    Well, when you get a new -- when you get a

15  new customer into the bank in the case like

16  Mr. Stoltzfoos, the county system has a system -- the

17  banking community is all tied together.  It's called

18  Chex -- Chex Systems.  And whenever anybody comes in to

19  take out a new account, they punch in to the system to

20  see if this particular individual with this Social

21  Security number has an account anywhere else.

22               And in this particular case, when the banking

23  community went into the Chex Systems when an individual

24  opened up an account -- in this case Mr. Stoltzfoos -- it

25  started showing that he had all these accounts opening up

1        all in the same time period.

2                Q.    Now, in this particular case you testified to

3        58 transactions involving deposits of cash by

4        Mr. Stoltzfoos into ten banks in Lancaster County during

5        the approximately six-week period in 2006; would you

6        agree?

7                A.    That's correct.

8                Q.    Is there any significance to each of these

9        banks with respect to Mr. Stoltzfoos making deposits of

10       the amounts that he did that you've testified to over the

11       period of time that you testified that he did in each of

12       these banks?

13               A.    Yeah.   What's significant about this case

14       different than an ordinary citizen is the fact that there

15       was multiple financial institutions used and the amount

16       was kept under the threshold of $10,000.   And

17       additionally on the signature cards, Mr. Stoltzfoos used

18       post office addresses for his residence.   He didn't use

19       his Groffdale Road address, he used different post

20       offices.

21               Q.    And even though we didn't get into those

22       addresses, did you verify each of the addresses listed on

23       the signature cards that you've testified to?

24               A.    Yes, sir.

25               MR. PORTMAN:   I believe that ends my

```
 1    examination of the witness, Your Honor.

 2                THE COURT:  Thank you.

 3                Mr. Conrad, cross-examination.

 4                MR. CONRAD:  May I have the Court's

 5    indulgence for just a moment?

 6                THE COURT:  You may.

 7                MR. CONRAD:  Thank you, sir.

 8                Your Honor, may we approach?

 9                THE COURT:  You may.

10                (The following occurred at sidebar:)

11                MR. CONRAD:  Your Honor, the source of the

12    monies have not been discussed in any way, and that's per

13    the Court's order.  If there's a prosecution for this

14    six-week period that has been identified by the

15    Commonwealth, it's now been established.

16                What I need to show as part of the burden

17    that I have, the Commonwealth will have to go to their

18    burden is going to be recklessness.  As part of that I

19    need to show that this man has done these kinds of

20    transactions before and was never prosecuted.

21                The next line of questioning I'd like to get

22    into is the fact that in 1999, there were numerous

23    structured deposits made and withdrawals made and he was

24    never prosecuted.  Additionally, in 2001 there were

25    numerous structured deposits and withdrawals made and he
```

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1    was never prosecuted.  I would like to go into that line

2    of questioning.  I don't believe that opens up any doors.

3    We're not discussing where the money came from, just the

4    fact that these deposits were made and withdrawals were

5    made.

6              MR. PORTMAN:  The only concern I have, Your

7    Honor, is the information that Mr. Conrad is referring to

8    is obtained through suspicious activity reports, which

9    are by federal statute.  I mean you can't discuss them in

10   open court.  I mean they're not even subject to

11   discussion.

12             I don't mind him getting into that if he

13   refrains from referring to the information from a

14   suspicious activity report.  I think that's fine

15   otherwise.  It's a bank document that is --

16             MR. CONRAD:  The question I would pose to the

17   officer is as a result of your investigation, did you

18   learn that there were numerous withdrawals and deposits

19   made back in 1999, yes or no.

20             MR. PORTMAN:  I don't have any problem with

21   that.

22             THE COURT:  Okay.

23             MR. PORTMAN:  He may refer to his reports.

24             MR. CONRAD:  In 2001, would you agree there

25   were numerous structured deposits and withdrawals made,

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1    yes or no.  That's what I need to go into.

2              MR. PORTMAN:  And I think -- I want to make

3    sure that the agent understands before he testifies that

4    he shouldn't get into sources.

5              MR. CONRAD:  Just as part of his

6    investigation did he learn that.  He doesn't need to say

7    it.

8              MR. PORTMAN:  I know it.

9              MR. CONRAD:  We can bring him forward right

10   now, Your Honor, if you'd like to make sure that he

11   doesn't mention that.

12             THE COURT:  When you go -- after you ask that

13   question --

14             MR. CONRAD:  That's it.  I'll have other

15   cross, but that's --

16             THE COURT:  Relative to that particular

17   issue.

18             MR. PORTMAN:  I'll even stipulate to that if

19   you want to do that.  If you want to ask him, that's

20   fine, but I'll stipulate to those.

21             MR. CONRAD:  I can ask him a yes-or-no

22   question.  That way we're not getting into anything.  He

23   can answer yes or no.  We can do it that way, Your Honor.

24   That way the officer, he's not compelled to go into

25   anything that he doesn't need to go into.

```
 1                THE COURT:  Mr. Licklider, would you join us
 2     for a moment.
 3                You're going to be asked on cross-examination
 4     two basic --
 5                MR. CONRAD:  Maybe more.
 6                THE COURT:  -- basic yes-or-no questions, but
 7     basically through your investigation, did you understand
 8     that he did numerous structured withdrawals and deposits
 9     in 1999, and then a similar question relative to 2001.
10     I'm directing that you have the opportunity to answer
11     that question, but not to go into the reasons why or
12     the -- give me the name of that report again --
13     suspicious activity report.  We're leaving that out.
14     Just that you did investigate that and that he was not --
15     I assume you're going to ask him was he charged with
16     that.  So you're permitted to answer the question, but I
17     don't want you to go into the suspicious activity report.
18     Understood?
19                THE WITNESS:  Yes, sir.
20                THE COURT:  Very well.
21                (Sidebar discussion concluded.)
22                MR. CONRAD:  Thank you, your Honor.
23                          CROSS-EXAMINATION
24     BY MR. CONRAD:
25          Q.   Good morning, Agent.
```

1    A.    Morning, Counselor.

2    Q.    Sir, you indicated, I think, that you've been

3 a field supervisor from 1991 to 2008; is that correct,

4 sir?

5    A.    That's correct.

6    Q.    Okay.  In that time I think you also

7 indicated that you've done hundreds -- or about a hundred

8 investigations; would that be fair --

9    A.    Approximately.

10    Q.    -- or more?

11    A.    Approximately, yes.

12    Q.    Has your -- or have your duties taken you

13 throughout the Commonwealth of Pennsylvania?

14    A.    Yes, sir.

15    Q.    Okay.  Of those hundred-plus investigations

16 that you've done, how many of those folks have been

17 Amish?

18    A.    Let's see.  Got some Eastern Europeans.  They

19 are from Eastern European.

20    Q.    No, sir, not all the other ethnic groups.

21    A.    I'm just going through them.

22    Q.    All right, sir.

23    A.    I guess Mr. Stoltzfoos.  I mean I don't go --

24 I don't have a list, you know, look for different ethnic

25 groups.  If you're bad -- I mean if you're -- I

1    investigate you, but apparently if he is Amish, I would

2    say he would be the first one.

3         Q.   And certainly as a result of your

4    investigation as you did your numerous interviews, it

5    certainly came to your attention that he was either

6    Amish, Mennonite, something to do with that older

7    community; isn't that correct?

8         A.   I can answer it, but it's not going to be a

9    yes-or-no answer.

10        Q.   I'm looking for a yes or no, but --

11        A.   I gave you a yes-or-no answer.  His parents

12   may be Amish, but from when I saw him when I investigated

13   his actions, he's not Amish from what he did and what I

14   saw in that house.

15        Q.   Well, sir, I'm not --

16        A.   Well, you're asking me whether he is Amish.

17   From what I saw in that house and the documents, he's not

18   Amish --

19             THE COURT:  Sir --

20             THE WITNESS:  -- or he's not practicing

21   Amish.  You asked.

22             THE COURT:  Sir, please.  We don't need to

23   add to it.  Just be responsive.

