1    listed as Commonwealth's Exhibit 80; is that correct?

2        A.    Yes.

3        Q.    Okay.  And you recognize that as an account

4    card that you use anytime someone opens a new account?

5        A.    That is correct.

6        Q.    That was used with Mr. Stoltzfoos; is that

7    correct?

8        A.    Correct.

9        Q.    Okay.  And would you agree with me that

10   there's no warning on there how one ought to put their

11   money in or ought not put their money in; is that

12   correct?

13       A.    It talks about the availability disclosure of

14   consumer deposit accounts, but as far as specifically,

15   no.

16       Q.    All right.  As far as you know, no one

17   approached Mr. Stoltzfoos about how he was putting his

18   money in these accounts; right?

19       A.    I'm sorry?

20       Q.    As far as you know, no one approached

21   Mr. Stoltzfoos about how he was putting his money in his

22   account; is that correct?

23       A.    Not to my knowledge, no.

24       Q.    Okay.  You're with M&T, right?

25       A.    That's correct.

1          Q.    You'd agree with me that everything that was

2    in that account was seized by the government?

3          A.    It was turned over to the Attorney General's

4    Office, correct.

5          Q.    All cash in the account was turned over,

6    correct?

7          A.    Correct.

8                MR. CONRAD:  Thank you, ma'am.  Nothing

9    further.

10               THE COURT:  M&T wins with the most number of

11   any account numbers.

12                         JENNIE McCOMSEY,
     called as a witness, having been duly sworn or affirmed,
13          was examined and testified as follows:

14                       DIRECT EXAMINATION

15   BY MR. PORTMAN:

16         Q.    Good afternoon.  Would you please state your

17   first and last names and spell both for the record?

18         A.    Okay.  Jennie McComsey.  First name,

19   J-e-n-n-i-e.  Last name, M- little c, big C-o-m-s-e-y.

20         Q.    And, Miss McComsey, by whom are you employed?

21         A.    Northwest Savings Bank in New Holland.

22         Q.    How long have you been employed by them?

23         A.    Six years.

24         Q.    And prior to that did you have any banking

25   experience?

1          A.    Yes.

2          Q.    And what was that?

3          A.    Sovereign Bank, three-and-a-half years.

4          Q.    And what are your current duties with

5     Northwest Savings Bank?

6          A.    I'm the senior teller CSR, which means I open

7     new accounts, and I'm in charge of all the tellers.

8          Q.    And are you familiar with the internal

9     documents generated by the bank?

10         A.    Yes.

11              MR. PORTMAN:  May I approach, Your Honor?

12              THE COURT:  You may.

13              THE WITNESS:  Thank you.

14    BY MR. PORTMAN:

15         Q.    Miss McComsey, I'm showing you -- giving you

16    what have been previously marked and identified as

17    Commonwealth's Exhibits 100 through 106.  Would you

18    please look through those.  Do you recognize those

19    documents?

20         A.    Yes, I do.

21         Q.    Direct your attention to Exhibit 100, could

22    you please identify that for us?

23         A.    This is a typical signature card.

24         Q.    And can you please tell us for whose account

25    is that?

1          A.    Levi Stoltzfoos.

2          Q.    And when was it opened?

3          A.    January 9th of '06.

4          Q.    And is there an account number on that?

5          A.    Yes, there is.

6          Q.    And would you please tell us that?

7          A.    Sure.  1711015709.

8          Q.    Okay.  Now, does Northwest Savings Bank have

9     customers, at least that you're familiar with, in the

10    Amish and/or Mennonite communities?

11         A.    Yes.

12         Q.    Yes.  Both for banking and non -- business

13    and non-business purposes?

14         A.    Yes.

15               MR. PORTMAN:  Thank you.  No further

16    questions.

17               THE COURT:  Cross-examination.

18               MR. CONRAD:  Thank you, Your Honor.

19                       CROSS-EXAMINATION

20    BY MR. CONRAD:

21         Q.    Good afternoon, ma'am.

22         A.    Good afternoon.

23         Q.    Ma'am, what you have in front of you,

24    Commonwealth's 100 --

25         A.    Yes.

1        Q.   -- you've indicated that's the signature

2   card; is that correct?

3        A.   That's correct.

4        Q.   Okay.  And, ma'am, you didn't -- this is used

5   whenever a new client comes in to start up an account;

6   correct?

7        A.   Yes.

8        Q.   And, in fact, it was used in this case when

9   Mr. Stoltzfoos came in?

10       A.   Yes.

11       Q.   You'd agree with me there's nothing on there

12   indicating how one ought or not deposit their monies into

13   the bank; is that correct?

14       A.   Correct.

15       Q.   And to your knowledge, did anyone or did you

16   say anything to Mr. Stoltzfoos about how to deposit his

17   money or not deposit his money?

18       A.   No, I did not.

19       Q.   Did you have any dealings with Mr. Stoltzfoos

20   at all?

21       A.   Besides opening the account, I made -- I took

22   one deposit.  It was through the drive-up.

23       Q.   All right.  Smell of the money -- did you

24   smell the money?

25       A.   Yes.

1        Q.    Have like an odor of -- a musty smell to it?

2        A.    Yes.

3        Q.    The bank straps around the money -- were

4    there bank straps?

5        A.    I think so.  I'm not --

6        Q.    Okay.

7        A.    Long time ago.

8              MR. CONRAD:  All right.  Very good.  Thank

9    you, ma'am.

10             I'm sorry.  If I could, Your Honor?

11             THE COURT:  You may.

12   BY MR. CONRAD:

13       Q.    All the money that was in the account, it was

14   entirely seized by the government; is that correct?

15       A.    That's correct.

16             MR. CONRAD:  Okay.  Thank you, ma'am.

17             MR. PORTMAN:  No further questions.

18             THE COURT:  You may step down.

19             MR. PORTMAN:  Your Honor, may we approach?

20             THE COURT:  You may.

21             (A sidebar discussion was held off the

22   record.)

23             THE COURT:  As some of you may recall from

24   coming into the courthouse this morning, the best-laid

25   plans don't always work and sometimes the opposite has

1    happened to us.  We realized this afternoon that we were

2    going to have seven professionals come in and they were

3    all appropriately here.  And I must say thanks to the

4    cooperation of counsel relative to this, we went through

5    those witnesses much more rapidly than counsel expected.

6              So at this point in time, I'm going to excuse

7    you until tomorrow morning.  The other witnesses will

8    begin at 9:00 tomorrow morning.  But as we have -- of

9    course you heard stipulations and limited testimony

10   relative to the records themselves.  There is no more

11   testimony for today and we don't have any other people

12   actually present to testify.  That's not unusual.

13   Sometimes the Court is rather pleased that things go

14   quickly rather than last all day, but that's not a

15   reflection on either counsel other than in a positive

16   way.

17             I do want to remind you we're going to resume

18   promptly at 9:00 with the additional witnesses.  I ask

19   that you report back to the jury room and I'm going to

20   say 8:30, realizing that some of you may be closer to

21   quarter of nine, but shoot for 8:30.

22             Please remember that you are not to discuss

23   this case among yourselves or with anyone else.  You are

24   not to conduct any experiments, visit the scene or make

25   any other individual investigations of any of the facts

1    of this case.  You are not to read, listen or watch

2    television or any media accounts of this case.  And

3    please, again, wear those juror buttons in a conspicuous

4    place, especially around the courthouse or between the

5    courthouse and the respective places where you have

6    parked.

7              Is there anything else before I excuse the

8    jury for the day?

9              MR. PORTMAN:  No, Your Honor.

10             MR. CONRAD:  No, Your Honor.

11             THE COURT:  Mr. Battisti, you may take them

12   back.  And that will be it for today and we'll see you

13   again tomorrow morning.

14             As you are recognized, please leave all your

15   notes on your seat and Mr. Battisti will grab those.

16             (The proceedings recessed at 2:20 p.m.)

17

18

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE

 2

 3         I HEREBY CERTIFY that I was present upon the

 4    hearing of the above-entitled matter and there reported

 5    stenographically the proceedings had and the testimony

 6    produced, and I further certify that the foregoing is a

 7    true and correct copy of my said stenographic notes.

 8         In testimony whereof, I have hereunto subscribed

 9    my hand this 16th day of June 2008.

10

11

12

13

14                      _____Susan A. Milton_____
                        Susan A. Milton
15                      Official Court Reporter

16

17         AND, NOW, _____, _____,

18    this transcript is approved and ordered to be filed.

19

20                      _____
                        Howard F. Knisely,  Judge

21

22

23

24

25
```

SUSAN A. MILTON, OFFICIAL COURT REPORTER

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF LANCASTER
CRIMINAL

DEFENSE ATTORNEY

COPY

4

5  _____ :

   COMMONWEALTH OF PENNSYLVANIA     :

6                                   :

               vs.                  :   No. 5995-2006

7                                   :

   LEVI L. STOLTZFOOS               :

8  _____ :

9

10                    JURY TRIAL

11                  VOLUME 3 OF 4

12

13         Before:  Honorable Howard F. Knisely, Judge

14         Date  :  Wednesday, May 7, 2008

15         Place :  Courtroom No. 3
                    50 North Duke Street
16                  Lancaster, Pennsylvania 17602

17

18

   APPEARANCES:

19

       STEVAN K. PORTMAN, ESQUIRE
20     ASSISTANT ATTORNEY GENERAL
           For - The Commonwealth
21

       JEFFREY A. CONRAD, ESQUIRE
22     CLYMER & MUSSER
       408 West Chestnut Street
23     Lancaster, Pennsylvania 17602
           For - The Defendant
24

25  Ordered 5-16-08  Lodged _____  Filed _____

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1             <u>INDEX TO WITNESSES</u>

2     VOLUME 3 OF 4

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Rachel Carslon | 200 | 202 | 204 | 205 |
| Karen Buch | 206 | 208 | --- | --- |
| David Kneisley | 212 | 214 | --- | --- |
| Lisa Krick | 271 | 223 | --- | --- |
| Anna Stoltzfoos | 228 | 235 | --- | --- |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                        (9:02 a.m.)

 3              THE COURT:  Before we get started, counsel,

 4    do you agree all of the jurors are present and in their

 5    proper spots?

 6              MR. CONRAD:  Yes, Your Honor.

 7              MR. PORTMAN:  Yes, Your Honor.

 8              THE COURT:  Thank you very much.

 9              Mr. Portman.

10                      RACHEL CARLSON,
      called as a witness, having been duly sworn or affirmed,
11              was examined and testified as follows:

12                    DIRECT EXAMINATION

13    BY MR. PORTMAN:

14         Q.    Good morning.

15         A.    Morning.

16         Q.    Would you please state your first and last

17    name and spell both for the record?

18         A.    Rachel Carlson.  R-a-c-h-e-l, C-a-r-l-s-o-n.

19         Q.    And Miss Carlson, by whom are you employed?

20         A.    National Penn Bank.

21         Q.    And how long have you been employed by them?

22         A.    About two years.

23         Q.    Before that were you in the banking industry?

24         A.    Yes.

25         Q.    Who did you work for then?
```

1      A.    I worked for Peoples Bank of Oxford, in 1999

2 I worked for First National Bank of Chester County and I

3 worked for Citizens Bank.

4      Q.    So in total, how long have you been in the

5 banking community?

6      A.    About ten years.

7      Q.    What is your present job description?

8      A.    I'm the Fraud Investigator.

9      Q.    And what are your duties?

10      A.    I am to investigate any and all types of

11 fraud that are perpetrated against the bank and to seek

12 out those responsible in a criminal or civil realm.

13      Q.    Okay.  Are you familiar with the internal

14 documents generated by the bank?

15      A.    Yes.

16           MR. PORTMAN:  If I may approach, Your Honor?

17           THE COURT:  You may.

18 BY MR. PORTMAN:

19      Q.    I've handed you what have been previously

20 marked and identified as Commonwealth's Exhibits 90

21 through 97-A.  Just take a look through those.  You

22 recognize those documents?

23      A.    Yes.

24      Q.    If you could please go to Exhibit 90 and tell

25 us what that is.

1          A.    This is a signature card that is used to

2    obtain the signature of the account opener at the time

3    that the account is opened.

4          Q.    And whose account is that?  Who owns that

5    account?

6          A.    This account is owned by Levi Stoltzfoos.

7          Q.    Could you please tell us the account number

8    and the date it was opened?

9          A.    The account number is 215641620, opened

10   March 18th of 2004.

11         Q.    As part of your job duties, do you know what

12   types of customers bank at National Penn Bank?

13         A.    Generally, yes.

14         Q.    And does the bank have customers from the

15   Amish and Mennonite communities?

16         A.    Yes.

17         Q.    And do they bank with the -- with National

18   Penn in both personal and business accounts?

19         A.    Yes.

20               MR. PORTMAN:  Nothing further.  Thank you.

21                    CROSS-EXAMINATION

22   BY MR. CONRAD:

23         Q.    Good morning, ma'am.

24         A.    Morning.

25         Q.    And the clients he was just referring to, the

1    Amish clients, you do see a lot of cash transactions with

2    those folks; correct?

3         A.   Well, I'm not in a branch any longer, but in

4    my experience in the Peoples Bank, I did wait on people

5    of the -- which is a division of National Penn, and it

6    has a lot of the Amish community.

7         Q.   Okay.  They deal in cash a lot you'd say?

8         A.   I didn't say that.  They bank with us;

9    specifically what they do, I don't know.  I'm not a

10   teller any longer.