24             THE WITNESS:  Yes, Your Honor.

25             I don't think he's practicing Amish, no.

BY MR. CONRAD:

         Q.   Sir, you went to his house; correct?

         A.   That's correct.

         Q.   It's a very plain house, isn't it, sir?

         A.   Every room in that house looks like an Amish

house except for his room, and that's not -- it's not in

character of an Amish house; the rest of that house, his

room was not.

         MR. CONRAD:  Court's indulgence.  I wasn't

prepared to head that direction.

         Your Honor, may I approach?

         THE COURT:  You may.

BY MR. CONRAD:

         Q.   Sir, you had an opportunity to go through

this house; correct?

         A.   That's correct.

         Q.   I believe either you or someone took pictures

of the house; is that correct?

         A.   Correct.

         Q.   And I asked you that did it look like a plain

house; is that correct, sir?

         A.   That's correct.

         MR. CONRAD:  We can mark all these.

         (Defendant's Exhibit Nos. 1 through 18

marked.)

1        MR. CONRAD:  Thank you, sir.

2   BY MR. CONRAD:

3        Q.   Agent, as I was about to say, I'm going to

4   show you what I've had marked for identification purposes

5   as Defendant's Exhibit 1.  What am I showing you, sir?

6        A.   That is one of the pictures from the inside

7   of the house.

8        Q.   That was taken when?

9        A.   The day of the search warrant.

10       Q.   Okay.

11       A.   March 30th.

12       Q.   Do you know exactly who took that picture?

13       A.   No, sir.  One of the agents was assigned to

14   take the pictures.  Whenever we do a search warrant, we

15   take a picture what the place looks like when we leave so

16   people can't come back and say, well, you trashed their

17   house.

18       Q.   Okay.  What part of the house would that be?

19       A.   I don't know.

20       Q.   One of the rooms in the house; correct, sir?

21       A.   Yes, sir.

22       Q.   Does it appear to be in the same or a similar

23   condition at the time you were there?

24       A.   Yes.

25       Q.   I'm going to show you what I've had marked

1    for identification purposes as Defense 2.  What is that,
2    sir?
3         A.   That's another picture inside of the house.
4         Q.   Okay.  Does it accurately depict the scene
5    the day you saw it, the day of the search warrant?
6         A.   Yes, sir.
7         Q.   Show you what I've had marked as Defense
8    Exhibit 3.  Can you tell me what that is, sir?
9         A.   Another picture from inside his parents'
10   home.
11        Q.   Does it accurately depict the scene?
12        A.   Yes, sir.
13        Q.   Nice corner cupboard there, right?
14        A.   Yeah, nice one.
15        Q.   Showing you what I've had marked as Defense
16   Exhibit 4.  What is that?
17        A.   That's another shot of the interior.  Appears
18   to be the kitchen.
19        Q.   Does it accurately depict the scene?
20        A.   Mm-hmm.
21        Q.   Plain kitchen; right, sir?
22        A.   Nice.
23        Q.   Show you what I've had marked as Defendant's
24   Exhibit 5.  What is that I'm showing you?
25        A.   Apparently that's one of the bedrooms;

1    however, I was not in that room.

2         Q.   And it was taken on the day of the search

3    warrant, obviously?

4         A.   Yes.

5         Q.   Defendant's Exhibit 6?

6         A.   Apparently that's another bedroom.  I was not

7    in that bedroom.

8         Q.   Taken the day of the search warrant, though;

9    is that correct?

10        A.   Yes, sir.

11        Q.   Defense Exhibit 7, what is that, sir?

12        A.   That's another photo from inside the

13   residence.

14        Q.   Does it accurately depict the scene?

15        A.   Yes, sir.

16        Q.   All right.  Defendant's Exhibit No. 8, what

17   is that, sir?

18        A.   That's the -- a portion of it -- of the dirt

19   floor.

20        Q.   Accurately depict the scene?

21        A.   Yes, sir.

22             THE COURT:  Did I understand you to say

23   portions of the third floor; is that correct?

24             THE WITNESS:  Dirt floor.  Dirt floor, Your

25   Honor.

```
 1              THE COURT:  I'm sorry.  Dirt floor.
 2    BY MR. CONRAD:
 3         Q.   Show you what I've had marked as Defendant's
 4    Exhibit 9.  What is that, sir?
 5         A.   That's a shovel and a dirt floor area and it
 6    appears to be a hole with shovels in it.
 7         Q.   Do you know who would have dug that hole?
 8         A.   Yes, sir.
 9         Q.   Who dug the hole?
10         A.   I told one of the agents to dig the hole.
11         Q.   Nothing was found there, was it?
12         A.   There was an odor in that basement that was
13    similar to the odor on the bills.
14         Q.   Must?
15         A.   Yes.
16         Q.   And the handle is broken on that, right?
17         A.   It could be, yes.
18         Q.   That was the family's own --
19         A.   Pardon me?
20         Q.   That was the family's shovel you fellows made
21    use of there, wasn't it?
22         A.   Yes, sir.
23         Q.   You recall breaking that shovel as a part of
24    this whole thing?
25         A.   No -- one of the agents did, yeah, that's
```

1    correct.

2         Q.    Show you Defendant's Exhibit 10.  What is

3    that, sir?

4         A.    That's the same shovel in the ground.

5         Q.    Down in the basement, right?

6         A.    That's correct.

7         Q.    Now, we were talking about the defendant's

8    room a little bit.  I'm going to show you what I've had

9    marked as Defendant's Exhibit Number 11.  What is that,

10   sir?

11        A.    That's one of the agents.

12        Q.    One of the agents in my client's room; isn't

13   that correct?

14        A.    I can't tell from that shot.

15        Q.    If I told you he has on my client's hat and

16   he's yucking it up in my client's bedroom, would that

17   surprise you?

18        A.    Well, the agents didn't go into the residence

19   wearing that hat.

20        Q.    He didn't wear that hat in, that's right.

21              That's not official, standard police gear, is

22   it?

23        A.    No, sir.

24        Q.    Defense Number 12, what is that, sir?

25        A.    That's a picture of, appears to be

1    Mr. Stoltzfoos' bedroom.

2         Q.   Show you what I've had marked -- looks the

3    same as it did that day; correct, sir?

4         A.   Yes, sir.

5         Q.   Defense Number 13.

6         A.   That's another area of the house I wasn't in.

7    That appears to be the house.

8         Q.   Taken that day, though; is that correct?

9         A.   Mm-hmm.

10        Q.   Defense Number 14?

11        A.   That's another bedroom which I wasn't in.

12        Q.   Defense Number 15?

13        A.   That's another area of the house I wasn't in.

14        Q.   Nice buck mounted up on the wall; correct,

15   sir?

16        A.   Sure.

17        Q.   Defense Number 16?

18        A.   That's another room that I was not in.

19        Q.   Taken on the day of the warrant, right?

20        A    That's right.

21        Q.   Defense 17?

22        A.   That's another room of the house, but I

23   wasn't in that room.

24        Q.   And Defense 18, what is that, sir?

25        A.   That is on the right-hand side of

1    Mr. Stoltzfoos' room.  He had brand new Philadelphia

2    Flyers and Eagles paraphernalia; shirts and hats.  That's

3    in the closet.

4          Q.    You agree with me all those things are neatly

5    folded in there; is that correct?

6          A.    That's correct.

7          Q.    Thank you, sir.

8                Now, depict the scene as you saw that house;

9    is that correct?

10               THE COURT:  Excuse me.  May --

11               THE WITNESS:  That's not all the pictures of

12   his bedroom.

13   BY MR. CONRAD:

14         Q.    General gist of the house?

15         A.    Of the house, yes.

16               MR. CONRAD:  Counsel, the statement?  Do you

17   have the statement or is it up there?

18               MR. PORTMAN:  That should be up there.

19               MR. CONRAD:  Your Honor, may I approach?

20               THE COURT:  You may.

21   BY MR. CONRAD:

22         Q.    Looking at Commonwealth's 20, referring you

23   to Commonwealth's 20, this is the notice you said you

24   first saw at the March 17th opportunity for you to speak

25   with my client; is that correct, sir?