11        Q.   All right.  Ma'am, the Commonwealth's Exhibit

12   in front of you, Commonwealth's 90, that's a signature

13   card; correct?

14        A.   Yes, it is.

15        Q.   That's used whenever someone first joins the

16   bank and they sign up, correct?

17        A.   Yes.

18        Q.   And you'd agree with me that nowhere on

19   Commonwealth's 90 does it give a new customer any idea

20   how to put their money in or how not to put their money

21   in; is that correct?

22        A.   Along with the signature card and by signing

23   the signature card, you agree to all the stipulations in

24   the customer account agreement, which is also given at

25   the time of deposit.  Does it -- what was your question?

1     Q.    It specifically doesn't tell you how to put

2   your money in or not to put your money in, correct?

3     A.    No.

4     Q.    And whenever the government investigated this

5   case -- you investigated this case, they seized all his

6   assets, isn't that correct, that were in the account?

7     A.    I'm here as a custodian of records.  I didn't

8   investigate this case initially.

9     Q.    Let me ask it this way -- you'd be aware of

10  this -- there's nothing left in that account; is that

11  correct?

12    A.    Yes, I believe so, nothing's left.  It was

13  seized.

14    MR. CONRAD:  All right.  Thank you.  Nothing

15  further.  Thank you.

16                REDIRECT EXAMINATION

17  BY MR. PORTMAN:

18    Q.    Just one question, Miss Carlson.  With

19  respect to information or lack of information on the

20  signature card about how to deposit money, based on your

21  training and experience, is a bank employee permitted to,

22  under relevant statutes and regulations, instruct a

23  customer how they can deposit cash?

24    A.    No.

25    MR. PORTMAN:  No further questions.  Thanks.

RECROSS-EXAMINATION

BY MR. CONRAD:

Q.   Ma'am, as a teller, if someone comes in and fills out their teller card wrong, you could certainly tell them they filled it out wrong, couldn't you?

A.   Teller card?

Q.   Let's say I brought a deposit in your bank and I messed it all up, you could say to me, you messed that all up, couldn't you?

A.   If the deposit didn't add up correctly; but with the influx of deposits, they are checked in the back room.  Tellers aren't -- tellers are not required to add up a huge stack of checks for, say, a business customer to make sure it's correct.  But if there's an obvious error on a deposit ticket, it can be corrected by a teller.

Q.   If I brought in my deposit, say, on the back of a matchbook and said, here's my deposit slip, you can tell me, wait, wait, wait, we don't use that?

A.   I get a deposit ticket for them and fill it out for them.

Q.   You'd do that for a customer, right?

A.   If they asked me to.

Q.   Well, you want to do banking with them, too, so you want them to put their money in with you and you

1    want them to be able to do business with you; correct?

2         A.   If they want to.

3              MR. CONRAD:  Okay.  Fair enough.  Thank you.

4              MR. PORTMAN:  Nothing on redirect.  Thank

5    you.

6              THE COURT:  Thank you.  You may be excused.

7                        KAREN BUCH,
     called as a witness, having been duly sworn or affirmed,
8            was examined and testified as follows:

9                      DIRECT EXAMINATION

10   BY MR. PORTMAN:

11        Q.   Good morning.  Good morning.

12        A.   Morning.

13        Q.   Would you please state your first and last

14   name and spell both for the record?

15        A.   Sure.  Karen, K-a-r-e-n; Buch, B-u-c-h.

16        Q.   And by whom are you employed?

17        A.   Sovereign Bank.

18        Q.   And how long have you been employed by them?

19        A.   Fifteen years.

20        Q.   And what is your job -- what are your job

21   duties?

22        A.   I am the Branch Manager.  I oversee the

23   branch sales, security.

24        Q.   And how long have you been doing that,

25   fifteen years?

1              A.    Mm-hmm.

2              Q.    Prior to that were you in the banking

3    industry?

4              A.    No.

5              Q.    Are you familiar with the internal documents

6    generated by the bank?

7              A.    Yes.

8              MR. PORTMAN:  If I may approach, Your Honor?

9              THE COURT:  You may.

10   BY MR. PORTMAN:

11             Q.    Look through those.

12             A.    Mm-hmm.

13             Q.    I provided you with what have been previously

14   marked and identified as Commonwealth's Exhibits 110

15   through 116.  Would you please look through those.

16             A.    Okay.

17             Q.    Are you familiar with those documents?

18             A.    I am.

19             Q.    Would you please refer to Exhibit 110 --

20             A.    Okay.

21             Q.    -- and tell us what that is.

22             A.    That is a signature card for Sovereign Bank.

23   When a customer comes in to open a new account, that's

24   the document that we would create.

25             Q.    Would you please tell us whose account that

1    is?

2           A.    Levi Stoltzfoos' account.

3           Q.    Please tell us the date it was opened and the

4    account number.

5           A.    January 7th, 2006.  And the account number

6    is 0022019944.

7           Q.    Were those documents provided to the

8    Commonwealth through Agent Licklider?

9           A.    Yes, they were.

10          Q.    And through your experience with the bank,

11   does the bank have customers from the Amish and Mennonite

12   communities?

13          A.    Absolutely, mm-hmm.

14          Q.    Do they deal with both personal and business

15   accounts?

16          A.    Yes.  Yes, I have both customers.

17          MR. PORTMAN:  Thank you.  No further

18   questions.

19                        CROSS-EXAMINATION

20   BY MR. CONRAD:

21          Q.    Good morning, ma'am.

22          A.    Good morning.

23          Q.    Regarding what counsel just asked you about

24   having Mennonite clients, whatnot, where is the bank

25   physically located, the one you work at?

1       A.    New Holland.  On Main Street in the New

2  Holland Shopping Center.

3       Q.    A lot of Amish folk in that area, correct?

4       A.    Yep.

5       Q.    I'm going to refer you to Commonwealth's 110.

6  Do you have that in front of you?

7       A.    Yes, I do.

8       Q.    That's a signature card, correct?

9       A.    Correct.

10      Q.    Folks fill that out when they first join the

11 bank, right?

12      A.    Yes.

13      Q.    All right.  And, of course, Mr. Stoltzfoos,

14 he filled one out, also?

15      A.    Yes, he did.

16      Q.    Ma'am, you'd agree with me that nowhere on

17 that signature card does it tell someone how to deposit

18 or how not to deposit their money; is that correct?

19      A.    It does not, right.

20      Q.    You're somewhat familiar with Mr. Stoltzfoos'

21 file; is that correct?

22      A.    Yes.

23      Q.    All right.  And, in fact, I believe, ma'am,

24 you actually had an opportunity, with regard to this case

25 somewhere throughout the investigation, to make it a note

1    in Mr. Stoltzfoos' file; isn't that correct?

2         A.   Sure.

3         Q.   Do you recall indicating -- that you noted to

4    the file Mennonite customer, lives with parents?

5         A.   Mm-hmm.

6         Q.   Do you recall doing that, you did note that

7    to the file?

8         A.   I did.

9         Q.   So did you know if he was Mennonite or Amish

10    or what he was?

11         A.   No.  The reason I made the note, because

12    there was a discrepancy with the address, so we're

13    supposed to document things if we're authorizing

14    something to go through; and as the Branch Manager, I

15    have the authority to do that.

16         Q.   You noticed something was different about

17    Levi Stoltzfoos?

18         A.   Yes.

19         Q.   You also note in your file, just moved back

20    with them, meaning the parents, I think; right?

21         A.   Yes.  That's what he told me.

22         Q.   All right.  Has no bills to show 30 Groffdale

23    Road, Leola, his address; right?

24         A.   Mm-hmm.

25         Q.   I think you also noted that he wanted to use

1  his new P.O. Box; is that correct?

2          A.  Yes.

3          Q.  But you also said, I think your note

4  indicates, I told him I needed a physical address and he

5  gave me his parents' --

6          A.  Yes.

7          Q.  -- correct?

8          A.  Yes.  We can't use a P.O. Box for an address

9  verification.

10         Q.  You advised him he couldn't?

11         A.  I can note it on the signature card for

12  mailing purposes, but I still need a physical address.

13         Q.  Absolutely.  And then you also said that, I

14  opened the account.

15              Many Mennonite customers have no bills?

16         A.  Right.  So I was justifying the reason I

17  didn't have a bill for his address.

18         Q.  Right.  Understood.

19              And the account that he had with you folks,

20  it was entirely cleaned out, right?  The government

21  seized all the money in that account; is that correct?

22         A.  Correct.

23         MR. CONRAD:  Thank you, ma'am.  Nothing

24  further, Your Honor.

25         MR. PORTMAN:  Nothing on redirect, Your

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1   Honor.

2                   THE COURT:  You may step down.  Thank you.

3                   THE WITNESS:  Thank you.

4                   MR. PORTMAN:  Your Honor, may we approach

5   briefly?

6                   THE COURT:  You may.

7                   (A sidebar discussion was held off the

8   record.)

9                   THE COURT:  While we have a minute before the

10  next witness is called -- this can be off the record.

11                  (A discussion was held off the record.)

12                          DAVID KNEISLEY,
    called as a witness, having been duly sworn or affirmed,
13          was examined and testified as follows:

14                      DIRECT EXAMINATION

15  BY MR. PORTMAN:

16          Q.   Good morning.

17          A.   Good morning.

18          Q.   Would you please state your first name, last

19  name and spell them for the record?

20          A.   Sure.  My first name is David, last name is

21  Kneisley, K-n-e-i-s-l-e-y.

22          Q.   And by whom are you employed?

23          A.   I am employed by Susquehanna Bancshares.

24                  THE COURT:  Let me stop you for one moment.

25  My last name is spelled K-n-i-s-e-l-y.

1          Just for the jury's sake, we are not in any

2    way related and never met before; is that correct?

3          THE WITNESS:  That's correct.

4          THE COURT:  Thank you very much.

5    BY MR. PORTMAN:

6          Q.   How long have you been employed by them?

7          A.   For eight years.

8          Q.   And prior to that were you in the

9    banking industry?

10          A.   I was.

11          Q.   For how long?

12          A.   Approximately ten years.

13          Q.   And was Susquehanna Bancshares -- what is

14   your current job description?

15          A.   I'm the Fraud Investigation Manager and in

16   the Loss Prevention Department.

17          MR. PORTMAN:  If I may approach, Your Honor?

18          THE COURT:  You may.

19   BY MR. PORTMAN:

20          Q.   I've shown you what have been previously

21   marked and identified as Commonwealth's Exhibits 120

22   through 125-A.  Would you please look through those.  Do

23   you recognize those documents?

24          A.   Yes, sir.

25          Q.   I'd like to direct your attention to 120.

Case 5:13-cv-02084-WLD-PT Document 52-3 Filed 11/19/13 Page 26 of 99

1   Can you please identify what that is?

2        A.   That is an account agreement or account

3   signature card, which is used to open -- documentation

4   that's used to open new accounts.

5        Q.   Can you please tell us whose account that is?

6        A.   Levi Stoltzfoos.

7        Q.   And the account number and the date it was

8   opened?

9        A.   The date of the account opening was 1/17

10  of 2006.  The account number is 10001385466.

11       Q.   Now, with respect to all those Exhibits 120

12  through 125-A, were they turned over to the Attorney

13  General's Office through Agent Licklider?

14       A.   Yes, they were.

15       MR. PORTMAN:  No further questions.

16                  CROSS-EXAMINATION

17  BY MR. CONRAD:

18       Q.   Good morning, sir.

19       A.   Good morning.

20       Q.   Sir, I'm going to refer you to Commonwealth's

21  120 if I could, sir.

22       A.   Okay.

23       Q.   That's a bank signature card; is that

24  correct?

25       A.   Correct.

1      Q.    And that's filled out by any new customer

2    that comes to the bank?

3      A.    Correct.

4      Q.    That form itself, though, you'd agree with me

5    doesn't contain any verbiage about how one ought to or

6    ought not deposit funds into the bank; is that correct?

7      A.    That is correct.

8      Q.    And did you have any dealings with

9    Mr. Stoltzfoos at all?

10      A.    I did not.

11      Q.    All right, sir.  The account that he had with

12    Susquehanna Banc, there are no funds left in that account

13    anymore; is that correct?

14      A.    That is correct.

15           MR. CONRAD:  Thank you.  Nothing further.

16           MR. PORTMAN:  Thank you.

17           THE COURT:  You may be excused, sir.

18           MR. PORTMAN:  May we approach?

19           THE COURT:  You may.

20           (The following occurred at sidebar:)

21           THE COURT:  Next witness will be?

22           MR. PORTMAN:  Lisa Krick, K-r-i-c-k, from

23    Susquehanna Bancshares.  It's with a C.

24           THE COURT:  She will be testifying --

25           MR. CONRAD:  She's going to be testifying

1  about the Patriot Act, the Bank Secrecy Act and general

2  operations to the banking industry.

3  THE COURT:  It's correct at this point there

4  has been no report or anything, she's just basically

5  testifying from her knowledge in the business; is that

6  correct?

7  MR. PORTMAN:  That is correct, Your Honor,

8  there's no expert report or anything of that nature.

9  MR. CONRAD:  Your Honor, for the record I'll

10  make an official objection because I received the report.

11  I do have her name in the report.  I received the report.

12  THE COURT:  And counsel made a request

13  relative to, at least, having an opportunity to speak

14  with her prior to her testimony; is that correct?