1      A.   That's correct.

2      Q.   All the scribbles and scratches all over

3  Commonwealth 20, you didn't make those, my client would

4  have made those; right?

5      A.   Your client did, sir.

6      Q.   Okay.  The numerous spelling errors that are

7  found throughout the document, he would have made those

8  spelling errors as he drafted this document; is that

9  right?

10     A.   Yes, sir.

11     Q.   I believe as you read over the document, you

12  stopped about halfway down.  Would that be correct?

13     A.   That's correct.

14     Q.   But there's more to the document; isn't that

15  right?

16     A.   Yes, sir.

17     Q.   In fact, he also said to you, no questions --

18  I'm sorry.  I don't want no part of government

19  investigation or harassment.  Correct?

20     A.   Yes, sir.

21     Q.   He said, no questions will be answered.  If

22  you have any questions, you can write to me.  Right?

23     A.   Yes, sir, I recall that.

24     Q.   You did not want to talk to me on the phone

25  and I am not going to be a part of your

```
 1    cross-examination.

 2            A.    Yes, sir.

 3            Q.    Let me give that to you.

 4            MR. CONRAD:   If I may approach.

 5    BY MR. CONRAD:

 6            Q.    I'll use my document just so I don't confuse

 7    you.

 8                  He said, what right do you have to steal my

 9    money?

10                  He said that to you, too; correct?

11            A.    Yes, sir.

12            Q.    Then he asked you, when will I get it back?

13    Will hiring a lawyer speed the process?  Right?

14            A.    Yes, sir.

15            Q.    He asked you, how much interest will be paid

16    to me?  That's what he asked, correct?

17            A.    Yes, sir.

18            Q.    Have people ever sued and won?  He said that

19    to you, right?

20            A.    Yes, sir.

21            Q.    Will you give a check back or will you reopen

22    my accounts?  He asked you that, too; right?

23            A.    Yes, sir.

24            Q.    There's another thing.  He's asking that

25    question to you and he's writing down what you respond?
```

1          A.   Yes, sir.

2          Q.   Okay.  He asked you, will you notify banks

3    that investigation is false alarm?  He wrote that, too;

4    right?

5          A.   Yes.  He wrote no.

6          Q.   Okay.  And he writes, which bank/banks

7    notified you?  I may choose not to do business with them

8    again.  Right?

9          A.   Yes, sir, that's what he wrote.

10         Q.   And he also wrote then, not liberty to say.

11   Your response, in other words, you wouldn't have had the

12   liberty to say at that time?

13         A.   That's correct.

14         Q.   Then he asked you finally, why was the five

15   p.m. meeting cancelled?  Why didn't you notify me of the

16   meeting change?  Right?

17         A.   Yes, sir.

18         Q.   That's the entirety of his statement to you;

19   correct, sir?

20         A.   Yes, sir.

21         Q.   All right.  As a part of your investigation,

22   did you actually see the monies that were taken?  The

23   actual cash itself, did you see that?

24         A.   Yes, some of it I did.

25         Q.   And you're aware -- is it part of your

1    investigation that some of the tellers said that the

2    monies smelled musty or moldy?

3         A.    That's correct.

4         Q.    Some even described it as almost wet?

5         A.    That's correct.

6         Q.    Bank straps, what are bank straps?

7         A.    Bank straps, in this particular case here,

8    many of the institutions gave them to me.  It's what

9    Mr. Stoltzfoos deposited the cash in.  They were bound

10   together with a strap and it would say a certain bank;

11   many of the banks at Blue Ball National Bank, and many of

12   them weren't named at all, but it was a strap that holds

13   thousand-dollar deposits, a thousand dollars at a time

14   deposit, made out of paper.

15        Q.    And generally speaking, individuals don't do

16   that.  I mean people don't strap their money, that's done

17   by banks; right?

18        A.    Normal course of business, that's correct.

19        Q.    In fact, many of the bank straps were from

20   1999; isn't that right?

21        A.    That's correct.

22        Q.    You went through a series of transactions

23   that my client made during a six-week period and we

24   outlined each one of those for the jury; right, sir?

25        A.    Yes, sir.

1   Q.   You didn't mention, though, about all the

2   transactions that were made back in 1999.  As a part of

3   your investigation, you'd have to admit there were

4   numerous transactions made back in 1999; weren't there,

5   sir?

6   A.   That's correct.

7   Q.   When one withdraws large sums out of the

8   bank, one could get those bills uncirculated and wrapped

9   up in a bank strap; is that correct?  I mean that's how

10  you would get it from a bank when you withdraw cash, you

11  would have a bank strap on it; is that right?

12  A.   Yes.  If it -- mostly cash drawers -- the

13  banks don't handle a whole lot of cash if -- you got to

14  tell them in advance you're getting a large sum of money

15  and it would be bound, that's correct.

16  Q.   And, of course, you didn't mention anything

17  to the jury, either, that back in 2001, again my client

18  made numerous transactions similar to the ones they heard

19  about in 2001; isn't that correct?

20  A.   That's correct.

21  Q.   If an individual wanted to put lots of money

22  in the bank, leave it in there for a while to earn

23  interest off of it, then withdraw it, if one made that

24  interest, that would certainly get reported; would it

25  not?

1    A.    I don't understand what you mean the interest

2  wouldn't be reported, no.  Why would that -- getting

3  interest on an amount of money you have in a bank, if you

4  have the money in the bank, you can do a wire transfer go

5  out and a currency transaction report's not done for

6  that.  You could take it out in bank checks.  It's not

7  done if you take it out in bank checks.  Only way it

8  triggers a CTR is cash in/cash out over ten.  Interest

9  doesn't have anything to do with it.

10    Q.    Understood.  Follow my question.

11    I understand where you're trying to go.  Let

12  me take you where I'm trying to go.

13    A.    Okay.

14    Q.    If an individual put money in the bank, a

15  large amount of money in a bank, let it bubble up

16  interest and pulled the money back out, that interest

17  that one makes, the bank has to report that interest,

18  don't they?

19    A.    Surely.

20    MR. CONRAD:  Okay.  Thank you, Your Honor.

21  Nothing further.

22    THE COURT:  Any redirect, sir?

23    MR. PORTMAN:  Yes, Your Honor.

24    If I may approach, Your Honor?

25

1                    REDIRECT EXAMINATION

2    BY MR. PORTMAN:

3        Q.    Sir, with respect to the 1999-2001

4    transactions that you were asked about, do you know,

5    without referring to your notes or your reports, whether

6    or not the same banks that were part of your

7    investigation of this case were also involved in those

8    transactions?

9        A.    No, sir, they weren't.  I think possibly

10   Fulton Bank was.

11       Q.    Okay.  Now, you were asked questions about

12   the house.  The search warrant was executed at 30

13   Groffdale Road; is that correct?

14       A.    That's correct.

15       Q.    When you arrived there, was there anyone

16   home?

17       A.    Yes, sir.

18       Q.    And who was present at the house?

19       A.    Levi's mother.

20       Q.    Did she identify herself as such?

21       A.    Yes.

22       Q.    Did you tell her why you were there?

23       A.    Yes, sir.

24       Q.    Did anyone from the family arrive during the

25   search?

```
1          A.    Yes, sir.

2          Q.    Who was that?

3          A.    Levi's father.

4          Q.    And how did he arrive?

5          A.    I don't know how he arrived.

6          Q.    But he was not present when you were there --

7          A.    That's correct.

8          Q.    -- initially?

9          A.    No.  I went up to the mother.  She was
```

hanging up wash in the back yard.  I had a uniformed

officer with me.  I showed her my I.D., I showed her the

search warrant.  And she told me, you know -- so she went

in.  She showed me everybody's room and she showed me

Levi's room.  And I said, that's the room we're

interested in.

```
16         Q.    Okay.  In addition to the photographs shown
```

to you by defense counsel, there were additional

photographs taken of that house; correct?

```
19         A.    Yes, sir.

20         Q.    Of the inside of the house?

21         A.    Yes, sir.

22         Q.    All right.  And did you have an opportunity
```

to go into the attic of that residence?

```
24         A.    Yes, sir, I did.

25         Q.    And can you please tell us what you saw in
```

1  the attic of this residence?