15  MR. CONRAD:  That is correct, Your Honor.

16  THE COURT:  How long do you think you'd like?

17  MR. CONRAD:  Five minutes.

18  THE COURT:  Let's say we'll take ten at this

19  point in time to give you sufficient opportunity just to

20  talk with her.  If you gentlemen want to use one of the

21  conference rooms and go across the hall, feel free to use

22  that.  And just let Joe know when you've had sufficient

23  time to do that.  Okay?

24  MR. PORTMAN:  Appreciate it, Your Honor.

25  Thank you.

1    THE COURT:  Ladies and gentlemen, at this

2    point in time, counsel are going to take a few moments --

3    as much as ten minutes, perhaps -- to have some

4    conversations outside of the courtroom.  So if I may,

5    Mr. Battisti, why don't we have the jury go back to the

6    jury room until they've had that opportunity to do their

7    consulting and then we'll bring you back in.

8         (A recess was taken.)

9         MR. CONRAD:  Your Honor, I'll note for the

10   record before the jury comes in, I've had an opportunity

11   to speak with Miss Krick and defense is prepared.

12        THE COURT:  I would just like to have it on

13   the record that am I correct that Miss Krick would be

14   testifying about knowledge and information she has

15   through the banking industry, but is not being called for

16   any kind of an expert opinion; is that correct?

17        MR. PORTMAN:  That is correct, Your Honor.

18        THE COURT:  Very well.  You may bring the

19   jury back in please.

20        (The jury returned to the courtroom.)

21             LISA KRICK,
     called as a witness, having been duly sworn or affirmed,
22            was examined and testified as follows:

23        THE COURT:  Everybody had an opportunity who

24   wishes to take notes to get their notes out?  Thank you.

25             DIRECT EXAMINATION

```
 1    BY MR. PORTMAN:
 2         Q.   Would you please state your first and last
 3    name and spell both for the record.
 4         A.   Lisa Krick.  L-i-s-a, K-r-i-c-k.
 5         Q.   And by whom are you employed?
 6         A.   I'm employed by Susquehanna Bancshares,
 7    Incorporated.
 8         Q.   How long have you been so employed?
 9         A.   I've been employed at Susquehanna a little
10    over five years.
11         Q.   Prior to that were you in the banking
12    industry?
13         A.   All for the last 25 years.
14         Q.   What are your current job duties?
15         A.   I am the Corporate BSA Officer.
16         Q.   And what does that entail?
17         A.   That entails implementing and enforcing the
18    BSA laws, the U.S. Patriot Act and all the various
19    regulatory requirements associated with those two Acts
20    and statutes.
21         Q.   And when you say BSA, are you referring to
22    the Bank Secrecy Act?
23         A.   Yes, I am.
24         Q.   And the Bank Secrecy Act and the Patriot Act,
25    are those both federal statutes?
```

1          A.    Yes, they are.

2          Q.    Have you had any special training --

3    specialized training in those fields?

4          A.    Absolutely.  I have various certifications,

5    continuing education courses.  And these are actually

6    requirements of the statute.

7          Q.    Now, you're familiar with this case involving

8    Levi Stoltzfoos; correct?

9          A.    Yes, I am.

10         Q.    In fact, you were the person who referred, at

11   least through Susquehanna Bancshares, information to the

12   Office of the Attorney General to Agent Licklider?

13         A.    Yes, I was.

14         Q.    With respect to your training and your

15   knowledge in the banking industry, can you tell us the

16   significance of a cash transaction report, why it's

17   generated -- why it has to be generated?

18         A.    We are required by federal law to monitor

19   cash activity; various reports are generated and various

20   forms are required under the BSA statute to be reported

21   to the federal government.

22         Q.    Okay.  When you say we, are you referring

23   just to Susquehanna Bancshares or financial institutions

24   such as banks in general?

25         A.    Any financial institution governed by a

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1    federal regulator.

2          Q.   And what, if anything, happens with a cash

3    transaction report after it's generated by a financial

4    institution?

5          A.   That document is submitted and it is

6    reviewed; and unless there is a problem, a financial

7    institution normally doesn't hear anything regarding that

8    report.

9          Q.   When you say submitted, is it submitted

10   internally or externally?

11         A.   It's submitted by us to FINCEN, F-I-N-C-E-N,

12   IRS.

13         Q.   And would you please tell the jury what

14   FINCEN stands for?

15         A.   It's the financial enforcement network where

16   most of your government forms associated with the BSA Act

17   are submitted to.

18         Q.   Now, banks are required to generate a cash

19   transaction report on a cash deposit or withdrawal in

20   excess of $10,000?

21         A.   That is correct.

22         Q.   Are they required to do so on an amount less

23   than that?

24         A.   We are not required to generate a CTR on an

25   amount less than that, no.

1    Q.   Under the statute, does any financial

2    institution have the discretion to do so?

3    A.   Absolutely.   That is normally utilized,

4    though, with another form.   It's not the CTR form.

5    Q.   And under the BSA or the Patriot Act, are

6    employees of financial institutions permitted to advise

7    customers of those institutions on how to deposit cash or

8    withdraw cash in order to avoid a cash transaction

9    report?

10    A.   Absolutely not.   As a matter of fact, every

11    employee of a financial institution may be held

12    criminally and civilly liable for assisting in any

13    suspicious activity as it relates to cash transactions.

14    Q.   And generally with respect to Susquehanna

15    Bancshares in particular, does the bank have dealings

16    with the Amish and Mennonite communities?

17    A.   Yes, we do.

18    Q.   Both personal and business accounts?

19    A.   Absolutely.

20    MR. PORTMAN:   If I can have a moment, Your

21    Honor?

22    THE COURT:   You may.

23    BY MR. PORTMAN:

24    Q.   Briefly, with respect to -- and I believe you

25    can speak to this just with respect to Susquehanna

1    Bancshares, do you have internal controls that track

2    deposits and withdrawals of cash?

3         A.    Susquehanna Bancshares utilizes software on

4    both the CTR and the currency transaction report

5    transactions over $10,000; and also on the suspicious

6    activity report, and they would be transactions of cash

7    under 10,000.  We're required by regulation to aggravate

8    those transactions and to monitor them.

9         Q.    And in this particular case with respect to

10   your involvement, what brought to your attention the

11   information you passed on to Agent Licklider?

12        A.    The transactions that occurred on the account

13   were multiple days and just under the CTR reporting

14   requirement.

15        Q.    And with respect to your experience with

16   Susquehanna Bancshares and your training and all that,

17   was that unusual with respect to Susquehanna Banc?

18        A.    It was unusual to the fact that it was

19   frequent.  They were sequential days and they were just

20   under the reporting requirements.

21        Q.    With respect to the Bank Secrecy Act and the

22   Patriot Act, do you know why those two Acts address

23   cash deposits and withdrawals?

24        A.    Those two Acts address cash deposits and

25   withdrawals for various reasons; tax evasion, terrorist

Case 1:13-cv-02688-WWC-PT Document 2-3 Filed 11/01/13 Page 35 of 99

1   financing, money laundering and narcotic trafficking.

2        Q.   And again, the information generated

3   internally by the bank is then forwarded to FINCEN?

4        A.   Correct.

5             MR. PORTMAN:  No further questions, Your

6   Honor.

7             THE COURT:  Cross-examination.

8             MR. CONRAD:  Thank you, Your Honor.

9                  CROSS-EXAMINATION

10  BY MR. CONRAD:

11       Q.   Good morning.

12       A.   Hi.

13       Q.   You'd indicated that the U.S. Patriot Act, if

14  I understand you correctly, the key things you're looking

15  for are tax evasion, money laundering, terrorist activity

16  and drug activity?

17       A.   Correct.

18       Q.   Your industry -- that particular industry,

19  that particular area is now one of the most highly

20  regulated areas of our government; is that correct?

21       A.   That is correct.

22       Q.   And you agree with me that is now the case

23  because of what happened back on September 11 of 2001?

24       A.   It was actually prior to that.  BSA itself

25  was implemented in 1970, but additional statutes have

1     been added to that Act due to September 11th, correct.

2          Q.    And the Patriot Act is a direct result of

3     what happened in 2001?

4          A.    Patriot Act is a direct result.  But having

5     said that, it is more know your customer and the ability

6     to obtain specific information for law enforcement.  The

7     monitoring of suspicious activity actually occurred in

8     the original Act of 1970.

9          Q.    Okay.  That's fair enough.  But you would

10    agree with me certainly it's all gotten a lot more

11    heightened after?

12         A.    Absolutely.

13         Q.    Additionally, as you said, when you see those

14    kind of transactions, it doesn't mean anything to you

15    except that it's suspicious; right?

16         A.    Correct.

17         Q.    And when you see some kind of suspicion, you

18    pass that along to others to let them look into it; is

19    that correct?

20         A.    My department investigates suspicious

21    activity.

22         Q.    But you do provide reports to the government?

23         A.    We do provide reports to the government.

24         Q.    One area counsel asked you about, he said to

25    you with regard to advising -- a bank advising a

1    customer, certainly when someone comes in and doesn't

2    fill out a form correctly, a bank teller can advise them

3    to fix the form, can they not?

4            THE COURT:  Excuse me.

5            THE WITNESS:  Yes.

6    BY MR. CONRAD:

7        Q.   I've got to stop you when you do that.   My

8    fault.

9            Additionally, then, so they could at least

10   advise them of that?

11       A.   To correct a form?

12       Q.   Right.

13       A.   Yes.

14       Q.   One thing a bank teller can't do is assist in

15   trying to subvert the law?

16       A.   The thing the teller cannot do is assist and

17   direct and advise.

18       Q.   But you would agree with me, though, that

19   there is a pamphlet that can be handed out to a customer

20   letting them know about the depositing rights or

21   depositing faux pas?

22       A.   Susquehanna does have a pamphlet that's

23   called Facts You Should Know; and it addresses CTR

24   reporting, correct.

25       Q.   Do you know, did the bank ever provide that

```
 1    to Mr. Stoltzfoos?

 2            A.    I do not know.  That would have been done in

 3    the branch front line.

 4                 MR. CONRAD:  Thank you, ma'am.

 5                 THE WITNESS:  Sure.

 6                 THE COURT:  Any redirect?

 7                 MR. PORTMAN:  Nothing on redirect, Your

 8    Honor.

 9                 THE COURT:  You may be excused.  Thank you.

10                 THE WITNESS:  Thank you.

11                 MR. PORTMAN:  Your Honor, again, make sure

12    all Commonwealth's Exhibits have been moved into evidence

13    and, if so, the Commonwealth rests.

14                 THE COURT:  According to my exhibit sheet,

15    each of the Commonwealth Exhibits has been moved into

16    evidence.  Again, they include Exhibits from Number 1

17    through 125-A, although they are not exclusive numbers

18    throughout.

19                 MR. PORTMAN:  Correct.  Thank you.

20                 MR. CONRAD:  No objection, Your Honor.

21                 THE COURT:  May counsel approach please?

22                 (The following occurred at sidebar:)

23                 MR. CONRAD:  Your Honor, this is a technical

24    argument to preserve the record if I could.  Under the

25    dealing in proceeds of unlawful activity, Title 18, 5111,
```

1    one of the things that the government -- one of the

2    things that's defined as unlawful activity is -- and the

3    definition of unlawful activity is any activity graded as

4    a misdemeanor of the first degree or higher.

5              There's no underlying offense here

6    whatsoever.  The government's proved nothing with regard

7    to any underlying offenses.  Normally you'd have

8    something.  There would be a theft of some sort.  There

9    would be some kind of drug transaction or something else

10   to accompany this.  That's not here in this case.  So I'm

11   going to move that the government failed to do that and

12   ask the Court to demur all the facts.

13             MR. PORTMAN:  Your Honor, I believe the

14   statute is written, the unlawful activity part addresses

15   subsection (a)(1) and (a)(2), specifically a reporting

16   requirement.  There's no mention of unlawful activity

17   within that particular subsection.

18             THE COURT:  For the record, in that counsel

19   for the Commonwealth has gone forward with 111(a) -- I'm

20   sorry, 5111(a)(3) of Title 18, which is not a section

21   which requires unlawful activity, I would overrule the

22   request for the demur.

23             Anything else, gentlemen?

24             MR. PORTMAN:  No, Your Honor.

25             MR. CONRAD:  No, sir.

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1          May I have a moment, Your Honor?

2          THE COURT:  You may.

3          MR. CONRAD:  Your Honor, may I call a

4    witness?

5          THE COURT:  You may.

6          MR. CONRAD:  Call Anna Stoltzfoos.

7                    ANNA STOLTZFOOS,
     called as a witness, having been duly sworn or affirmed,
8          was examined and testified as follows:

9          MR. CONRAD:  Your Honor, the Court has the

10   exhibits, I believe, sir.  If I may approach?

11                  DIRECT EXAMINATION

12   BY MR. CONRAD:

13         Q.   Good morning.

14         A.   Morning.

15         Q.   Can you please introduce yourself to the

16   jury.  Tell the jury your name.

17         A.   I'm Anna Stoltzfoos.

18         Q.   And can you spell your name for the jury --

19   or for the record?

20         A.   Capital A-n-n-a, capital S-t-o-l-t-z-f-o-o-s.

21         Q.   Okay.  Ma'am, where do you live at?

22         A.   Thirty South Groffdale Road, Leola,

23   Pennsylvania.

24         Q.   How long have you lived there?

25         A.   Since the year of '76, whatever that is.

---

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1     Thirty-two years in September.