2           MR. CONRAD:  Your Honor, I'm going to object.

3  May I approach?

4           THE COURT:  You may approach.

5           (The following occurred at sidebar:)

6           MR. CONRAD:  Your Honor, I'm going to object

7  because as part of the motion in limine we talked about,

8  anything in that attic that would come into play, it

9  would bring that which you precluded into play.

10          MR. PORTMAN:  I don't recall anything about

11  the attic.

12          MR. CONRAD:  No.  The items, the items found

13  in the attic.

14          MR. PORTMAN:  I'm not getting into what was

15  found.  I'm going to these boxes that are up there --

16          MR. CONRAD:  The fact there were boxes in the

17  attic?

18          MR. PORTMAN:  And that his father said they

19  were his.

20          MR. CONRAD:  Whose?

21          MR. PORTMAN:  Levi's.

22          MR. CONRAD:  We're not going to get into the

23  contents of the boxes?

24          MR. PORTMAN:  No.

25          THE COURT:  Very well.

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1                    (The sidebar discussion concluded.)

2                    MR. CONRAD:  I'll withdraw it, Your Honor.

3    BY MR. PORTMAN:

4          Q.    With respect to the attic, were you upstairs?

5    Did you go into the attic?

6          A.    Yes.  Levi's father took me to the attic.

7          Q.    Were there numerous boxes up in the attic?

8          A.    Yes, sir.

9          Q.    And was an area of the attic identified to

10   you by Mr. Stoltzfoos, Levi's father, as being Levi's?

11         A.    That's correct.

12         Q.    Without getting into particulars,

13   approximately how many boxes did you see, if you recall?

14         A.    Thirty to 40.

15         Q.    Now, with respect to the -- again, the bank

16   straps that you've testified to, other than the bank

17   straps from Blue Ball National Bank, do you recall any

18   other bank straps?

19         A.    Yeah, there were other bank straps.  Some of

20   them had no name on it and there could have been some

21   other ones, too.

22         Q.    You were also asked if you had an opportunity

23   to view some of the cash that was submitted by

24   Mr. Stoltzfoos to the banks, correct?

25         A.    That's correct.

1        Q.    You recall whether or not that currency was

2    current as far as date or not?

3        A.    The best of my recollection, the most recent

4    currency was the year 2001.

5             MR. PORTMAN:  No further questions.  Thank

6    you.

7             MR. CONRAD:  If I may, Your Honor?

8             THE COURT:  Recross.

9                      RECROSS-EXAMINATION

10   BY MR. CONRAD:

11       Q.    The Chex Systems that you said for the jury

12   earlier, when did Chex Systems go into effect?

13       A.    I don't know.

14       Q.    Any idea?  You've been in this since 1991.

15   How long have you been using it for?

16       A.    I don't use that.  It's not my program.  It's

17   an actual community -- in Lancaster County, the banks use

18   it.

19       Q.    As part of your training and experience as

20   the Commonwealth took you through, though, you've never

21   heard of Chex Systems?

22       A.    Yeah, but I don't know when it went into

23   operation.

24       Q.    Would it have been in effect back in 1995?

25       A.    Probably not.

1          Q.    How about 1999?

2          A.    I don't know.  I can't --

3          Q.    Okay.  And with regard to what happened in

4    1999 and 2001, my client was never prosecuted for any of

5    those deposits or withdrawals; is that right?

6          A.    No, sir.

7                MR. CONRAD:  Nothing further, Your Honor.

8                MR. PORTMAN:  Nothing further, Your Honor.

9                THE COURT:  Thank you.  You may step down,

10   sir.

11               At this point in time, is there anything

12   counsel would like to bring to my attention before we

13   break for lunch?

14               MR. PORTMAN:  Yes, Your Honor.  I would move

15   all the Commonwealth's exhibits into evidence.

16               MR. CONRAD:  Without objection.

17               THE COURT:  The Exhibits Number 1 through

18   125-A, although not exclusive of all those numbers that

19   have been presented so far, will be admitted into

20   evidence.

21               MR. CONRAD:  Yes, sir.

22               MR. PORTMAN:  Thank you.

23               THE COURT:  At this point in time, ladies and

24   gentlemen, we are going to take our lunch break.  It's an

25   appropriate time to adjourn.

1          MR. CONRAD:  Your Honor.  I'm sorry.  I'm

2    sorry to cut the Court off.  I apologize, sir.  If I may

3    go ahead and move mine into evidence before the jury is

4    released.

5          MR. PORTMAN:  No objection, Your Honor.

6          THE COURT:  Defense Exhibits 1 through 18

7    will also be admitted into evidence.

8          MR. CONRAD:  Thank you, Your Honor.

9          THE COURT:  Mr. Battisti, what time would you

10   like them to return to the jury room?

11         THE BAILIFF:  1:15, no later than 1:20.

12         THE COURT:  Please remember that during this

13   break, do not discuss the case among yourselves or with

14   anyone else during your lunch recess.  Furthermore, you

15   are reminded to wear your juror badges at all times in a

16   conspicuous place, especially if you choose to eat here

17   in the courthouse or walk the halls at all in the

18   courthouse.

19         And, also, you're devoid of reading any

20   newspaper articles or watching any television.  Not that

21   you may have access to it, but I must warn you of that.

22   Likewise, you did understand we're going to gather your

23   information, so if you would please return your notes and

24   everything into your respective pouch.  And would you

25   like them to leave that on the chair?  Just leave that on

1    your chair after you're done.

2                    Mr. Battisti, you may have the jury.

3                    (The lunch recess was taken.)

4                    A F T E R N O O N   S E S S I O N

5                        (1:30 p.m.)

6                    THE COURT:  Counsel agree for the record that

7    all of the members of the jury are present and seated?

8                    MR. CONRAD:  Yes, Your Honor.

9                    MR. PORTMAN:  Yes, Your Honor.

10                   THE COURT:  Thank you very much.

11                   Mr. Portman.

12                   MR. PORTMAN:  Thank you, Your Honor.  Call

13   Tarah Forsythe.  She will be coming right in, Your Honor.

14                        TARAH FORSYTHE,
     called as a witness, having been duly sworn or affirmed,
15             was examined and testified as follows:

16                        DIRECT EXAMINATION

17   BY MR. PORTMAN:

18            Q.    Good afternoon.

19            A.    Good afternoon.

20            Q.    Would you please state your name for the

21   record and spell your first and last name?

22            A.    Tarah Forsythe.  T-a-r-a-h, F-o-r-s-y-t-h-e.

23            Q.    And, Miss Forsythe, by whom are you employed?

24            A.    Coatesville Savings Bank.

25            Q.    In what capacity?

SUSAN A. MILTON, OFFICIAL COURT REPORTER

```
 1              A.    Assistant manager.
 2              Q.    And for how long have you been so employed
 3    there?
 4              A.    Seven years.
 5              Q.    And do you have a particular branch that you
 6    work out of?
 7              A.    New Holland.
 8              Q.    I'm going to show you what have been
 9    previously marked as Commonwealth's Exhibits 40, 41, 42,
10    43, 44 and 45.
11              MR. PORTMAN:  May I approach, Your Honor?
12              THE COURT:  You may.
13    BY MR. PORTMAN:
14              Q.    Ask you to look those over.
15              A.    Mm-hmm.
16              Q.    With respect to Commonwealth's Exhibit 40, do
17    you recognize that?
18              A.    Yes.
19              Q.    Can you tell us what that is?
20              A.    That is our signature card we use.
21              Q.    And is that for a particular account?
22              A.    It's for all accounts.
23              Q.    All right.  And in this particular case,
24    whose name is that account in?
25              A.    Levi Stoltzfoos.
```

1          Q.    And what date was it opened?

2          A.    It was opened January 19th, 2006.

3          Q.    And is that document kept in the ordinary

4     course of business by the bank?

5          A.    Yes, it is.

6          Q.    And the account number that's on that account

7     if you would, please?