2          Q.    What do you or your family do for a living?

3          A.    Well, my husband, he's just self-employed on

4     his own, whatever, in restoring old tractors and engines.

5     I'm just a housekeeper.  I clean a house, clean for an

6     old lady a couple times a month.

7          Q.    Okay.  There's been some discussion here in

8     this case about faith in the Amish faith.  Are you a

9     member of the Amish faith?

10         A.    Yes.

11         Q.    Is there an Old Order and New Order?

12         A.    Yes.

13         Q.    What is that?  What does that mean?

14         A.    The New Order are more modern.

15         Q.    And what are you?

16         A.    I'm with the Old Order.

17         Q.    How about are you married?

18         A.    Yes.

19         Q.    What's your husband's name?

20         A.    Paul.

21         Q.    All right.  What is he?

22         A.    He's New Order.

23         Q.    Okay.  Do you have any children?

24         A.    Yes.

25         Q.    How many children do you have?

SUSAN A. MILTON, OFFICIAL COURT REPORTER

```
1        A.   Five.

2        Q.   All right.  Does one of those children

3   include Levi Stoltzfoos?

4        A.   Yes.

5        Q.   All right.  How old is Levi?

6        A.   Thirty-nine.

7        Q.   Okay.  And where does he live?

8        A.   At 30 South Groffdale Road with us.

9        Q.   Okay.  Does he follow the same faith as you?

10       A.   He did at one time.

11       Q.   Well, describe his education for the jury.

12  Where did he go to school?

13       A.   At the Amish Musser Parochial School; like an

14  eight-room schoolhouse.

15       Q.   All right.

16       A.   Like an eighth grade, yeah.

17       Q.   So he went through eighth grade?

18       A.   Yes.

19       Q.   Did he go any farther than that in school?

20       A.   Well, he went to vocational class for about a

21  year, until he was 15.

22       Q.   Okay.  And then after that what did he do?

23       A.   He worked on a farm for his uncle at first

24  until he was -- worked at a furniture shop.

25       Q.   And he's lived with you all his life?
```

1          A.    Yeah.  He had his home there.  At one time he

2   worked out of town, but he was still there weekends.

3          Q.    All right.  Okay.  Is he still a part of the

4   faith?

5          A.    No.

6          Q.    Why not?

7          A.    He choose to wear -- ride a bike and not wear

8   his black hat and white -- he wanted to wear white

9   sneakers instead of black and I guess he didn't want to

10  have his hair the way they wanted him to have it.

11         Q.    So he can't be a part of the church if he

12  doesn't do those things?

13         A.    Not a member, no.

14         Q.    Okay.  All right.  I want to ask you some

15  questions about your home.

16              MR. CONRAD:  Your Honor, may I approach?

17              THE COURT:  You may.

18  BY MR. CONRAD:

19         Q.    Ma'am, I'm going to show you what I've had

20  marked as Defense Exhibit 18.  Do you recognize this

21  picture?

22         A.    Well, I guess, yes.  And still I don't

23  really -- I wasn't really used to looking in his closet,

24  but it would look like it, yes.

25         Q.    Whose closet is that?

```
 1          A.   Well, Levi's, of course.

 2          Q.   Okay.  Levi's closet.

 3               Who keeps the closet like that?

 4          A.   He does.

 5          Q.   Do you ever touch his stuff?

 6          A.   No.

 7               MR. CONRAD:  Your Honor, may I approach?

 8               THE COURT:  You may.

 9    BY MR. CONRAD:

10          Q.   Ma'am, I'm going to show you a series of

11    pictures, okay, and I'll just have one final question for

12    you at the end.  We don't need to go through all of them.

13    I'll have you look at all of them, then I'll ask you a

14    question at the end.  Do you understand?

15          A.   Mm-hmm.

16          Q.   I'm going to show you Defense 1.  Can you

17    take a look at that for me?  Have you had time to see it?

18          A.   Mm-hmm.

19          Q.   I'm going to show you Defense 2.  Let me ask

20    you this:  What is Defense 1?  Generally speaking, what

21    is that?  It's a picture, right?

22          A.   Well, it's our living room.

23          Q.   All right.  And what's on Defense 2?

24          A.   That's also our living room with my china

25    closet in the corner.
```

SUSAN A. MILTON, OFFICIAL COURT REPORTER

```
 1          Q.    Okay.  And how about Defense 3, what is that?

 2          A.    Well, that's also the china cupboard there in

 3   my living room.

 4          Q.    How about Defense 4?

 5          A.    That's part of our kitchen --

 6          Q.    Okay.

 7          A.    -- where my hutch is.

 8          Q.    How about Defense 5?

 9          A.    Oh, that's our bedroom.

10          Q.    Okay.  All right.  Let me show you Defense 6.

11   What is that?

12          A.    That's also our bedroom.

13          Q.    All right.  Defense 7?

14          A.    That's my sewing room.

15          Q.    Okay.  Defense Number 8?

16          A.    That's our cellar.

17          Q.    The basement of the house?

18          A.    Yeah.

19          Q.    All right.  How about Defense 9?

20          A.    That's also from the cellar.

21          Q.    All right.  Is there a hole in that picture?

22          A.    I don't know, but I know what it's supposed

23   to be.  It's where he dug and broke my shovel.

24          Q.    Who dug that hole?

25          A.    The ones that came to do the search warrant.
```

1        Q.    Okay.  Ten would be the same thing, right?

2        A.    Yeah.

3        Q.    All right.  Do you recognize whose bedroom

4 this is in Defense 11?

5        A.    Yeah.  That's Levi's room, but that's not

6 Levi there.

7        Q.    Right.  Is there a man in that picture

8 wearing a hat?

9        A.    Yeah, he's wearing a hat.

10        Q.    Is that his hat or your son's hat?

11        A.    That's my son's hat.

12        Q.    Okay.  Defense 12, what is this?

13        A.    That's Levi's desk I guess when they were

14 taking the search warrant.

15        Q.    All right.  Defense Number 13?

16        A.    That's a spare bedroom.

17        Q.    All right.  Defense 14?

18        A.    That's also the spare bedroom.

19        Q.    Defense 15?

20        A.    That's more or less a storage room where we

21 have extra furniture and things like that in.

22        Q.    And the buck hanging on the wall?

23        A.    Yeah.  That's my husband's trophy.

24        Q.    Defense 16?

25        A.    That's also our living room.

1          Q.    All right.  And Defense 17, what is that?

2          A.    Oh, that's our other son's bedroom.

3          MR. CONRAD:  Okay.  All right.  Thank you,

4    ma'am.

5          No further questions, Your Honor.

6                      CROSS-EXAMINATION

7    BY MR. PORTMAN:

8          Q.    Ma'am, I'm going to have an opportunity to

9    ask you a few questions, okay?

10          You were present at your home when the search

11   warrant was executed, correct?

12          A.    Yeah.

13          Q.    And with respect to Defense Exhibit 11, which

14   is the picture of your son's room with the law

15   enforcement officer wearing his hat, do you recall that

16   day and that gentleman?

17          A.    No.

18          Q.    If I showed you the picture again, do you

19   think it would refresh your memory of that gentleman?

20          A.    I can't picture all the folks that were

21   there, really, or the guys.

22          Q.    Ma'am, I'm going to show you Defense Exhibit

23   Number 11 and ask you to take a look at it.  Do you

24   recall that gentleman?

25          A.    Well, yeah, maybe.  It was a Black guy,

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1      something like that, but I don't know his name or

2      nothing.

3              Q.    Sure.  Do you recall offering him a jar of

4      jelly at the end of the day when everybody was getting

5      ready to leave?

6              A.    I know I did -- maybe I did someone, but I

7      forgot about it already, but I didn't know it was this

8      guy.

9              Q.    Okay.  And looking at that picture, do you

10     recall whether or not he is the gentleman that actually

11     broke the shovel?  Do you recall if he is the one?

12             A.    I don't know who broke it.  I wasn't down

13     there when they did it.

14             Q.    Okay.  Now, with respect to Levi and being a

15     member or not a member of the Amish community, is there a

16     particular point in time when he became a nonmember of

17     the Amish community?

18             A.    I don't know what to say.  I don't know.

19             Q.    Was it within the last year, two years, three

20     years?

21             A.    No.  It's like ten, 12 years ago already.

22             Q.    And your son has worked for many years in the

23     non-Amish community, correct?  Let me rephrase that.

24                   I think you testified that he worked on his

25     uncle's farm?

1      A.    Yeah.

2      Q.    Then he worked in a furniture shop?

3      A.    Yeah.  He worked for different furniture

4  shops.

5      Q.    All right.  And King's Construction, are you

6  familiar with him working there?

7      A.    Yes.  That was like his last job.  They

8  worked out of town building horse barns mostly then.

9      Q.    And Levi's room, you've been shown pictures

10  of Levi's room prior to the day that the search warrant

11  was executed.  How many times have you been in his room?

12      A.    Very little.

13      Q.    Very little.  Were you familiar with the

14  items he kept in there?

15      A.    Not nearly all of them, no.

16      Q.    Okay.  And Levi's living at home, he drove a

17  truck; correct?

18      A.    In his last years he did, yeah.

19      Q.    And did he buy his own clothes?

20      A.    When he wasn't Amish he did, yes.

21          MR. PORTMAN:  Thank you, ma'am.  No further

22  questions.

23          MR. CONRAD:  No redirect, Your Honor.

24          THE COURT:  Thank you, ma'am.  You may step

25  down.

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1    MR. CONRAD:  Your Honor, I believe that

2    Defense Exhibits 1 through, I believe, 18 have already

3    been moved in; is that correct, sir?

4         THE COURT:  That is correct.

5         MR. CONRAD:  With that, defense rests.

6         THE COURT:  Thank you very much.

7         Mr. Conrad, could I have you bring the

8    exhibits back up to me?  I know there are a few left, and

9    I believe that means all of them are gathered up there at

10   this point in time.

11        MR. CONRAD:  Yes, sir.

12        THE COURT:  Ladies and gentlemen of the jury,

13   at this point in time in that the Commonwealth and the

14   defense has now rested, that means we have concluded the

15   evidence.  As it is a little bit after ten o'clock, we're

16   going to take our mid-morning break right now.  And when

17   we come back, I'm going to give you some directions

18   relative to what happens next in the proceedings and then

19   we will have closing arguments from both counsel.  So

20   we'll take a 15-minute recess at this point in time and

21   I'll give you some of my instructions, closing arguments

22   of counsel and then we'll see where we stand by noontime.

23        MR. PORTMAN:  Your Honor, I have a motion to

24   make.

25        (The jury left the courtroom.)

1          MR. PORTMAN:  Your Honor, with testimony

2    having concluded for both sides, I have a motion to amend

3    the Information.  I discussed it with Mr. Conrad and he

4    has no objection.  This is just to conform the evidence

5    to the Information.

6          Count 56, there's an amount indicated of

7    $9,900 relevant to National Penn Bank on February 11th

8    of 2006.  We'd ask to amend that to the amount of $9,000.

9          MR. CONRAD:  No objection, Your Honor.

10         THE COURT:  I'm going to amend that directly

11   on the initial Information.

12         MR. PORTMAN:  And the next count, Your Honor,

13   Count 57, relative to Fulton Savings Bank for

14   February 11th of 2006, the amount indicated is $6,600.

15   That is a typo.  That should be $9,000 to conform to the

16   evidence presented.

17         MR. CONRAD:  Again, Your Honor, no objection.

18         THE COURT:  9,000 even, correct?

19         MR. PORTMAN:  Yes, Your Honor.

20         That is it, Your Honor.  Thank you.

21         THE COURT:  May I have counsel approach

22   briefly?  Just a couple of things.

23         (A sidebar discussion was held off the

24   record.)

25         THE COURT:  Commonwealth's Exhibits, I am not

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1  going to permit Number 11 to go to the jury.  That's the

2  search warrant of the house and the attached receipt of

3  items which includes a number of items which we've kept

4  out.  All of the other Commonwealth Exhibits I am going

5  to let go out to the jury.

6           MR. CONRAD:  Does the note go out, sir?

7           THE COURT:  The note goes out.

8           MR. CONRAD:  I thought that was -- I'll

9  object to the note going out, I guess.  I will, not I

10  guess.

11           MR. PORTMAN:  Your Honor, both parties have

12  extensively gone over the contents of that note and I

13  believe all of the contents of it were put into the

14  record.  I ask that it go out.

15           THE COURT:  I understand what you mean

16  relevant to the confession.  I'll take that one under

17  advisement over the lunch break, but all of the other

18  items relative to the banks will go out.  And the search

19  warrants relevant to the banks, which do not mention

20  anything other than the documents, will also go out.

21           As to regarding the Defense Exhibits, all of

22  the pictures, I see no reason why all of them cannot go

23  out.

24           MR. PORTMAN:  I have no objection to any of

25  those.

1          THE COURT:  Only one I'll re-address prior to

2  the jury will be the statement, I'll call the yellow

3  paper.

4          MR. CONRAD:  Thank you.

5          THE COURT:  Does counsel have any proposed

6  voir dire questions that they would like to be able to --

7  normal, regular questions that are presented?

8          MR. PORTMAN:  No, Your Honor.

9          MR. CONRAD:  We're just looking for standard

10  jury instructions, Your Honor.  Obviously he did not take

11  the stand -- we need to address that -- the culpability

12  levels.