8          A.    3026001651.

9          Q.    And the remaining exhibits, 41 through 45, do

10    you recognize those?

11         A.    Yes.  They're deposit tickets.

12         Q.    And are those deposit tickets the type of

13    tickets that are kept in the ordinary course of your

14    bank's business?

15         A.    Yes.

16         Q.    And are they all for the same account?

17         A.    Yes, they are.

18         Q.    Are they for the account you just testified

19    to?

20         A.    Yes.

21              MR. PORTMAN:  No further questions.

22              MR. CONRAD:  Ask for a stipulation with

23    regard to those.  Your Honor, with regard to the

24    transactions that were done themselves, not the bank

25    card, but as to the transactions we'll stipulate.  I

```
 1    guess they're already in at this point, so . . .

 2              THE COURT:  Except for the bank?

 3              MR. CONRAD:  The bank -- I will have

 4    questions about the signature card.  We would stipulate,

 5    obviously, to the transactions that were already brought

 6    in by the Commonwealth.

 7              THE COURT:  Okay.  For the jury, let me just

 8    remind you of one thing.  In my opening comments to the

 9    jury, I indicated that statements of counsel are not

10    evidence; however, there is an exception to that.

11              When counsel reaches a stipulation -- and a

12    stipulation meaning that all of the documents that she's

13    reported are the bank and are the bank's records, with

14    the exception of Number 40 at this point in time -- are

15    being accepted by both sides as legitimate and

16    appropriate bank records.  So the stipulation allows

17    those to be in evidence even though there isn't going to

18    be further testimony about them.

19              And we may well hear some more stipulations

20    before the day's out.  So I want you to understand that

21    it is evidence.  They're agreeing that it's appropriate

22    evidence in regards to the items that they're stipulating

23    to.

24              Counsel.

25              MR. PORTMAN:  No further questions, Your
```

1    Honor.

2              MR. CONRAD:  Your Honor, may I approach?

3              THE COURT:  You may.

4                    CROSS-EXAMINATION

5    BY MR. CONRAD:

6         Q.   Ma'am, you have I think it's marked as 40; is

7    that right?

8         A.   Yes.

9         Q.   If I can get that from you just for a second.

10             Now, you indicated that this Commonwealth's

11   40 is kept in the normal course of business; is that

12   correct?

13        A.   Yes.

14        Q.   And when is that particular document filled

15   out?

16        A.   When they open the account.

17        Q.   Okay.  And when you say when they open the

18   account, that's whenever a new customer would open an

19   account; correct?

20        A.   Yes.  Even if it's a previous customer, every

21   new account you open, we make a new signature card.

22        Q.   Okay.  And your bank where you work at, where

23   do you work at?

24        A.   Coatesville Savings Bank.

25        Q.   Okay.  Where's it located?

```
 1              A.    New Holland is the branch I work in.

 2              Q.    All right.  And that's here in Lancaster

 3     County?

 4              A.    Yes.

 5              Q.    You get many Mennonite, Amish folk that come

 6     in there?

 7              A.    Yes.

 8              Q.    Lots?

 9              A.    Lots.

10              Q.    Deal in cash a lot of times?

11              A.    Yes or no, it just depends.

12              Q.    Okay.  Now, whenever someone fills out this

13     form you were just talking about, Commonwealth's 40 that

14     you have there, you would agree with me that nowhere on

15     that form is there any kind of warning as to how one

16     should put their money into a bank; is that correct?

17              A.    No.

18              Q.    Okay.  And very much your bank is in the

19     trust business, right?  You want people to come in and

20     entrust their monies to you; is that correct?

21              A.    Yes.

22              Q.    If you happen to see someone, for instance,

23     making transactions -- someone came in and made a couple

24     9,000-dollar deposits, would you take them aside and talk

25     to them, they ought not be doing that?
```

1  A. No, because when you have a currency

2 transaction report, like a suspicious activity, we're not

3 allowed to tell that we're filling out a suspicious

4 transaction report.

5  Q. But you don't have to fill one of those out

6 all the time; isn't that right?

7  A. My employer requires us to fill one out.  If

8 we feel anything is suspicious, we are required to fill

9 it out.

10  Q. Okay.  You're required to, but the

11 suspiciousness, that just comes from someone who just --

12 that's an opinion by someone at the bank; isn't that

13 right?

14  A. Well, I mean generally people don't bring in

15 lots of cash.  So, yes, when the cash was brought in like

16 back to back to back and just underneath the 10,000 mark,

17 yes, I did feel as though that was suspicious.

18  Q. I'm not questioning you about that.

19  A. Okay.

20  Q. What I'm simply saying is that if you have a

21 customer and they happen to be doing something not quite

22 right, you just couldn't reach out to them and say, hey,

23 you can't do that?

24  A. I mean I guess we could have, but we did not.

25  Q. In this case nobody did that, right?

1          A.   No.

2          Q.   And no one said that he would potentially

3     face the loss of all his money; is that right?

4          A.   No, I did not say that to him.

5          Q.   All right.  And, in fact, the government did

6     come in and literally take all his money out of that

7     account, didn't they?

8          A.   Yes, they did.

9          Q.   Do you have a total figure for that?

10         A.   I don't here in front of me and I can't

11    remember what it was.

12         Q.   Tens of thousands of dollars?

13         A.   Yeah.  It's been a couple years.  I can't

14    remember what it was.

15              MR. CONRAD:  Okay.  Thank you.  Nothing

16    further, Your Honor.

17              THE COURT:  Any redirect, sir?

18              MR. PORTMAN:  Just briefly.

19                    REDIRECT EXAMINATION

20    BY MR. PORTMAN:

21         Q.   Miss Forsythe, you're familiar with the Cash

22    Transaction Report?

23         A.   Yes, I am.

24         Q.   And when was a -- strike that.

25              Have you had training in the preparation of

1    the Cash Transaction Report?

2            A.    Yes, I have.

3            Q.    What does that training consist of?

4            A.    I've been through seminars and like been

5    trained multiple times.  I have to be trained every year

6    on it.

7            Q.    Okay.  Who requires that a financial

8    institution, such as a bank, prepare a cash transaction

9    report?  Is it your bank or another agency?

10           A.    No.  Our bank does it and then we turn it

11   over to our BSA Department; and then where they go from

12   there, I'm not sure.

13           Q.    And BSA refers to what?

14           A.    Our Bank Secrecy Act.

15           Q.    What is the triggering event where a

16   financial institution, such as a bank, must complete a

17   cash transaction report?

18           A.    Anything over $10,000.

19           Q.    Cash transaction?

20           A.    Yes.

21           Q.    Including deposits and withdrawals?

22           A.    Yes.

23           Q.    Is it discretionary with a bank whether or

24   not to do a cash transaction report for amounts less

25   than 10,000 or -- 10,000 or less?

1          A.    Well, if you do, you wouldn't do the cash

2    transaction report.    Then it would be the suspicious

3    activity report.

4          Q.    You would note various amounts being

5    deposited less than 10,000 --

6          A.    Yes.

7          Q.    -- on a form?

8          A.    Yes.

9                MR. PORTMAN:  Thank you.  Nothing further.

10               THE WITNESS:  You're welcome.

11               MR. CONRAD:  No recross, Your Honor.

12               THE COURT:  Thank you.  You may step down.

13               MR. PORTMAN:  Commonwealth would call Annie

14   Frackman.

15                    ANNIE FRACKMAN,
      called as a witness, having been duly sworn or affirmed,
16           was examined and testified as follows:

17                   DIRECT EXAMINATION

18   BY MR. PORTMAN:

19         Q.    Good afternoon.  Would you please state your

20   first and last name and spell them for the record?

21         A.    Annie, A-n-n-i-e, F-r-a-c-k-m-a-n.

22         Q.    And, Miss Frackman, by whom are you employed?

23         A.    Sterling Financial Corporation, which owns

24   Bank of Lancaster County.

25         Q.    How long have you been employed by Sterling

Financial?