13          THE COURT:  I have all those.

14          MR. CONRAD:  Certainly.

15          THE COURT:  I'm sorry, counsel.  You look --

16          MR. PORTMAN:  No.  That's okay.

17          THE COURT:  All right.  Probably 15 minutes

18  from now.

19          MR. PORTMAN:  Thank you, Your Honor.

20          THE COURT:  I'll do my general address to the

21  jury, we'll do the closings.  We'll probably stop at that

22  point in time and do the instructions after lunch.  That

23  would be my general plan at this point.

24          MR. PORTMAN:  Thank you.

25          MR. CONRAD:  Thank you, Your Honor.

```
 1                    (A recess was held.)

 2                    THE COURT:  Are there any matters for the

 3       Court's attention before we bring the jury back in?

 4                    MR. PORTMAN:  No, Your Honor.

 5                    MR. CONRAD:  No, Your Honor.

 6                    THE COURT:  Are both counsel prepared for

 7       closing?

 8                    MR. PORTMAN:  Yes, Your Honor.

 9                    MR. CONRAD:  Yes, sir.

10                    THE COURT:  Thank you.  Mr. Battisti, if you

11       would please.

12                    (The jury entered the courtroom.)

13                    THE COURT:  Ladies and gentlemen of the jury,

14       now you have heard all of the evidence which is to be

15       presented in this case.  The next step is for counsel to

16       give you their closing arguments.  Even though these

17       arguments do not constitute evidence, you should consider

18       them very carefully.

19                    In their arguments, the Deputy Attorney

20       General and defense counsel will call to your attention

21       evidence which they consider material and will ask you to

22       draw certain inferences from that evidence.  To the

23       extent that the inference which counsel asks you to draw

24       from are supported by the evidence and appeal to your

25       reason and judgment, you may consider them in your
```

1    deliberations.  However, you must keep in mind that you
2    are not bound by counsel's recollection of the evidence.
3    It is your recollection of the evidence and your
4    recollection alone which must guide you through
5    deliberations.  If there is a discrepancy between
6    counsel's recollection and your recollection, you are
7    bound by your own recollection.

8              Also, your consideration of the evidence is
9    not limited to the evidence mentioned by counsel.  You
10   must consider all of the evidence which you consider
11   material to the issues involved.

12             Counsel may also bring up certain principles
13   of law in their arguments.  You are not bound by any
14   principles of law mentioned by counsel.  You must apply
15   the law as you are instructed by me and only the law to
16   the facts as you find them.

17             Under the Rules of Criminal Procedure of the
18   Supreme Court of Pennsylvania, counsel for the defendant
19   makes his closing argument first, followed by the closing
20   argument of the Deputy Attorney General, then I will
21   instruct you in the law which you will apply to the facts
22   as you find them.

23             Mr. Conrad.

24             MR. CONRAD:  Your Honor, may it please,
25   Mr. Portman.  Ladies and gentlemen of the jury, I told

1    you when we first got started, I was very excited about

2    taking on this case and very excited to get before you to

3    bring this matter before you.

4             Levi Stoltzfoos is a man who grew up in a

5    community in a faith that is distrustful of the

6    government.  He is distrustful of the government.  He's a

7    man that hoards his money.  He's afraid that the

8    government is going to take his money.  And guess what?

9    They did.  The government of Pennsylvania, Commonwealth

10   of Pennsylvania took every penny that Levi Stoltzfoos

11   owns.  Every single penny.

12            You heard witness after witness after witness

13   talk about the bank accounts, talk about the fact that he

14   brought the money in.  And all that money is now gone.

15   Money's gone.  Freedom at issue today.

16            This matter, I submit to you, means the world

17   to Levi Stoltzfoos.  These fellows tomorrow morning are

18   going to get up and move on to the next case.  That

19   fellow right there has got everything on the line today.

20   And you folks sit in judgment.  You folks hold all the

21   cards.  You hold judgment on the facts today.  The Judge

22   dictates what the law will be and what you'll follow, but

23   you hold the facts.

24            What are the facts in this case?  What did

25   the Commonwealth show you?  The Commonwealth showed you,

1  with numerous witnesses from the stand, a six-week period

2  where Levi Stoltzfoos came in and made transactions under

3  $9,000.  Did he do it?  Yep.  Over and over and over and

4  over and over again he did.  Why did he do it?  Why did

5  he do it?  And you folks were paying good attention.  I

6  watched you the whole, entire way through, so I know you

7  were following each little detail.

8          What do we know about Levi Stoltzfoos?  Well,

9  first of all, what did we hear from the Commonwealth?

10 What we heard from the Commonwealth was he made these

11 transactions over six weeks.  That's what he did.

12 Underneath the guidelines.  He was underneath the

13 10,000-dollar limit.  Didn't want a form filled out.

14 Find him guilty.

15          You know, Mr. Commonwealth, Detective, I

16 think he failed to tell the jury about some other

17 instances that occurred.  How about back in 1999?  And

18 all of us had the opportunity to live through 1999 and a

19 little event in the history of our world and of our

20 country, a little event called Y2K.

21          What happened in Y2K?  Well, for all of you

22 that are looking back -- and we can draw on our common

23 understanding when you walked through those doors, you

24 can use your common sense to bring into this courtroom.

25 And I submit to you, you should and we need you to.

Case 5:13-cv-02688-WLO-PT Document 2-3 Filed 11/19/13 Page 58 of 99

1    Common sense, common understanding.

2              What happened back at Y2K?  The world was

3    worried.  Our whole country was worried.  The whole

4    banking system, the whole computer system, everybody was

5    worried about a meltdown come that midnight in 2000.  You

6    folks were all there.  You lived through it.  We were all

7    worried.

8              Many people in our society went and pulled

9    money out of the bank.  Is that a crime?  Well, before

10   you came in here yesterday or two days ago, you probably

11   didn't think so, but if you happen to have a lot of cash

12   in the bank and you're pulling it out under $9,000 -- or

13   under $10,000 because you don't want to fill out a form

14   because you don't know what the forms are, you're

15   distrustful of the government, well, that's a problem,

16   except in this case, Levi Stoltzfoos did that back in

17   1999 and nobody in the world cared.  Then our system

18   didn't fall apart.

19             America, we made it through 2000.  We made it

20   through Y2K.  Computers didn't shut down.  The whole

21   world didn't stop.  Good to go.  Now we go back to

22   business as usual waiting for the next catastrophe in

23   history.

24             Levi Stoltzfoos, if you caught this, when he

25   wants to buy something, he puts money in the bank.  So in

1   2001, he did some transactions again and the government,

2   as the government told you in their case, did they tell

3   you about the fact that he put structured things in in

4   2001?  Nope, didn't do it.

5           Now, we brought that up why?  Because, again,

6   he did it in 1999, he did it in 2001 and he came in in

7   2006 and did it again.  What's the difference?  What

8   happened?  Well, not to talk about world history and do

9   a -- my mouth runs very fast; I have to constantly

10  lubricate it.

11          But there's another event that happened and

12  Lisa Krick took the stand and told you about it.

13  Horrible day in American history come to be referred to

14  as 9/11.  September 11 in 2001.  And on that date, we all

15  know what happened.  And I'm not going to go into that,

16  but on that date our country made a dramatic shift.  And

17  now the focus of so many things turned towards terrorist

18  activity, turned towards those kind of issues to try to

19  make sure our country is safe, including creating the

20  Patriot Act.  And now the heightened security goes into

21  looking at financial affairs.

22          Do we want fellows like Agent Licklider going

23  after those kind of things?  Yes, we do.  Is he a little

24  uptight?  He might be.  You saw him on the stand, but God

25  Bless his heart.  We want him to be like that.  We want

1    him being a highly motivated individual.  We want him

2    sifting through those records.  We want him out there on

3    the front line looking for those folks that can bring

4    damage to our country.

5            As Lisa Krick pointed out to you, when the

6    banking system sees suspicious activity, they begin their

7    investigation and they call on law enforcement to start

8    looking into it.  Now, what does that cause one to do?

9    We're hot on the trail.  Let's find out where this goes.

10   Sift this back through.  Let's find out.  Where does this

11   take us?

12           Are we going to find an international drug

13   dealer over here or are we going to find somebody who is

14   dealing in firearms or are we going to find a bomber?  Or

15   is our investigation going to take us to Leola,

16   Pennsylvania?  Is our investigation going to take us to

17   Levi Stoltzfoos, who has lived in our community all his

18   life, who has grown up Amish, who has cash on hand?

19           We certainly want our government to do the

20   proper investigation.  We certainly want our government

21   to do all those kinds of things.  We want those laws to

22   be in place and protect us.  But when the black-letter

23   law, when the people that are put out there to enforce

24   these things come back and then you see this kind of

25   conduct, do we punish this like we do these other things?

```
 1              What we have here today is this:  The man put
 2    transactions in under the limit.  He did it many times.
 3    He's distrustful.  That's the act that he did.  The act.
 4    But what you folks are called to do is to look at what's
 5    going on in his head -- that's what you folks do --
 6    because in order to have a crime, you need an act, and
 7    then you need a corresponding mens rea it's called, or a
 8    criminal mind or a guilty mind.  You need those two
 9    components to convict someone of a crime.  The act was
10    done and the government comes chasing after.
11              Now, we've seen the act.  We look at it and
12    we look at it and go, wait a second.  I don't think
13    that's what we're looking for.  I don't think that's what
14    we did the Patriot Act for.  Maybe we were looking for
15    someone else in the Patriot Act.  I just made a mess here
16    on one of our exhibits.
17              If that's what we're looking for, you folks
18    as the jury -- that's why juries have been created, so if
19    the government comes down too hard on one of us, on one
20    of our citizens, you folks are the final line.  And you
21    folks can say whoa, whoa, wait a second here.  Now, wait.
22    This doesn't rise to the level of a crime.  This is not
23    what we're here to do.  We're going to seize everything
24    this man has, put his liberty in jeopardy over this.
25              Folks, the statement, what do we know about
```

1   Levi Stoltzfoos?  What have you folks seen throughout

2   this trial?  Well, I submit to you, you heard about the

3   statement that he made to the police.  He went in and

4   made a statement.  And, of course, the Commonwealth's

5   going to talk about that, we'll talk about that.

6          What did he say?  Levi Stoltzfoos, eighth

7   grade education, living in Leola, working at numerous

8   furniture factories, furniture places, working at King's

9   Construction.  What do we know about what's going on

10  inside his mind?  What do we know?

11         Well, he says this:  I have worked for more

12  than 22 years.  First line.  I had money in my personal

13  safe.  I decided to put money back in bank and have one

14  year's CD opened by 4/23/06.

15         See what we do?  Put the money in, get a CD,

16  interest on that kind of money, interest, take out our

17  interest, go buy our truck.  We talked about that.

18         I asked one of the witnesses, what happens if

19  we put the money in and do that?  If we create interest,

20  is that a taxable item?  People find out about that,

21  mm-hmm, bank will issue a statement at the end of the

22  year.

23         You get interest money, bank's going to know

24  about that.  He wants to put it in, get his interest.  I

25  needed money.  I needed the money so I could buy new

1    truck this fall.

2            By the way, that's what he says.  I needed

3    the money so I could buy new truck this fall.  New is

4    spelled wrong.  I knew when you withdraw 10,000 cash or

5    deposit $10,000 cash, a form has to be filled out.  I

6    found this out in fall of 1999 before the new millennium.

7    Before the new millennium, spelled wrong.

8            I don't want no part of government

9    investigation or harassment.  No questions will be

10   answered.  If you have any questions, you can write to

11   me.  You did not want to talk to me on phone.  I'm not

12   going to be a part of cross-examination.

13           Now, here's what we find out about Levi's

14   understanding of the law here, the next few lines.  What

15   right do you have to steal/take my money?  He's talking

16   with the government.  He's talking.  You took my money.

17   What right do you have to my money?  When will I get it

18   back?  Will hiring a lawyer help me?  How much interest

19   am I going to get?  You guys took my money.  How much

20   interest are you going to give me?  Will you notify banks

21   that investigation is a false alarm?

22           Can we expect that of our government?  Well,

23   you folks know the political realities of our world.

24   We're tough going, the Attorney General's Office, and

25   when we come down on somebody, we're coming down.

1  Well, that's all well and good.  We want our

2  government doing that.  We want our government coming

3  down on those that are out there doing something wrong,

4  but that's not what we have here in this case.  I submit

5  to you we do not.  We do not.

6  The government has the burden in this case.

7  The government carries the burden to show you beyond a

8  reasonable doubt.  We have no burden at all.  In fact,

9  Levi does not have to take the stand.  He doesn't have to

10  take the stand at all.  I encouraged him not to take the

11  stand.  Why?  Well, what else do we know about Levi?

12  Folks, you're going to see these things.

13  These exhibits will go back with you.  The closet we were

14  talking about, Levi Stoltzfoos' closet, this is his

15  closet in his house.

16  Now, I talked about bringing your common

17  understanding into this courtroom.  As you look at that

18  picture, as we see that picture, order.  Perfectly placed

19  in there.  Set up.  Discipline.  That's how his closet is

20  set up.