     A.    Seventeen years.

     Q.    Have you always worked with the Bank of Lancaster County?

     A.    Yes.

     Q.    I'm going to show you -- what are your duties there?

     A.    I work in the Security Department and the Compliance Department.

     Q.    And within those departments what are your responsibilities?

     A.    Our responsibilities are to monitor accounts and look for any type of suspicious activity or anything that needs to be questioned or clarified.

     Q.    And that's with regards to financial transactions performed for the bank?

     A.    Correct.

     MR. PORTMAN:  May I approach, Your Honor?

     THE COURT:  You may.

BY MR. PORTMAN:

     Q.    Miss Frackman, I've handed you a set of documents that have been previously marked and identified as Commonwealth's Exhibits 30 through 37-A.  Would you please look through those.  Are you familiar with those documents?

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1          A.    Yes, I am.

2          Q.    Directing your attention to Exhibit 30, would

3    you please identify what that is?

4          A.    That is a new account sheet.

5          Q.    For your bank?

6          A.    Correct.

7          Q.    And can you tell us please in whose name that

8    account appears and the account number?

9          A.    The account is for Levi L. Stoltzfoos and the

10   account number is 9020010147.

11         Q.    Does it indicate when that was opened?

12         A.    It was opened 3/10 of 2004.

13         Q.    And is it signed by Mr. -- by someone

14   identified as Levi Stoltzfoos?

15         A.    Correct.

16         Q.    Those documents 30 through 37-A, are those

17   documents maintained in the ordinary course of business

18   by your bank?

19         A.    Correct.

20         Q.    Are those documents ones that were turned

21   over to the Office of the Attorney General through Agent

22   Licklider?

23         A.    Correct.

24         Q.    There's been questions asked previously on

25   this.  Your bank is a community bank here in the local

```
 1    community?

 2             A.    Correct.

 3             Q.    Number of different communities --

 4             A.    Yes.

 5             Q.    -- in Lancaster County?

 6             A.    Yes.

 7             Q.    Any other counties?

 8             A.    We have different banks under the Sterling

 9    umbrella that deal in different counties, yes.

10             Q.    With respect to Lancaster County, does your

11    bank have dealings with the Amish community and the

12    Mennonite community?

13             A.    Yes.

14             Q.    For business, personal accounts?

15             A.    Both.

16             Q.    And have you yourself had personal dealings

17    with the Amish or Mennonite community for banking

18    purposes?

19             A.    Yes, when I worked in the branch.

20             MR. PORTMAN:  Nothing further, Your Honor.

21             THE COURT:  Cross-examination.

22             MR. CONRAD:  Thank you, Your Honor.

23                       CROSS-EXAMINATION

24    BY MR. CONRAD:

25             Q.    Ma'am, you were speaking about the document
```

1    Commonwealth's 30; is that correct?  Is that the

2    signature card?

3           A.    That is correct.

4           Q.    Okay.  And that signature card, when is that

5    filled out?

6           A.    I'm sorry?

7           Q.    When is it normally filled out?

8           A.    At the time of the account opening.

9           Q.    So someone comes in, opens a new account,

10   they fill that out and start banking with you?

11          A.    Correct.

12          Q.    Okay.  And looking at Commonwealth's 30 that

13   you have there in front of you, you'd agree with me

14   there's no warning on there anywhere about how one should

15   put their money in the bank; is that correct?

16          A.    Correct.

17          Q.    Okay.  And, in fact, in this case with regard

18   to Levi Stoltzfoos, as he was putting his money

19   in, $9,000 at a time or whatever it happened to be, no

20   one took him aside and said, sir, you can't do that;

21   right?

22          A.    I don't know that I can answer that because I

23   don't know if anybody spoke to him about that.

24          Q.    To your knowledge, though.

25          A.    To my knowledge, no.

1    Q.   Okay.  All right.  Did you deal with
2    Mr. Stoltzfoos yourself at the bank?
3    A.   No.
4    Q.   You did not?
5    A.   No.
6    Q.   Do you know anybody at the bank who did -- in
7    particular who dealt with him on this?
8    A.   The tellers.
9    Q.   The tellers.  Okay.
10    MR. CONRAD:  Court's indulgence for one
11    moment.
12    THE COURT:  Yes.
13    BY MR. CONRAD:
14    Q.   Now, I want to refer you to a statement --
15    MR. CONRAD:  I'm sorry.  Strike that, Your
16    Honor.  Thank you.  No further questions.  Thank you,
17    ma'am.
18    MR. PORTMAN:  You may step down.
19    One moment, Your Honor.
20    THE COURT:  Many times you'll notice during
21    the course of the trial, counsel will be conferring.  And
22    I can tell you that from a Judge's standpoint, the
23    conferences counsel are having are for the purpose of
24    speeding up the procedures.  And you'll find that they
25    will do some stipulations as a result of this or limit

1    their questions, and so I encourage counsel.  When they

2    speak, what they're doing should be of no interest to

3    you, but I can tell you it's all benefitting the

4    proceedings.

5              MR. PORTMAN:  May we approach, Your Honor?

6              MR. CONRAD:  In that same vein, may we

7    approach?

8              THE COURT:  You may.

9              (A sidebar discussion was held off the

10   record.)

11             THE COURT:  Many of the witnesses that we

12   have, as perhaps you as jurors, are professionals from

13   banks as you've understood at this point, and some of

14   those bankers are here perhaps out of order.  This next

15   witness we're going to call would follow in the proper

16   sequence of things.

17             I assume she's from the Bank of Lancaster

18   County; is that correct?

19             MR. CONRAD:  Yes.  And, Your Honor, I'm

20   sorry.  May I step outside just for a moment?  I may need

21   to change up on that.

22             THE COURT:  Yes.  And it may be that the

23   defense will call somebody to keep the sequence going so

24   we don't have to then recall them again at a later time.

25   So I've given them that opportunity if they want to do

1    that.  So if that happens, you'll see defense ask

2    questions first, then the Commonwealth, but that it's not

3    unusual.  Again, it's for the purpose of trying to keep

4    going with the witnesses that we have present.

5              MR. CONRAD:  Your Honor, after the Court

6    extended that courtesy to the defense, which we

7    appreciate, it appears we're going to hold off on that

8    right now.  So I apologize.

9              THE COURT:  No problem.  Thank you.

10             MR. PORTMAN:  We call Nadine McGarrity to the

11   witness stand.

12                        NADINE McGARRITY,
     called as a witness, having been duly sworn or affirmed,

13            was examined and testified as follows:

14                      DIRECT EXAMINATION

15   BY MR. PORTMAN:

16        Q.   Would you please state your name and spell

17   your first and last names for the record?

18        A.   Nadine McGarrity.  N-a-d-i-n-e, M-c capital

19   G-a-r-r-i-t-y.

20        Q.   And, Miss McGarrity, by whom are you

21   employed?

22        A.   The Ephrata National Bank.

23        Q.   And for how long have you been so employed?

24        A.   Thirteen years.

25        Q.   And prior to that were you in the banking

1    industry?

2           A.    Yes, I was.

3           Q.    Which bank?

4           A.    Fulton Bank.

5           Q.    And how long prior to joining Ephrata

6    National Bank?

7           A.    Nine years at Fulton.

8           Q.    And what are your -- what is your current

9    title with the bank?

10          A.    Vice President Security.

11          Q.    And what are your duties with the bank?

12          A.    I'm responsible for the entire security

13   function and part of the BSA function.

14          Q.    And BSA is the Bank Secrecy Act?

15          A.    Yes.

16          Q.    And do you have dealings with cash

17   transactions reports?

18          A.    Yes, I do.

19          Q.    And you also have, as part of your duties,

20   responsibilities for the internal bank records?