21  Is Levi Stoltzfoos a bit different?  Well,

22  some fellows from the Attorney General's Office did a

23  search warrant on his house.  And when they stomped

24  through the Stoltzfoos' house, as they stomped through,

25  digging holes in the basement looking for a mold smell,

Case 13-cv-02884-WLO-PT Document 2-3 Filed 11/19/13 Page 65 of 99

1   why did this catch their eye?  Because the money that had

2   been brought into the banks was musty and moldy, like it

3   had been sitting around someplace.  Maybe in a safe at

4   somebody's house for a long period of time.  Maybe since,

5   say, back in 1999.  That Y2K thing.  Money been sitting

6   around for a very long time.

7            And as they stomped through, they're picking

8   on Levi.  I submit to you that's a conclusion you can

9   draw.  Ho, ho, ho.  Put on the hat.  Ho, ho, ho.  Look at

10  this goofy guy the way he's got his stuff set up in here,

11  the way he's got his closets and stuff.  Not funny.  Not

12  funny at all, because over here it's just a job, but over

13  here it's a life.

14           The Commonwealth has to show to you the act

15  and the mens rea, the guilty mind.  I submit to you they

16  have not shown you that.  Not at all.

17           What is a guilty mind?  Four different

18  standards you can have.

19           Anything I say about the law, the Judge is

20  the final arbiter of that.  I'm merely bringing it up to

21  you.  Doesn't count.  It's what he says.

22           I submit you're going to hear this:  There

23  are four levels of culpability in criminal law.  One, an

24  intentional act; two, a knowing act; three, a reckless

25  act; four, a negligent act.

1           In this particular case, the only way the

2    Commonwealth wins in this case, the only way you folks

3    can find this man guilty under this is if they show you

4    an intentional act, a knowing act or a reckless act.

5    That's what they've got to show you.  It's their burden.

6    They have to show you that beyond a reasonable doubt.  I

7    submit to you they have not shown you that.

8           Is he somewhat negligent?  Could we find him

9    to be somewhat negligent?  Should he have known?  Should

10   he have known?  Maybe he should've, but they didn't show

11   it and they have to show you.

12          What do we know about what we were shown?

13   What did we hear?  What we heard in this case is as

14   follows:  I asked every single one of these bank

15   examiners -- these tellers -- I kept screwing up the

16   whole way through -- when they took the stand, when you

17   had him fill out the form, did you tell him how to do it?

18   Did you give him any leeway?  How would somebody know if

19   someone's already been doing this for the last year,

20   1999, 2001?  How would you know?  Did anybody here know?

21   How would you know?

22          Well, some of them said, we can't do that.

23   It would be a violation of the law.

24          Well, we had at least some testimony from the

25   one young lady.  Let's see.  What was her name?  Karen

1    Buch.  Karen Buch didn't like the way he filled out his

2    address.  He's giving a P.O. Box.  What did Karen Buch

3    do?  Mr. Stoltzfoos, you can't do that.  I have to have a

4    proper address, and he gave his parents' address.

5              So can we make a change?  Can someone who you

6    put all your trust in, all your money in, can you expect

7    at least that level?  Can we expect something from them?

8    Well, we certainly got it out of Karen Buch.

9              What did Lisa Krick say?  Very poised, very

10   proper.  I know all about banking.  And here's the deal:

11   They can't do that.  By law, they can't assist in making

12   an improper transaction.  True, except for one little

13   thing.  When they see these things coming in, when they

14   see these accounts being done $9,000 at a time, there's a

15   pamphlet we could just simply hand Mr. Stoltzfoos.  Grows

16   up Amish, eighth grade education.  We want his money.

17   Here's a pamphlet.  Make sure you double-check that.

18             Maybe he checks it at the house and goes,

19   that's a crime?  I didn't know it was a crime.  I did it

20   in 1999.  I did it in 2001.  Now they're going to take

21   all my money.

22             Folks, it's in your hands.  Levi Stoltzfoos'

23   fate is in your hands.  You folks are the final judge, if

24   you will, of the facts.  Take a look at this case.

25   There's no way -- based on the evidence that's already

1   into this case, there's no way you can find this man

2   guilty beyond a reasonable doubt of committing a crime.

3           Folks, I'm going to ask you to go back there

4   and deliberate.  Fight for him.  Don't give up.  Find

5   this man not guilty.  Thank you.

6           Thank you, Your Honor.

7           MR. PORTMAN:  May I, Your Honor?

8           THE COURT:  Mr. Portman.

9           MR. PORTMAN:  Court's indulgence for a

10  second.

11          Can all the jurors see that?

12          Your Honor, does that block your --

13          THE COURT:  That's fine.

14          MR. PORTMAN:  Good morning, ladies and

15  gentlemen.  I want to thank you first for paying

16  attention to this entire trial.  Like Mr. Conrad, I

17  noticed you were all attentive, taking notes, paying

18  attention to the testimony.

19          One of the things you are aware of, that the

20  only evidence presented in this case is that which came

21  from the witness box or which was stipulated to by the

22  defense and the Commonwealth.  One of the things I want

23  to address first is the issue of Mr. Stoltzfoos'

24  relationship with the Amish community or non-relationship

25  with the Amish community.

1          One of the things we know from his mother is

2     that approximately ten years ago, he left the Amish

3     community.  And he had an eighth grade education and one

4     year of technical training.  It doesn't necessarily

5     equate that the man is stupid or dumb.  It means he has

6     an eighth grade education.  He had a year of technical

7     training.

8          You also heard through testimony that --

9     through his mother, he worked and he's been working.  So

10    we know he's capable of many things.  One of those things

11    is amassing 540-some thousand dollars prior to January

12    6th of 2006 and deciding to put that money into the

13    banking system through 58 structured transactions.

14         We also know that as of 1999, Levi Stoltzfoos

15    knew that if he deposited or withdrew cash in the amount

16    of $10,000 -- in excess of $10,000, that some type of

17    form would have to be filled out.  You heard from various

18    members of the banking community that testified that form

19    is called a cash transaction report.

20         You heard from Lisa Krick and some of the

21    other witnesses for the Commonwealth that in excess

22    of $10,000 in a cash deposit or withdrawal, the bank must

23    fill out a cash transaction report.  Anything less than

24    that, it's discretionary.  He -- excuse me.  So we have

25    prior knowledge of the cash transaction report as early

1    as 1999, as alluded to by Mr. Conrad.

2              Why as of January 6th of 2006 did he decide

3    to put this money in the bank -- banking system, do this

4    through the 58 transactions?  That's not before us.  We

5    don't know.  It's not my burden to explain to you why he

6    did it.  All I have to show is that he did it and that he

7    did it for a particular reason, and that reason is to

8    avoid the cash transaction reporting requirement under

9    the Bank Secrecy Act and the Patriot Act that's

10   applicable in this case.

11             So Mr. Stoltzfoos, on January 6th of 2006,

12   approaches the Bank of Lancaster County and deposits

13   $10,000 in cash.  Subsequent to that, he makes 57 other

14   transactions over a six-week period and deposits

15   $542,000.

16             As you can see from the exhibit that I have

17   up here, it's a chart.  It helps me understand all the

18   transactions.  If we start with, of course, the Bank of

19   Lancaster County, we can see the various transactions;

20   10,000, 9,900, 9,900, 9,500, 9,000.  Similar in all of

21   the other nine banks.  He had a particular scheme in

22   mind, and that was to avoid a cash transaction reporting

23   requirement.

24             He may not like it, but he's not above the

25   law.  That reporting requirement applies to everyone who

1     deposits more than $10,000 in cash or withdraws more

2     than $10,000 in cash.

3          Also, as you heard from Miss Krick, if their

4     internal controls indicate there's some type of activity

5     that they are suspicious of, it raises a red flag.  It

6     sets off some bells and whistles and they have to look at

7     it.  And if they think it's suspicious, they must report

8     it.

9          The burden isn't on the customer, the burden

10     is on the bank.  If the bank doesn't do it, the bank is

11     in trouble.  If they had let Mr. Stoltzfoos do this, if

12     each of these ten banks had done that, let him get away

13     with it, they would be in trouble, as you heard from

14     Miss Krick, either criminally or civilly.  So they had an

15     obligation to do it and they did it.

16          Mr. Stoltzfoos doesn't like it.  He's not

17     above the law.  The law applies to him in this case

18     because he did 58 transactions, causing the banks -- or

19     attempting to cause the banks to avoid having to report

20     that cash transaction report to the federal government.

21          You heard from Mr. Conrad that Mr. Stoltzfoos

22     is afraid of the government.  He's distrustful of the

23     government.  That may be.  There's no evidence of that in

24     this case.  You didn't hear that from the witness stand.

25     No one testified that the Commonwealth -- that he's

1   afraid of the government or distrustful of the

2   government.  You didn't hear his mother say that.

3             When I initially started in my opening, I

4   indicated to you this is a fairly simple case, and it is.

5   And, again, I can reference the items of the 58 cash

6   transactions; $10,000, $9,900, $9,000, $8,700, $6,600,

7   $5,300.  Various times those deposits were made in the

8   ten banks, 58 separate occasions over a six-week period.

9             Nineteen ninety-nine, whatever happened in

10  1999 happened.  That's the inference given to you by

11  Mr. Conrad, that whatever he did, did not come to the

12  attention of law enforcement or law enforcement ignored

13  it.  That happens.  Law enforcement doesn't catch every

14  crime.  Law enforcement doesn't investigate every

15  potential crime.

16            Two thousand one, same thing; an inference

17  that Mr. Stoltzfoos made some cash structuring.  Nothing

18  happened with the law enforcement community, but in 2006

19  we have a tremendous event here.  We have 58 transactions

20  within a six-week period.  $542,000.  That comes to the

21  attention of law enforcement.  And what happened when it

22  came to the attention of law enforcement?

23  Agent Licklider investigated it and we're here today.

24            What I'm going to ask you is to apply the

25  facts of this case, as I've just reviewed them with you,

1    to the law given by the Judge.  You took an oath at the

2    beginning of your service to abide by the instructions of

3    the Judge.  If you agree with the law, you abide by the

4    Judge.  If you disagree with the law, you must abide by

5    the Judge's instructions.

6            At the conclusion of your deliberations, I

7    ask you to find the defendant guilty of all charges.

8    Thank you.

9            THE COURT:  Just take the white part off and

10   you can step aside.

11           Ladies and gentlemen, at this point in time,

12   there is only one part of the trial left, and that is the

13   Judge's charge to the jury relative to the law.  We will

14   take up some matters relative to that charge with counsel

15   over the next number of minutes.

16           At this point in time, I'm going to have the

17   jury taken back to the jury lounge.  We're going to be

18   doing our lunch early.  I want everybody back to

19   reassemble and start at 1:00 instead of 1:30, so you're

20   all going to start early.  But I want everybody back by

21   quarter of one so that we can start promptly with the

22   charge at 1:00.

23           Once I have finished with my charge to the

24   jury -- and that means basically reading the law to the

25   jury -- then you will have the opportunity to go back

1    into the jury lounge and deliberate relative to this

2    matter.

3              Because the law does not permit you to take

4    notes on the Judge's charge, Mr. Battisti will be

5    gathering up all of your notes and they will not be back

6    on your seat when you come back to begin at 1:00.  But

7    depending on which 12 are actually in the jury room, you

8    will receive those notes as well as some of the presented

9    evidence in the jury room for your deliberations, so if

10   you could all pack up your notes and leave them on your

11   seats for now.  Again, they will be returned to you at

12   the proper point for deliberations.

13             Please remember the admonishment I've given

14   you each time we broke, and that is you are to wear those

15   jury badges in a conspicuous place, especially while

16   you're around the courthouse and its environs.  You're to

17   avoid reading any newspaper articles or listening to

18   anything on the radio or television.  You're not to

19   communicate with each other about this case until you

20   have been sent back to the jury room for deliberations.

21             So at this point, we'll break for the

22   morning.  Again, please, in the jury room by 12:45 so we

23   can start promptly at 1:00.

24             (The jury left the courtroom.)

25             THE COURT:  If I may have counsel up front

1    just for a query before we split for lunch.

2                (A sidebar discussion was held off the

3    record.)

4                (The lunch recess was taken.)

5                A F T E R N O O N   S E S S I O N

6                     (1:05 p.m.)

7                THE COURT:  May I have counsel approach.

8    Maybe we can do everything up here, but, Susan, you can

9    stay where you are there.

10               MR. CONRAD:  Move these exhibits around here,

11   if we could.

12               THE COURT:  I may have all of the exhibits.

13               Over lunch my law clerk gave me a message or

14   two from Mr. Conrad regarding specific things for charge.

15   Can you hear?  If you will just speak to those, I'd

16   appreciate it.

17               MR. CONRAD:  Your Honor, I had called with

18   regard to requesting a jury instruction for mistake of

19   fact -- or, I'm sorry, ignorance or mistake of fact under

20   8.304.

21               THE COURT:  Did you want to respond, Counsel?

22               MR. PORTMAN:  Yes, Your Honor.  I don't

23   believe, based on the testimony before the Court, that

24   there is an issue of ignorance or mistake.  Counsel in

25   closing arguments acknowledged that the defendant

1    intentionally acted in structuring deposits and that he

2    knew of the statutory requirement or purpose of the

3    statutory requirement for the cash transaction report as

4    early as 1999.  I don't think there's any ignorance or

5    mistake involved in these charges or the offenses.

6         THE COURT:  It's the Court's opinion that the

7    mistake of law is what's at issue here and not

8    ignorance -- or mistake of law and not ignorance from

9    mistake of fact, and, therefore, the charge which is on

10   ignorance or mistake of fact will not be read into the

11   record as the claim of ignorance of law is an

12   inappropriate claim for a defense.