21          A.    Yes.

22               MR. PORTMAN:  If I may approach the witness,

23   Your Honor?

24               THE COURT:  You may.

25   BY MR. PORTMAN:

1          Q.    Miss McGarrity, I've shown you what have been
2    previously marked as Commonwealth's Exhibits 50
3    through 55.  Would you please review those.  Do you
4    recognize those?
5          A.    Yes.
6          Q.    With respect to Exhibit 50 -- Commonwealth's
7    Exhibit 50, can you please tell us what that is?
8          A.    It's the new account signature card, the new
9    account agreement.
10         Q.    And is that for a particular person?
11         A.    Pardon me?
12         Q.    Who is that for?
13         A.    Levi Stoltzfoos.  Levi L.
14         Q.    Can you please give us the date it was opened
15   and the account number?
16         A.    It was opened January 9th of 2006 and the
17   account number is 882011.
18         Q.    And the remaining Exhibits 51 through 55, can
19   you tell us what those are?
20         A.    Exhibit Number 51 is a new account deposit.
21   It was the opening deposit for the account.
22         Q.    And do the balance of those documents also
23   reference deposits?
24         A.    Yes.  Yes.
25         Q.    And are those documents 50 through 55, are

1    those exhibits kept in the ordinary course of business by

2    your bank?

3            A.    Yes.

4            Q.    Were they produced to the Commonwealth

5    through Agent Licklider?

6            A.    Yes.

7            Q.    With respect to your bank, does your bank

8    have any professional dealings or institutional dealings

9    with the Amish or Mennonite communities?

10           A.    Yes, we do.

11           Q.    And do they maintain accounts with your

12   banks?

13           A.    Yes.

14           MR. PORTMAN:  Nothing further.  Thank you.

15           THE COURT:  Cross-examination.

16           MR. CONRAD:  Thank you, Your Honor.

17                     CROSS-EXAMINATION

18   BY MR. CONRAD:

19           Q.    Good afternoon, ma'am.

20           A.    Good afternoon.

21           Q.    Ma'am, this card is still filled out when

22   someone just starts -- signature card -- I'm sorry -- on

23   Commonwealth's 50, that would be filled out when someone

24   opens a new account; is that correct?

25           A.    Yes, that's correct.

1    Q.    And you would agree with me there's nothing

2  on that document that would warn someone how they should

3  or should not put their money in the bank; is that

4  correct?

5    A.    That's correct.

6    Q.    And your bank, like in this case, you happen

7  to see someone who happens to be putting their money in

8  -- structuring, if you would -- $9,000 at a time, did

9  anyone approach Mr. Stoltzfoos and say, don't do that?

10    A.    Not that I'm aware of, but I don't know.  I

11  wasn't with the tellers.

12    Q.    To your knowledge, though.

13    A.    To my knowledge, no.

14    Q.    Okay.  All right.  And you said you also

15  handle security for the bank; is that correct?

16    A.    Yes, that's correct.

17    Q.    As part of your dealings with this case, you

18  had a chance to review some of the monies; correct?

19    A.    Not the money, the straps.

20    Q.    Okay, the straps.

21    A.    The teller sent the straps to me.

22    Q.    Okay.  And those straps were from 1999,

23  correct?

24    A.    That's correct.

25    Q.    And you also found like an odor or musty

1    smell on the money; is that correct?

2         A.    That's correct.

3         Q.    All right.  I guess one other thing.  Total

4    -- you're with Ephrata National, right?

5         A.    That's correct.

6         Q.    The government actually seized somewhere in

7    the neighborhood of $48,200; is that correct?

8         A.    I think it was slightly more than that, but

9    that's correct.

10              MR. CONRAD:  All right.  Thank you.

11              MR. PORTMAN:  No further questions.

12              THE COURT:  You may step down, ma'am.

13              MR. PORTMAN:  Commonwealth would call Elaine

14   Shope, Your Honor.

15                         ELAINE SHOPE,
     called as a witness, having been duly sworn or affirmed,
16           was examined and testified as follows:

17                      DIRECT EXAMINATION

18   BY MR. PORTMAN:

19        Q.    Good afternoon.  Would you please state your

20   first and last names and spell both for the record?

21        A.    Elaine Shope.

22        Q.    Spell your first and last name.

23        A.    Oh, spell it.  E-l-a-i-n-e, S-h-o-p-e.

24        Q.    And by whom are you employed?

25        A.    Fulton Bank.

1       Q.    And how long have you been employed by them?

2       A.    Twenty-nine years.

3       Q.    And what is your job description with them?

4       A.    Branch manager.

5       Q.    And what are your duties?

6       A.    I'm responsible for running the Greenfield

7   office today.

8       Q.    Does that entail being responsible for

9   internal bank documents?

10      A.    Yes.

11      Q.    Deposit tickets, new account cards, so forth?

12      A.    Yes.

13            MR. PORTMAN:  May I approach, Your Honor?

14            THE COURT:  You may.

15            MR. PORTMAN:  Thank you.

16  BY MR. PORTMAN:

17      Q.    I've just handed you what have been

18  previously marked and introduced as Commonwealth's

19  Exhibits 60 through 66-A.  Would you please look through

20  those?

21      A.    Okay.

22      Q.    Are you familiar with those documents?

23      A.    Yes.

24      Q.    Directing your attention to Commonwealth's

25  Exhibit 60, can you please tell us what that is?

```
 1          A.    It's a new account form.
 2          Q.    And is this for -- who is the new account
 3    for?
 4          A.    It's for Levi L. Stoltzfoos.
 5          Q.    Does it indicate when it was opened?
 6          A.    Yes.
 7          Q.    When was that?
 8          A.    March 18th, 2004.
 9          Q.    And the account number on that account?
10          A.    3622-68587.
11          Q.    And Exhibits 61 through 66-A, are you
12    familiar with those documents?
13          A.    Yes.
14          Q.    And they represent deposit information on
15    cash deposits into that account; is that correct?
16          A.    Yes.
17          Q.    And with respect to those exhibits 60 through
18    66-A, are they maintained in the ordinary course of the
19    bank's business?
20          A.    Yes.
21          Q.    That particular account?
22          A.    Yes.
23          Q.    Were they provided to the Office of the
24    Attorney General through Agent Licklider?
25          A.    Yes.
```

```
 1              Q.    Thank you.

 2              One other question.  With respect to the

 3   bank, your particular branch is located where?

 4              A.    Where I am today?

 5              Q.    Yes.

 6              A.    Greenfield.

 7              Q.    And are there bank branches other than

 8   Greenfield that are located in Lancaster County?

 9              A.    Yes.

10              Q.    Does your bank have business dealings or

11   personal dealings with members of the Amish and Mennonite

12   communities?

13              A.    Yes.

14              MR. PORTMAN:  Thank you very much.

15                       CROSS-EXAMINATION

16   BY MR. CONRAD:

17              Q.    Good afternoon, ma'am.

18              A.    Hello.

19              Q.    In those dealings, a lot of cash transactions

20   with Amish folks?

21              A.    Yes.

22              Q.    Okay.  And this what's in front of you right

23   now, Commonwealth 60, I believe -- is that the top

24   document there?

25              A.    Yes, it is.
```

1       Q.   It's a signature card; is that correct?

2       A.   Yes.

3       Q.   One would fill that out when one comes in to

4  open a new account, correct?

5       A.   Correct.

6       Q.   You'd agree with me there's nothing on

7  Commonwealth's 60 there in front of you that would give a

8  new customer any idea how to or not to put their money in

9  the bank; is that correct?

10      A.   Correct.

11      Q.   Okay.  And if you had a customer that

12 happened to be putting money in, like in this case with

13 Mr. Stoltzfoos, he was putting money in $9,000 at a time,

14 did anybody approach him -- in fact, nobody approached

15 him and said, hey, you can't do that?

16      A.   I couldn't answer that.  I don't know.

17      Q.   Okay.  Fair enough.

18           In this particular instance, all the money

19 that was in his accounts, it was all seized by the

20 government; is that correct?

21      A.   I don't know that.

22      Q.   You don't know that at all?

23      A.   I don't.

24           MR. CONRAD:  Okay.  Fair enough.  Thank you,

25 ma'am.

1          THE WITNESS:  Okay.

2          MR. PORTMAN:  No further questions, Your

3  Honor.

4          THE COURT:  You may step down.  Thank you.

5          MR. PORTMAN:  Commonwealth would call Lana L.

6  Neff to the stand, Your Honor.

7                    LANA L. NEFF,
   called as a witness, having been duly sworn or affirmed,
8          was examined and testified as follows:

9                 DIRECT EXAMINATION

10 BY MR. PORTMAN:

11         Q.    Good afternoon.  Would you please state your

12 first and last names and spell both for the record?