13        MR. CONRAD:  Your Honor, the other motion we

14   would make at this time would be that under 5111, in

15   reviewing it under subsection 3, that the word to avoid

16   intrinsically implies an intent.  I, obviously, argued in

17   our pretrial motions that at a minimum, it should be

18   reckless, which would -- then the catchall would be

19   intentional, knowingly and reckless.  I only bring to the

20   Court's attention and argue, just as a last resort, that

21   to avoid implies, in and of itself, an intent in the word

22   itself.

23        THE COURT:  In other words, relative to

24   culpability, you're requesting the Court only to read the

25   definition of intentional and not the definition of

1    knowing or reckless?  Is that my understanding of your

2    request?

3                MR. CONRAD:  Yes, sir.  Yes, sir.

4                MR. PORTMAN:  All I ask is that the Court

5    read intentionally and knowingly, as earlier in these

6    proceedings requested.  The charge as to recklessly,

7    that's been withdrawn and I'd ask for intentionally

8    and -- based on the evidence presented during the case

9    both by the Commonwealth and the defense, intentionally

10   and knowingly was presented to the jury and ask that you

11   charge on both of those.

12               MR. CONRAD:  Before the Court responds -- I'm

13   sorry, and I want to apologize to the Court right

14   now -- I'm actually going to withdraw it.  I've already

15   argued it to the jury myself.  I'm going to ask the Court

16   to withdraw my motion as to that request.

17               THE COURT:  My intent was to indicate

18   culpability as I did to the jury after the opening

19   comments.  And because of that, I think it would be

20   appropriate to read all three.  That's what I've told

21   them.  How they choose to apply it, of course, is theirs,

22   but I've already indicated that.  I believe that's a

23   correct statement of the law under 3028, I believe

24   it's C.

25               MR. PORTMAN:  I would agree, Your Honor.

1      THE COURT: And I think it's appropriate at

2  this point that I should read each of those.

3      MR. CONRAD: I'll withdraw that, Your Honor.

4  If I could just make a few motions just to cover the

5  record if I could, sir.

6      Just briefly, under -- I'm sorry. Just as a

7  number of motions for judgment of acquittal with regard

8  to a challenge to the weight of the evidence, simply move

9  that the Commonwealth failed as a matter of law to

10 present sufficient evidence to go to the jury based on

11 the weight of the evidence.

12     MR. PORTMAN: Your Honor, I believe the

13 Commonwealth has met its burden and presented sufficient

14 evidence to overcome a demur at this time.

15     THE COURT: The demur relative to that issue

16 is denied.

17     MR. CONRAD: Same motion, Your Honor, with

18 regard to sufficiency.

19     MR. PORTMAN: Same argument, Your Honor.

20     THE COURT: And the ruling of the Court

21 relative to sufficiency is that the demur motion on

22 behalf of the defense is also denied relative to that

23 motion.

24     MR. CONRAD: Yes, sir. Thank you.

25     THE COURT: Now, this is the verdict slip.

1  I'm going to give each of you an opportunity every page

2  after that and it took all of lunch to put it together.

3          MR. CONRAD:  It's the same all the way

4  through, Your Honor?

5          THE COURT:  It's the same all the way

6  through.  What I have indicated is the very brief

7  introduction, the same headline to each.

8          MR. PORTMAN:  With the date.

9          THE COURT:  Then the date, the amount and the

10 bank, and then guilty or not guilty for each.  So they

11 will have to make a determination on each of the 58

12 counts individually.

13         MR. CONRAD:  Your Honor, defense's first

14 objection would be, first of all, I'm going to object to

15 the title.  The title itself, in taking a look at some of

16 the statutory construction under Title 18, under 104 with

17 regard to the purposes of criminal law -- I'll wait for

18 the Court to get there.  I'm sorry.  Title 18, section

19 104.

20         THE COURT:  Very well.

21         MR. CONRAD:  Under section 104, the general

22 purposes of this title, that being the Crimes Code

23 itself, under number three, the safeguard offenders

24 against excessive and disproportionate or arbitrary

25 punishment.  And, Your Honor, as part of our -- what our

1    preliminary case arguing it will -- our argument is that

2    this statute is unconstitutional on its face.

3              Simply because the conduct that it seeks to

4    prohibit, unlawful activities or proceeds and unlawful

5    activities, are not encompassed at all in this section 3.

6    So already on its face we've argued that it's

7    unconstitutional.  The Court has found it to be

8    constitutional for purposes of this trial.  And because

9    the Court has so found, then it gives rise to that if the

10   Commonwealth came up with that title, then that's what it

11   is.

12             Additionally, number four, to give fair

13   warning of the nature of the conduct declared to

14   constitute an offense and of the sentences that may be

15   imposed or on a conviction or of an offense.  If we have

16   a gentleman that steps up before the Court to enter a

17   plea, a PV or whatever it happens to be, the Court will

18   always read the subsection and the title of the offense

19   to make sure it's clear as to what the person's being

20   charged with.

21             Additionally -- and I have some case law

22   here.  I'll hand this up to the Court.  I've already

23   provided a copy to the defense counsel.  This is

24   Commonwealth versus Barnhardt.  This particular case

25   discusses 5111, this particular crime itself.  This is a

1    -- I think it was a 1998 case.

2             I'm going to direct the Court to Page 4, the

3    bottom -- the bottom, last paragraph and the last

4    sentence on Page 4, a Court cannot disregard clear and

5    unambiguous statutory language under the pretext of

6    pursuing the spirit of the statutes.  And, Your Honor, if

7    I may be so bold -- please forgive me, Your Honor -- it

8    appears as though the court is trying to seek the spirit

9    here and that's not the court's purview.

10             The black letter law is that they charged him

11    in the charging document with dealing in proceeds of

12    unlawful activity, and it's listed 58 times in the

13    Information.  It would be my argument, Your Honor, that

14    this jury should have those words before it as it

15    considers this.

16             So as to just the title, Your Honor, that

17    would be my argument.  I would have another argument with

18    regard to the additional wording.

19             MR. PORTMAN:  Your Honor, the statute -- the

20    case law that Counsel has referenced applies to the prior

21    section 5111.  It subsequently was amended and the

22    sections discussed in that opinion are no longer

23    applicable to the current 5111 to which Mr. Stoltzfoos

24    was charged.  We're not dealing with any section

25    5111(a)(2)(1).  We are dealing currently with 5111(a)(3).

```
 1              And since counsel brought up the heading of
 2     the statute, I refer the Court to 5108, which is titled
 3     compounding.  And if you read the offense defined under
 4     5108(a), a person commits a misdemeanor of the second
 5     degree if he accepts or agrees to accept any peculiar
 6     benefit in consideration of refraining from reporting to
 7     law enforcement authorities the commission or suspected
 8     commission of any offense or information relating to an
 9     offense.  Nowhere in that definition is the word
10     compounding used.  Same argument with 5111.
11              The heading of the section is not an element
12     of the offense.  If that was the case, then we would have
13     to, in our case in chief, have presented evidence of
14     dealing in proceeds of unlawful activities.
15              It was agreed in chambers that the source of
16     the funds in this case were not at issue.  Counsel is now
17     trying to make them an issue and I would have addressed
18     those in our case in chief if he's going to bring in
19     unlawful activities and the proceeds.  Therefore, it was
20     expressly excluded from our case in chief with agreement
21     of counsel we were not going in that direction because we
22     were charging specifically dealing in proceeds of
23     unlawful activity, which would bring in the offenses that
24     required -- that are predicates to charging under (a)(1)
25     or (a)(2).
```

SUSAN A. MILTON, OFFICIAL COURT REPORTER

1          THE COURT:  The clear and unambiguous

2     statutory language for which this defendant was charged

3     is the language of 5111(a)(3).  To add the unlawful

4     activity, which I have specifically ruled that the

5     Commonwealth may not bring to the Court's -- I'm sorry,

6     to the jury's attention during trial or any proposed

7     unlawful activities, in using that in the title of each

8     of the items in the verdict slip brings back into what I

9     have eliminated the Commonwealth from bringing to the

10    attention of the jury.

11          I think the title is appropriate because he

12    is not charged with any unlawful activity.  There's been

13    no testimony of any unlawful activity and he is only

14    charged with the statutory obligation that brings about

15    the avoiding a transaction reporting requirement.

16          And you had another one?

17          MR. CONRAD:  Yes, Your Honor.  And I --

18    obviously we accept the Court's ruling; however, Your

19    Honor, as I take a look -- and I know your secretary

20    would have done much work on this.  However, as I take a

21    look at the wording that is now before us on the verdict

22    slip and just by way of example for the record here, that

23    as the Court has indicated, the heading is going to be in

24    bold letters, avoiding transaction reporting

25    requirements, rather than the dealing in proceeds of

1    unlawful activities.

2          Accepting the Court's ruling on that, the

3    next line then reads that on January 6th or 7th, 2006,

4    deposited cash of $9,000 into the Bank of Lancaster.

5    Your Honor, that wording, what the defense would request

6    would be simply that it indicate January 7th, Bank of

7    Lancaster, guilty or not guilty.

8          What this essentially does, if a juror looks

9    at this -- there's no requirement of culpability in there

10    whatsoever.  If they just look at this and say on

11    January 7th, deposited cash, $9,000, into the bank, it

12    almost takes away everything, all culpability

13    requirements.

14          So I would simply argue, Your Honor, that all

15    the slip should indicate is as to what date and what bank

16    and nothing else.  I think they would look at that, Your

17    Honor, and feel compelled to go with that.

18          MR. PORTMAN:  Your Honor, although the

19    statute does not require a specific amount, the entirety

20    of the Commonwealth's case was based on structuring and

21    the triggering or not triggering of a cash transaction

22    report under federal or state law.  The amounts at issue

23    are definitely pertinent to the triggering -- for the

24    defendant's avoidance of triggering a cash transaction

25    report.  I believe that information is relevant to the

```
 1    jury deliberations as to whether or not on each specific
 2    event, it was an attempt by the defendant to avoid -- or
 3    have the bank avoid a cash transaction reporting
 4    requirement.
 5                MR. CONRAD:  Counsel, you still want the
 6    $9,000 in?
 7                MR. PORTMAN:  I would want the applicable
 8    amount for each transaction part of the jury slip.
 9                MR. CONRAD:  Date and amount?
10                MR. PORTMAN:  Date and amount.
11                MR. CONRAD:  Bank?
12                MR. PORTMAN:  Bank, yes.
13                THE COURT:  The language the Court used in
14    each of these Counts 1 through 58, that on a date,
15    deposited cash of a specific amount into a certain bank
16    is not only relevant to the evidence presented by the
17    Commonwealth, but also that which has been argued and
18    admitted to by the defense.  I don't think there is any
19    issue that on that date, that amount of cash was
20    deposited in that particular bank.  The decision relative
21    to guilty or not guilty is whether he did it for the
22    purpose of avoiding a transaction reporting requirement.
23                All of the material that is under the title
24    has clearly been conceded to by defense and, therefore,
25    I'm using the language to each of those concessions and
```

1    the evidence presented.

2              MR. CONRAD:  Clearly, however, Your Honor, we

3    did not admit to the conduct level.  We did not --

4              THE COURT:  We wouldn't be having a trial.

5              MR. CONRAD:  Yes, sir, exactly.  But I fear

6    that almost makes it look as though we have a strict

7    liability offense to the jurors.  If they just look at

8    that, it lets --

9              THE COURT:  You're taking out of context the

10   fact that the Court is going to be reading the

11   instructions, which will probably last approximately an

12   hour until I get through the instructions as to this.

13              I'm going to take a five-minute recess.

14              MR. PORTMAN:  Thank you, Your Honor.

15              (A recess was taken.)

16              THE COURT:  For the record, I acknowledge the

17   objections of defense counsel relative to the title and

18   the language used prior to the guilty or not guilty.

19   They may be noted for the record; however, I'm overruling

20   his objection and this will be the guilty plea -- I'm

21   sorry, the verdict slip of guilty or not guilty that will

22   go out with the jury.

23              Any further proceedings before we bring the

24   jury in for my charge?

25              MR. CONRAD:  No, Your Honor.

1        MR. PORTMAN:  No, Your Honor.

2        THE COURT:  Would you please.

3        (The jury entered the courtroom.)

4        THE COURT:  Ladies and gentlemen of the jury,

5   if at any time while I'm giving you my instructions you

6   are having difficulty hearing me, please just raise your

7   hand and hopefully that will help me raise my voice.

8        Although offenses and charges are different

9   in every case, the law is constant and similar, if not

10  exactly the same, for each case.  This means I will be

11  reading quite a bit to you from prepared forms.  This is

12  done so that we, as Judges, are consistent with what

13  jurors are told from the bench.

14       Members of the jury, now that all of the

15  evidence has been presented and the attorneys for both

16  sides have made their closing arguments, it becomes my

17  duty to instruct you in the law which you will apply to

18  the facts as you find them in reaching your verdict.  In

19  doing this, I am going to be reading a written charge, as

20  almost all Judges do, to make certain that what I'm

21  telling you is in accordance with the law and is standard

22  and uniform.

23       I advise you of that because there is a very

24  typical and understandable tendency not to pay attention

25  to someone who is reading from prepared notes and text.

1    I ask you to pay close attention even though I will be

2    reading to you.