13         A.    My name is Lana Neff.  It's L-a-n-a, N-e-f-f.

14         Q.    And Miss Neff, by whom are you employed?

15         A.    Graystone Bank.

16         Q.    And how long have you been employed by them?

17         A.    Two-and-a-half years.

18         Q.    And prior to that were you employed in the

19 banking industry?

20         A.    Yes, I was.  I worked for Blue Ball National

21 Bank for 26-and-a-half years.

22         Q.    What are your current duties with Graystone

23 Bank?

24         A.    I am the Branch Sales Manager.

25         Q.    And do you work at a particular branch?

1        A.    I work at the Meadowbrook Office in Leola.

2        Q.    What are your duties there?

3        A.    I just oversee the branch's daily activities

4   and opening of new accounts and the lending function.

5        Q.    And are you familiar with the internal forms

6   generated by the bank?

7        A.    Yes, I am.

8              MR. PORTMAN:  May I approach, Your Honor?

9              THE COURT:  You may.

10  BY MR. PORTMAN:

11       Q.    Miss Neff, I handed you what have been

12  previously marked and identified as Commonwealth's

13  Exhibits 70 through 75-A.  Please take a minute and look

14  through those.

15             Have you had a chance to look through those?

16       A.    Yes.

17       Q.    Are you familiar with those documents?

18       A.    Yes, I am.

19       Q.    Directing your attention to Commonwealth's

20  Exhibit 70, can you please identify what that is?

21       A.    This is a signature card for the opening of a

22  checking account in our bank.

23       Q.    And for which customer?

24       A.    For Levi Stoltzfoos.

25       Q.    And when was that opened?

1         A.    That was opened January 14th, 2006.

2         Q.    And what account number is that?

3         A.    The account number is 210002077.

4         Q.    And did you open that account?

5         A.    Yes, I did.  It's a money market account.

6         Q.    And with respect to the remaining Exhibits 71

7   through 75-A, do they pertain to deposit records of cash

8   deposits into that account?

9         A.    Yes, they do.  They're all deposit tickets

10  crediting his money market account, and they're all cash

11  deposits.

12        Q.    Does your bank, Graystone Bank, have dealings

13  with members of the Amish and Mennonite communities?

14        A.    Absolutely, yes.

15        Q.    Both business and non-business accounts?

16        A.    Yes.

17        Q.    And when that account was opened, was

18  Mr. Stoltzfoos present, in your presence?

19        A.    Yes.  He opened the account.

20        Q.    Okay.  Is he in here today?

21        A.    Yes, he is.

22        Q.    Can you identify him for us, please?

23        A.    That's him right over there.

24              MR. PORTMAN:  Indicating the defendant to the

25  right of defense counsel.  Thank you.

1           THE WITNESS:  You're welcome.

2                     CROSS-EXAMINATION

3    BY MR. CONRAD:

4           Q.   Miss Neff, relax, really.  You're very tense.

5    Relax.  Going to be just fine.

6           A.   I was in a hurry to get here.

7           Q.   With regard to that account, when you -- and

8    you have it in front of you there, I guess it's

9    Commonwealth's 70; is that correct, ma'am?

10          A.   Yes.

11          Q.   And Commonwealth's 70, you give that to

12   anyone who opens up a new account; is that correct?

13          A.   This new account signature card, yes.

14          Q.   And you would agree with me that on

15   Commonwealth's 70, there's nothing indicating to a new

16   client how they should or should not put money in the

17   bank; is that correct?

18          A.   On the signature card?

19          Q.   Right.

20          A.   No.

21          Q.   Okay.  And if, like in this case, if you

22   happened to see a customer that's putting in money under

23   the limit, they're not supposed to?

24          A.   Correct.

25          Q.   Did anyone ever approach him and say, hey,

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1    you can't do that?

2          A.    No.   We're not allowed to do that.   That's

3    not something that we're supposed to do.

4          Q.    Not supposed to do?

5          A.    Right.   It's something that I wouldn't do.

6          Q.    Okay.  All right.   That's fair enough.

7                In this particular case, the government

8    seized all his assets through your bank, correct --

9          A.    Yes.

10         Q.    -- that were in your bank?  To the tune of

11   some 47,000 -- $47,800?

12         A.    I think that was about correct.

13               MR. CONRAD:  Okay.  Very well.   Thank you.

14               Nothing further, Your Honor.

15               MR. PORTMAN:  Nothing further, Your Honor.

16               Commonwealth will call Linda Lane, Your

17   Honor.

18                        LINDA LANE,
     called as a witness, having been duly sworn or affirmed,
19             was examined and testified as follows:

20                    DIRECT EXAMINATION

21   BY MR. PORTMAN:

22         Q.    Good afternoon.

23         A.    Good afternoon.

24         Q.    Would you please spell your first and last

25   name and state them for the record?


                SUSAN A. MILTON, OFFICIAL COURT REPORTER

```
 1              A.    Sure.  L-i-n-d-a.  Last name, L-a-n-e.

 2              Q.    Linda Lane?

 3              A.    Correct.

 4              Q.    By whom are you employed?

 5              A.    M&T Bank.

 6              Q.    And for how long have you been employed by

 7    them?

 8              A.    Eight years.

 9              Q.    And prior to that did you have banking

10    experience?

11              A.    No.

12              Q.    With respect to your current position, what

13    do you do?

14              A.    I'm a branch manager.

15              Q.    And how long have you been a branch manager?

16              A.    Eight years.

17              Q.    And what are your duties as a branch manager?

18              A.    I cover everything from operations to

19    relationship management, customer service and teller

20    work.

21              Q.    Are you familiar with the internal documents

22    generated by the bank?

23              A.    I am.

24              MR. PORTMAN:  If I may approach, Your Honor?

25    BY MR. PORTMAN:
```

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1      Q.   Miss Lane, I've handed you what have been

2   previously identified as Commonwealth's Exhibits 80

3   through 83.  Would you please look through those?  Have

4   you had a chance to look through those?

5      A.   I did.

6      Q.   Do you recognize those documents?

7      A.   I do.

8      Q.   I'd like to direct your attention to

9   Exhibit 80.  Can you please tell us what that is?

10      A.   This is our account opening document.

11      Q.   And for which account holder is that?

12      A.   This is for Levi L. Stoltzfoos.

13      Q.   And can you tell us when that was opened and

14   the account number?

15      A.   Sure.  The account opening date would be

16   January 9th of 2006.  The account number is 15 double

17   zero 4213706938.

18      Q.   And if you would please again refer to

19   Exhibits 81 through 83.  And those reference cash -- the

20   deposit statements into the account?

21      A.   That is correct.

22      Q.   And with respect to Exhibits 80 through 83,

23   are they kept in the ordinary course of the bank's

24   business?

25      A.   I'm sorry, I can't hear.

1        Q.    Sorry.   Those Exhibits 80 through 83, are

2   they kept in the ordinary course of the bank's business?

3        A.    Yes.

4        Q.    And were those turned over to the Attorney

5   General's Office through Agent Licklider?

6        A.    Yes.

7        Q.    M&T Bank has branches in Lancaster County?

8        A.    That is correct.

9        Q.    From your personal experience, do you know

10  whether or not the bank has relationships, personal

11  and/or business, with the Amish or Mennonite communities?

12       A.    We most certainly do.

13            MR. PORTMAN:   Thank you.   No further

14  questions.

15                    CROSS-EXAMINATION

16  BY MR. CONRAD:

17       Q.    Good afternoon, ma'am.

18       A.    Good afternoon.

19       Q.    The signature card that you have there in

20  front of you --

21       A.    Mm-hmm.

22       Q.    -- on Page 8 -- I guess it's labeled Page 8;

23  is that correct?   Commonwealth's 80.   I'm sorry.

24       A.    You mean the account Exhibit 80?

25       Q.    Yes.   I'm not being very clear at all.   It's