3              What I am about to say to you provides you

4    with tools that you will need to make your decision in

5    this case.  If you think of it in those terms, I think

6    you'll understand the importance of what I'm about to say

7    and the necessity for you to pay attention to what I have

8    to say.

9              As I have said, you will apply only the law

10   in which I instruct you.  You will not apply any other

11   law which any of you know or think you know.  If you wish

12   instructions in the law in addition to those given to you

13   by me or if you wish clarification to those instructions,

14   then you may, through your foreman or forelady, send an

15   appropriate request.

16             As I mentioned to you at the outset, it is my

17   responsibility to decide all questions of law and you

18   must accept and follow my rulings and instructions on

19   matters of law.  But I am not the judge of the facts and

20   it is not for me to decide what are the true facts

21   concerning the charges against the defendant.  You, as

22   the jury, are the sole and only judges of the facts.  It

23   is your responsibility to weigh the evidence, and based

24   on that evidence and the logical inferences which flow

25   from that evidence to find the facts, to apply the rules

1    of law which I give to you to the facts as you find them

2    and then decide whether this defendant has or has not

3    been proven guilty of any charges.

4           In determining the facts, you are to consider

5    only the evidence which has been presented in court and

6    the logical inferences which derive from that evidence.

7    You are not to rely on supposition or guess or any

8    matters that are not in evidence.  You should not regard

9    as true any evidence which you find to be not credible

10   even if it is uncontradicted.  Your determination of the

11   facts should not be based on empathy for or prejudice

12   against the defendant or of the crime, nor on which

13   attorney made the better speech nor on which attorney you

14   like better.

15          In my instructions to you, I may refer to

16   some particular evidence.  If I do so, it will be only to

17   a very limited extent if at all.  I certainly don't

18   propose to refer to all of the evidence, but I will leave

19   it to your recollection for as I've said, it's your

20   recollection and yours alone that governs.  You are not

21   bound by my recollection nor by the recollection of

22   counsel in their arguments to you.

23          You're not to conclude that any evidence

24   which I call to your attention or which counsel has

25   called to your attention is the only evidence which you

1    should consider.  It is your responsibility to consider

2    all of the evidence that you believe material in

3    deliberating upon your verdict.

4              A fundamental principle of our system of

5    criminal law is that a defendant is presumed to be

6    innocent.  The mere fact that he was arrested and charged

7    with crimes is not evidence of his guilt.  Furthermore, a

8    defendant is presumed to remain innocent throughout the

9    trial unless and until you conclude, based upon careful

10   and impartial consideration of the evidence, that the

11   Commonwealth has proved him guilty beyond a reasonable

12   doubt of the charges against him.

13             It is not the defendant's burden to prove

14   that he is not guilty.  Instead, it is the Commonwealth

15   always has the burden of proving each and every element

16   of the crimes charged and that the defendant is guilty of

17   those crimes beyond a reasonable doubt.

18             A person accused of a crime is not required

19   to present evidence or to prove anything in his own

20   defense.  If the evidence presented fails to meet the

21   Commonwealth's burden, then your verdict must be not

22   guilty.  On the other hand, if the evidence does prove

23   beyond a reasonable doubt that the defendant is guilty of

24   the crimes charged, then your verdict should be guilty.

25             Although the Commonwealth has the burden of

1  proving the defendant is guilty, this does not mean the

2  Commonwealth must prove its case beyond all doubt or to a

3  mathematical certainty, nor must it demonstrate the

4  complete impossibility of innocence.  A reasonable doubt

5  is a doubt that would cause a reasonably careful and

6  sensible person to refrain or cease from acting upon a

7  matter of highest importance in his or her own affairs or

8  to his or her own interest.

9        A reasonable doubt must fairly arise out of

10  the evidence that was presented or out of the lack of

11  evidence presented with respect to some element of each

12  of the crimes charged.  A reasonable doubt must be a real

13  doubt, not an imagined one.  It cannot be a doubt

14  manufactured to avoid carrying out an unpleasant duty.

15        To summarize, you may not find the defendant

16  guilty based upon mere suspicion of guilt.  The

17  Commonwealth has the burden of proving the defendant

18  guilty beyond a reasonable doubt.

19        If the Commonwealth has met that burden, then

20  the defendant is no longer presumed to be innocent and

21  you should find him guilty.  On the other hand, if the

22  Commonwealth has not met its burden, then you must find

23  him not guilty.

24        You must consider and weigh the testimony of

25  each witness and give it such weight as, in your

1    judgment, it is fairly entitled to receive.  The matter

2    of credibility of witnesses -- that is, whether his or

3    her testimony is believable or accurate in whole or in

4    part -- is solely for your determination.

5              Among some of the factors which might bear on

6    that determination are whether the witness has any

7    interest in the outcome of the case or has friendship or

8    animosity towards other persons concerned in the case;

9    the behavior of the witness on the witness stand and his

10   or her demeanor; his or her manner of testifying and

11   whether he or she shows any bias or prejudice which might

12   color his or her testimony; the accuracy of his or her

13   memory and recollection; his or her ability and

14   opportunity to acquire knowledge of or to observe the

15   matters about which he or she testifies; the consistency

16   or inconsistency of his or her testimony, as well as its

17   reasonableness or unreasonableness in light of all of the

18   other testimony and evidence in the case.

19             The defendant in this case did not take the

20   stand and testify in his own behalf.  He is not required

21   to do so.  He has a constitutional right not to take the

22   stand and testify.

23             He may exercise that right for any one of a

24   number of reasons.  You are not permitted to speculate on

25   these reasons or to draw any inference of guilt or any

1    inference adverse to the defendant by virtue of the fact

2    that he did not testify.  If you were to do so, you would

3    be violating your oath as jurors.

4              As judges of the facts, you are the sole

5    judges of the credibility of witnesses and their

6    testimony.  This means you must judge the truthfulness

7    and accuracy of each witness' testimony and decide

8    whether to believe all, part or none of that testimony.

9              The following are some of the factors that

10   you may and should consider when judging credibility and

11   deciding whether or not to believe testimony:  Was the

12   witness able to see, hear and know the things about which

13   he or she testified?  How well could the witness remember

14   and describe things about which he or she testified?  Was

15   the ability of the witness to see, hear, know, remember

16   or describe those things affected by youth, old age or by

17   any physical, mental or intellectual deficiency?  Did a

18   witness testify in a convincing manner?  How did he or

19   she look, act and speak while testifying?  Was his or her

20   testimony uncertain, confused, self-contradictory or

21   evasive?  Did the witness have any interest in the

22   outcome of the case, bias, prejudice or other motive that

23   might affect his or her testimony?  How well does the

24   testimony of the witness compare with the other evidence

25   in the case, including the testimony of other witnesses?

```
 1              If you believe some or part of the testimony
 2    of a witness to be accurate, consider whether the
 3    inaccuracies casts doubt upon the rest of his or her
 4    testimony.  Let me repeat that because I may have
 5    misspoke.  If you believe some or part of the testimony
 6    of a witness to be inaccurate, consider whether the
 7    inaccuracies casts doubt upon the rest of his or her
 8    testimony.  This may depend upon whether or not he or she
 9    has been inaccurate in an important matter or a minor
10    detail or in any possible explanation.  For example, did
11    the witness make an honest mistake and simply forget, or
12    did he or she deliberately falsify?
13              While you're judging the credibility of each
14    witness, you are likely to be judging the credibility of
15    other witnesses or evidence.  If there is a real
16    irreconcilable conflict, it is up to you to decide which,
17    if any, conflicting testimony or evidence is to be
18    believed.
19              As the sole judges of credibility and fact,
20    you, the jurors, are responsible to give the testimony of
21    every witness and all of the other evidence whatever
22    credibility and weight you think it deserves.  If you
23    find that there were conflicts in the testimony, you, the
24    jury, may have the duty of deciding which testimony to
25    believe, but you should first try to reconcile or fit
```

1  together any conflicts in the testimony if you can fairly

2  do so.

3          Discrepancies in and conflicts between the

4  testimony of different witnesses may or may not cause you

5  to disbelieve some or all of the evidence or testimony.

6  Remember that two or more persons witnessing an incident

7  may see or hear it differently.  Also, it is not uncommon

8  for a witness to be innocently mistaken in his or her own

9  recollection of how something happened.

10         If you cannot reconcile a conflict in the

11  testimony, it is up to you to decide which testimony, if

12  any, to believe and which to reject as not true or

13  inaccurate.  In making this decision, consider whether

14  the conflict involves a matter of importance to your

15  decision in this case or merely some unimportant detail

16  in whether the conflict is brought about by innocent

17  mistake or an intentional falsehood.  You also should

18  keep in mind other factors already discussed which go

19  into deciding whether or not to believe a particular

20  witness.

21         In deciding which of the conflicting

22  testimony you believe, you should not necessarily be

23  swayed by the number of witnesses on either side.  You

24  should consider whether the witness appeared to be biased

25  or unbiased, whether they had an interest or

1    disinterested persons, and you should consider all other

2    factors which go to the reliability of their testimony.

3    The important thing is the quality of testimony of each

4    witness.  You should also consider the extent to which

5    conflicting testimony is supported by other evidence.

6              Evidence in this case is of two different

7    types.  On one hand, there is direct evidence, which is

8    testimony by a witness of his or her own personal

9    knowledge, such as something he or she saw or heard

10   himself or herself.  The other type of evidence is

11   circumstantial evidence, which is testimony about facts

12   that point to the existence of other facts that are in

13   question.

14             Whether or not circumstantial evidence is

15   proof of the other facts in question depends, in part, on

16   the application of common sense and human experience.

17   You should recognize it is sometimes necessary to rely

18   upon circumstantial evidence in criminal cases

19   particularly where the crime is committed in secret.  In

20   deciding whether or not to accept circumstantial evidence

21   as proof of the facts in question, you must be satisfied,

22   first, that the testimony of the witness is truthful and

23   accurate; and, second, that the existence of the facts

24   the witness testifies to leads to the conclusion the

25   facts in question also happened.

Case 5:13-cv-02688-WLO-PT Document 2-3 Filed 11/19/13 Page 97 of 99

1    In this particular case, Levi L. Stoltzfoos

2 is charged under a section which is entitled dealing in

3 proceeds of unlawful activities.   To find the defendant

4 guilty of this offense, you must find that the following

5 elements have been proven beyond a reasonable doubt:

6 First, the defendant conducted a financial transaction.

7 To conduct a financial transaction means to initiate or

8 conclude or participate in initiating or concluding such

9 a transaction.

10    A financial transaction is one involving the

11 movement of funds by wire or other means or involving one

12 or more monetary instruments, that is, coin or

13 currency of the United States or of other country,

14 Travelers checks, personal checks, bank checks, money

15 orders, investment securities in bearer form or otherwise

16 in such form that title thereto passes upon delivery, and

17 negotiable instruments in bearer form or otherwise in

18 such form that title thereto passes upon delivery.

19    A transaction includes a purchase, sale,

20 loan, pledge, gift, transfer, delivery or other

21 disposition with respect to a financial institution.   The

22 term includes a deposit, withdrawal, transfer between

23 accounts, exchange of currency, loan, extension of

24 credit, purchase or sale of any stock, bond, certificate

25 of deposit, or any other monetary instrument and any

1    other payment transfer or delivery by, through or into a

2    financial institution by whatever means affected.

3              A financial institution in these

4    circumstances, as both counsel have indicated, are banks;

5    and there, of course, are ten separate banks which can

6    either be under the insured bank, as defined by the FDIC,

7    commercial bank or trust company.  There are a number of

8    other institutions listed that could be applicable.  They

9    are not in this particular case, so I will not read them

10   into the record.

11             Here the Commonwealth has charged that a

12   financial transaction in which the defendant engaged

13   was 58 separate transactions to ten separate banks in

14   Lancaster County.  Second, the defendant conducted these

15   financial transactions to avoid a transaction reporting

16   requirement under state or federal law.

17             In this case, the Commonwealth alleges that

18   the defendant was required to report the transactions

19   under the following provisions of law:  Under the Federal

20   United States Code, Title 315, 313, reports on domestic

21   coins/currency transactions are found in the Federal Code

22   of Regulations, Title 31, Part 103.22; b, a financial

23   institution, other than casinos.  Each financial

24   institution other than a casino shall file a report of

25   each deposit, withdrawal, exchange or currency or other

1    payment or transfer, by, through or such other financial

2    institution which involves a transaction of currency of

3    more than $10,000.

4              Additionally, the Commonwealth alleges the

5    defendant structured each transaction, in violation of 31

6    U.S.C., which is the United States Code, Section 5324,

7    structuring transactions to evade reporting requirement

8    prohibited, which states, in relevant part, the domestic

9    coin and currency transactions involving financial

10   institutions.  No person shall, for the purpose of

11   evading the reporting requirements of section 5313(a) or

12   5325, or any regulation prescribed under any such

13   section, reporting or recordkeeping requirements imposed

14   by any order issued under section 5326 or the

15   recordkeeping requirements imposed by any regulation

16   prescribed under 21 -- section 21 of the Federal Deposit

17   Insurance Act, or that the person would cause or attempt

18   to cause a domestic financial institution to fail to file

19   such a report; and thirdly, the value of the property

20   involved in the transaction was $542,000.

21             Culpability required under this particular

22   Act is that to establish a material element of this

23   offense, a person acts either intentionally, knowingly or

24   recklessly with regard to the elements of the offense.  A

25   person acts intentionally with respect to a material